# EXHIBIT  C

**Deutsche Bank Alex.Brown**
A Division of Deutsche Bank Securities Inc.
P.O. Box 1776, Baltimore, MD 21203

DEUTSCHE BANK SECURITIES INC
280 PARK AVE
NEW YORK NY 10017-1216
TEL: (212) 454-4459

# CONFIRMATION

MAIL TO:

PAGE: 2 of 3

FOR THE ACCOUNT OF:

ARCANUM EQUITY FUND, LLC
ATTN: TERRY RAWSTERN
13116 HARRIERS PLACE
BRADENTON FL 34212-2964

ARCANUM EQUITY FUND, LLC
ATTN: TERRY RAWSTERN
13116 HARRIERS PLACE
BRADENTON FL 34212-2964

ACCOUNT NUMBER:    N4G-005389
ACCOUNT TYPE:      1

YOUR ACCOUNT EXECUTIVE:
JOSHUA SHOSHAN
A.E. NUMBER:       ENJ

For additional trade confirmations, please see the reverse side.

YOU BOUGHT:

WESTERN UN CORP SUB SER WI INT RATE 5.930%
MATURITY 10/01/2016 DATED 09/29/2006 BOOK ENTRY ONLY
CALLABLE 1ST CPN DTE 04/01/07 CPN PMT SEMI ANNUAL
ON APR 01 AND OCT 01 MOODY RATING A3 S & P RATING A-
FITCH RATING NA

| TRADE DATE: | 07-30-08 |
| PROCESS DATE: | 07-30-08 |
| SETTLEMENT DATE: | 08-04-08 |
| CUSIP NUMBER: | 959802-AB-5 |
| SYMBOL: | WU.GB |

WE CONFIRM THE BELOW TRADE(S), SUBJECT TO THE TERMS AND CONDITIONS SET FORTH ON THIS CONFIRMATION

| TRADE NUMBER | QUANTITY | PRICE | PRINCIPAL | INTEREST | COMMISSION COMM EQUIV | SERVICE CHARGE | TRANS. FEE | NET AMOUNT USD | MKT/ CPTY |
|---|---|---|---|---|---|---|---|---|---|
| P1BNW4 | 7,000,000 | 97.20 | 6,804,000.00 | 141,825.83 | | 4.50 | | 6,945,830.33 | 4/5 |
| YIELD | 6.374% TO | MATURITY | | | | | | | |

| TOTALS | 7,000,000 | | 6,804,000.00 | 141,825.83 | | 4.50 | | 6,945,830.33 | |

THIS CONFIRMATION IS AN ADVICE NOT AN INVOICE. REMITTANCE OR SECURITIES ARE DUE ON OR BEFORE SETTLEMENT DATE.

SEE TERMS AND CONDITIONS AND EXPLANATION OF CODED SYMBOLS RELATING TO THIS CONFIRMATION ON OTHER THAN ROUND LOTS (NORMALLY 100 SHARES) F DIF
APPEARS ABOVE AN ODD-LOT DIFFERENTIAL HAS BEEN CHARGED IN CONNECTION WITH THIS TRANSACTION.THE AMOUNT OF SUCH DIFFERENTIAL WILL BE FURNISHED UPON REQUEST
CLEARING THROUGH PERSHING LLC A SUBSIDIARY OF THE BANK OF NEW YORK MELLON CORPORATION. MEMBER FINRA NYSE, SIPC. ONE PERSHING PLAZA, JERSEY CITY, NJ 07399

Account Overview

**Client Number:** 0304.3864 - 2120 333 01 USD CURRENT ACCOUNT
**Valuation date:** 13.03.2009   Reference currency: USD

| DATE | DESCRIPTION | VALUE DATE | DEBIT | CREDIT | BALANCE |
|------|-------------|------------|-------|--------|---------|
| 16.12.2008 | SALE USD 4 000 000<br>5.93 % NOTES WESTERN UNION CO<br>2006/01-OCT-2016 | 18.12.2008 | | 3'054'612.97 | |



# EXHIBIT  D

Form **1065**

Department of the Treasury
Internal Revenue Service

# U.S. Return of Partnership Income
**For calendar year 2008, or tax year beginning** May 19 , **2008,**
**ending** Dec 31 , **20** 08 .
► **See separate instructions.**

OMB No.1545-0099

**2008**

**A** Principal business activity

Investment Activity

**B** Principal product or service

Investments

**C** Business code number

523900

Use the IRS label. Otherwise, print or type.

Name of partnership

Vestium Equity Fund, LLC

Number, street, and room or suite number. If a P.O. box, see the instructions.

13116 Harriers Place

City or town                    State   ZIP code

Bradenton                       FL  34212

**D** Employer identification number

26-2778554

**E** Date business started

05/19/08

**F** Total assets (see instrs)

$      7,442,295.

**G** Check applicable boxes: **(1)** [X] Initial return **(2)** [ ] Final return **(3)** [ ] Name change **(4)** [ ] Address change **(5)** [ ] Amended return
**(6)** [ ] Technical termination - also check (1) or (2)

**H** Check accounting method: **(1)** [ ] Cash **(2)** [X] Accrual **(3)** [ ] Other (specify) ► _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ............. ► 11

**J** Check if Schedule M-3 attached ............... [ ]

**Caution.** Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | | |
|---|---|---|---|---:|
| **I N C O M E** | **1a** Gross receipts or sales .................................. | 1a | | |
| | **b** Less returns and allowances ........................... | 1b | 1c | |
| | **2** Cost of goods sold (Schedule A, line 8) ......................................... | | 2 | |
| | **3** Gross profit. Subtract line 2 from line 1c ...................................... | | 3 | |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts *(attach statement)* | | 4 | |
| | **5** Net farm profit (loss) *(attach Schedule F (Form 1040))* ............................ | | 5 | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 *(attach Form 4797)* .................. | | 6 | |
| | **7** Other income (loss) *(attach statement)* | | 7 | |
| | **8** **Total income (loss).** Combine lines 3 through 7 ..................................... | | 8 | |
| **D E D U C T I O N S (SEE INSTRUCTIONS FOR LIMITATIONS)** | **9** Salaries and wages (other than to partners) (less employment credits) .............. | | 9 | |
| | **10** Guaranteed payments to partners ............................................... | | 10 | |
| | **11** Repairs and maintenance ....................................................... | | 11 | |
| | **12** Bad debts ..................................................................... | | 12 | |
| | **13** Rent .......................................................................... | | 13 | |
| | **14** Taxes and licenses ............................................................ | | 14 | |
| | **15** Interest ...................................................................... | | 15 | |
| | **16a** Depreciation *(if required, attach Form 4562)* | 16a | | |
| | **b** Less depreciation reported on Schedule A and elsewhere on return | 16b | 16c | |
| | **17** Depletion **(Do not deduct oil and gas depletion.)** ................................. | | 17 | |
| | **18** Retirement plans, etc ......................................................... | | 18 | |
| | **19** Employee benefit programs ..................................................... | | 19 | |
| | **20** Other deductions *(attach statement)* ........................................ *STMT* | | 20 | 379,900. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 .............. | | 21 | 379,900. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 ....................... | | 22 | -379,900. |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member manager) is based on all information of which preparer has any knowledge.

► _____

Signature of general partner or limited liability company member manager

► _____

Date

May the IRS discuss this return with the preparer shown below (see instrs)? [ ] Yes [ ] No

**Paid Preparer's Use Only**

| Preparer's signature | ► | Date | Check if self-employed ... [ ] | Preparer's SSN or PTIN |
|---|---|---|---|---|

Firm's name (or yours if self-employed), address, and ZIP code    Self-Prepared

EIN

Phone no.

**BAA For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.**    PTPA0112  03/05/09    Form **1065** (2008)

*(watermark: Tax Return Filed 4-15-2009)*

Form **1065** (2008)   Vestium Equity Fund, LLC                                    26-2778554                    Page **4**

| Schedule K | Partners' Distributive Share Items | | Total amount |
|---|---|---|---|

| | | | Total amount |
|---|---|---|---|
| **Income (Loss)** | **1** Ordinary business income (loss) (page 1, line 22) | **1** | −379,900. |
| | **2** Net rental real estate income (loss) (attach Form 8825) | **2** | |
| | **3a** Other gross rental income (loss) ........... **3a** | | |
| | **b** Expenses from other rental activities (attach stmt) ........ **3b** | | |
| | **c** Other net rental income (loss). Subtract line 3b from line 3a | **3c** | |
| | **4** Guaranteed payments | **4** | |
| | **5** Interest income | **5** | 1,101,079. |
| | **6** Dividends: **a** Ordinary dividends | **6a** | |
| | **b** Qualified dividends ........... **6b** | | |
| | **7** Royalties | **7** | |
| | **8** Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | **8** | |
| | **9a** Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | **9a** | |
| | **b** Collectibles (28%) gain (loss) ........... **9b** | | |
| | **c** Unrecaptured section 1250 gain (attach statement) ........... **9c** | | |
| | **10** Net section 1231 gain (loss) (attach Form 4797) | **10** | |
| | **11** Other income (loss) (see instructions)   Type ▶ | **11** | |
| **Deductions** | **12** Section 179 deduction (attach Form 4562) | **12** | |
| | **13a** Contributions | **13a** | |
| | **b** Investment interest expense | **13b** | |
| | **c** Section 59(e)(2) expenditures:  **(1)** Type ▶ _____ **(2)** Amount ▶ | **13c (2)** | |
| | **d** Other deductions (see instructions)  Type ▶ | **13d** | |
| **Self-Employ-ment** | **14a** Net earnings (loss) from self-employment | **14a** | 0. |
| | **b** Gross farming or fishing income | **14b** | |
| | **c** Gross nonfarm income | **14c** | |
| **Credits** | **15a** Low-income housing credit (section 42(j)(5)) | **15a** | |
| | **b** Low-income housing credit (other) | **15b** | |
| | **c** Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) | **15c** | |
| | **d** Other rental real estate credits (see instructions)  Type ▶ | **15d** | |
| | **e** Other rental credits (see instructions) ......... Type ▶ | **15e** | |
| | **f** Other credits (see instructions) ........... Type ▶ | **15f** | |
| **Foreign Trans-actions** | **16a** Name of country or U.S. possession ▶ | | |
| | **b** Gross income from all sources | **16b** | |
| | **c** Gross income sourced at partner level | **16c** | |
| | Foreign gross income sourced at partnership level | | |
| | **d** Passive category ▶ _____ **e** General category ▶ _____ **f** Other ........ ▶ | **16f** | |
| | Deductions allocated and apportioned at partner level | | |
| | **g** Interest expense ▶ _____ **h** Other _____ ▶ | **16h** | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | |
| | **i** Passive category ▶ _____ **j** General category ▶ _____ **k** Other _____ ▶ | **16k** | |
| | **l** Total foreign taxes (check one): ▶ Paid ☐   Accrued ☐ | **16l** | |
| | **m** Reduction in taxes available for credit (attach statement) | **16m** | |
| | **n** Other foreign tax information (attach statement) | | |
| **Alternative Minimum Tax (AMT) Items** | **17a** Post-1986 depreciation adjustment | **17a** | |
| | **b** Adjusted gain or loss | **17b** | |
| | **c** Depletion (other than oil and gas) | **17c** | |
| | **d** Oil, gas, and geothermal properties — gross income | **17d** | |
| | **e** Oil, gas, and geothermal properties — deductions | **17e** | |
| | **f** Other AMT items (attach stmt) | **17f** | |
| **Other Infor-mation** | **18a** Tax-exempt interest income | **18a** | |
| | **b** Other tax-exempt income | **18b** | |
| | **c** Nondeductible expenses | **18c** | |
| | **19a** Distributions of cash and marketable securities | **19a** | 2,779,757. |
| | **b** Distributions of other property | **19b** | |
| | **20a** Investment income | **20a** | 1,101,079. |
| | **b** Investment expenses | **20b** | |
| | **c** Other items and amounts (attach stmt) | | |

**BAA**                                                                           Form **1065** (2008)

Tax Return Filed 4-15-2009

Form **1065** (2008)  Vestium Equity Fund, LLC                    26-2778554          Page **5**

## Analysis of Net Income (Loss)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16l | | | | | **1** | | 721,179. |

| 2 | Analysis by partner type: | **(i)** Corporate | **(ii)** Individual (active) | **(iii)** Individual (passive) | **(iv)** Partnership | **(v)** Exempt organization | **(vi)** Nominee/Other |
|---|---|---|---|---|---|---|---|
| **a** | General partners | | | | | | |
| **b** | Limited partners | 638,982. | | 34,994. | 47,203. | | |

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | **Assets** | **(a)** | **(b)** | **(c)** | **(d)** |
| 1 | Cash | | 0. | | 891,138. |
| 2a | Trade notes and accounts receivable | | | | |
| **b** | Less allowance for bad debts | | | | |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets *(attach stmt)* | | | | |
| 7 | Mortgage and real estate loans | | | | |
| 8 | Other investments *(attach stmt)* .... Ln .8 .Stmt | | | | 6,551,157. |
| 9a | Buildings and other depreciable assets | | | | |
| **b** | Less accumulated depreciation | | | | |
| 10a | Depletable assets | | | | |
| **b** | Less accumulated depletion | | | | |
| 11 | Land (net of any amortization) | | | | |
| 12a | Intangible assets (amortizable only) | | | | |
| **b** | Less accumulated amortization | | | | |
| 13 | Other assets *(attach stmt)* | | | | |
| 14 | Total assets | | 0. | | 7,442,295. |
| | **Liabilities and Capital** | | | | |
| 15 | Accounts payable | | 0. | | |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 | Other current liabilities *(attach stmt)* | | | | |
| 18 | All nonrecourse loans | | | | 184,772. |
| 19 | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 20 | Other liabilities *(attach stmt)* | | | | |
| 21 | Partners' capital accounts | | 0. | | 7,257,523. |
| 22 | Total liabilities and capital | | 0. | | 7,442,295. |

| Schedule M-1 | Reconciliation of Income (Loss) per Books With Income (Loss) per Return |
|---|---|

**Note.** Schedule M-3 may be required instead of Schedule M-1 (see instructions).

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | 721,179. | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | **a** | Tax-exempt interest .. $ | |
| 3 | Guaranteed pmts (other than health insurance) | | 7 | Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | **a** | Depreciation ...... $ | |
| **a** | Depreciation ..... $ | | | | |
| **b** | Travel and entertainment ...... $ | | 8 | Add lines 6 and 7 | |
| 5 | Add lines 1 through 4 | 721,179. | 9 | Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | 721,179. |

| Schedule M-2 | Analysis of Partners' Capital Accounts |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | 0. | 6 | Distributions: **a** Cash | 2,779,757. |
| 2 | Capital contributed: **a** Cash | 9,316,101. | | **b** Property | |
| | **b** Property | | 7 | Other decreases (itemize): | |
| 3 | Net income (loss) per books | 721,179. | | | |
| 4 | Other increases (itemize): | | | | |
| | | | 8 | Add lines 6 and 7 | 2,779,757. |
| 5 | Add lines 1 through 4 | 10,037,280. | 9 | Balance at end of year. Subtract line 8 from line 5 | 7,257,523. |

PTPA0134  08/04/08                                          Form **1065** (2008)

651108

| Final K-1 | Amended K-1 | OMB No. 1545-0099 |

**Schedule K-1**
(Form 1065)

Department of the Treasury
Internal Revenue Service

**2008**

For calendar year 2008, or tax
year beginning May 19 , 2008
ending Dec 31 , 2008

**Partner's Share of Income, Deductions,
Credits, etc.**     ► See separate instructions.

## Part III    Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | |
|---|---|---|
| 1 | Ordinary business income (loss) -163,357. | 15 Credits |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | 16 Foreign transactions |
| 4 | Guaranteed payments | |
| 5 | Interest income 473,465. | |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | 17 Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | 18 Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | 19 Distributions |
| | | A         2,270,000. |
| 13 | Other deductions | 20 Other information |
| | | A         473,465. |
| 14 | Self-employment earnings (loss) | |

*See attached statement for additional information.

### Part I    Information About the Partnership

**A** Partnership's employer identification number
26-2778554

**B** Partnership's name, address, city, state, and ZIP code
Vestium Equity Fund, LLC
13116 Harriers Place
Bradenton, FL 34212

**C** IRS Center where partnership filed return
Ogden, UT

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II    Information About the Partner

**E** Partner's identifying number
80-0209904

**F** Partner's name, address, city, state, and ZIP code
Veritas Investments, LLC
1123 North Market Blvd #3
Sacramento, CA 95834

**G** ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I** What type of entity is this partner? Corporation

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 43.00016 % | 43.00016 % |
| Loss | 43.00016 % | 43.00016 % |
| Capital | 43.00016 % | 43.00016 % |

**K** Partner's share of liabilities at year end:

Nonrecourse ........................ $ 79,453.
Qualified nonrecourse financing ....... $
Recourse ............................ $

**L** Partner's capital account analysis:

Beginning capital account ............. $ 0.
Capital contributed during the year .... $ 3,000,000.
Current year increase (decrease) ...... $ 310,110.
Withdrawals and distributions.......... $ 2,270,000.
Ending capital account ............... $ 1,040,110.

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

FOR IRS USE ONLY

**BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.**

Schedule K-1 (Form 1065) 2008

PTPA0312   12/15/08

Tax Return Filed 4-15-2009

651108

| Schedule K-1 | **2008** | Final K-1 | Amended K-1 | OMB No. 1545-0099 |

**Schedule K-1**
**(Form 1065)**

**2008**

For calendar year 2008, or tax
year beginning May 19 , 2008
ending Dec 31 , 2008

Department of the Treasury
Internal Revenue Service

**Partner's Share of Income, Deductions,
Credits, etc.**    ► **See separate instructions.**

**Part I    Information About the Partnership**

**A** Partnership's employer identification number
26-2778554

**B** Partnership's name, address, city, state, and ZIP code
Vestium Equity Fund, LLC
13116 Harriers Place
Bradenton, FL 34212

**C** IRS Center where partnership filed return
Ogden, UT

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II    Information About the Partner**

**E** Partner's identifying number
75-3196402

**F** Partner's name, address, city, state, and ZIP code
EIMT, LLC
21 Natoma Street #110
Folsom, CA 95630

**G** ☐ General partner or LLC        ☒ Limited partner or other
        member-manager                LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I** What type of entity is this partner? Corporation

**J** Partner's share of profit, loss, and capital (see instructions):

|          | Beginning     | Ending        |
|----------|---------------|---------------|
| Profit   | 15.75038 %    | 15.75038 %    |
| Loss     | 15.75038 %    | 15.75038 %    |
| Capital  | 15.75038 %    | 15.75038 %    |

**K** Partner's share of liabilities at year end:
Nonrecourse ......................... $      29,102.
Qualified nonrecourse financing ....... $
Recourse ............................ $

**L** Partner's capital account analysis:
Beginning capital account ............ $           0.
Capital contributed during the year ..... $   1,000,000.
Current year increase (decrease) ...... $     113,588.
Withdrawals and distributions ......... $      81,391.
Ending capital account ............... $   1,032,197.

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

**Part III    Partner's Share of Current Year Income,
Deductions, Credits, and Other Items**

| # | Item | Amount |
|---|------|--------|
| 1 | Ordinary business income (loss) | −59,836. |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 173,424. |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| 14 | Self-employment earnings (loss) | |

| # | Item | Amount |
|---|------|--------|
| 15 | Credits | |
| 16 | Foreign transactions | |
| 17 | Alternative minimum tax (AMT) items | |
| 18 | Tax-exempt income and nondeductible expenses | |
| 19 | Distributions | A  81,391. |
| 20 | Other information | A  173,424. |

*See attached statement for additional information.

*FOR IRS USE ONLY*

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2008
PTPA0312  12/15/08

Tax Return Filed 4-15-2009

# EXHIBIT  E



## SCHEDULE A - LENDER'S DOCUMENT DB

| Date | 16 June 2008 |
| --- | --- |
| Transaction Code | |
| Loan Amount | $500,000.00 – Five Hundred Thousand Dollars and no/100 |

I/we, the undersign bind myself/ourselves to the Arcanum Master Loan Agreement as defined thereunder by executing this Schedule "A" – Lender's Document, and wish to lend the amount indicated above to Arcanum Equity Fund, LLC pursuant to the terms and conditions of the Arcanum Master Loan Agreement.

I/we qualify as "accredited investors" as indicated below:

| Initial One Below | |
| --- | --- |
| | Corporation that have net assets of at least $5,000,000. |
| | Limited Partnership or Limited Liability Company that have net assets of at least $5,000,000. |
| *KK* | Individual who, either alone or jointly with a spouse, beneficially owns, directly or indirectly, financial assets (i.e. cash, securities, real estate) having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds $1,000,000; or<br><br>Whose net income before taxes exceeded $200,000 in each of the two most recent years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the two most recent years or who, in either case, reasonably expects to exceed that net income level in the current year. |

| | |
| --- | --- |
| | Please initial here if you are not a Unites States citizen or entity. |

LENDER CONTACT INFORMATION

| Name(s) | The Kenitzer Family Foundation |
| --- | --- |
| Address | 4150 Creekwood Coutt |
| | Pleasanton, CA  94588 |
| Phone | 925 734-6305 |
| Fax | 925 426-6793 |
| Email | ken@kenitzer.com |

_Kennneth L Bent_
Lender's Signature

_Glenne J. Kenitzer_
Lender's Signature

_ity Fund, LLC
13116 Harriers Place
Bradenton, FL  34212
aefdbforms@gmail.com



## SCHEDULE A - LENDER'S DOCUMENT DB

| Date | 18 June 2008 |
|---|---|
| Transaction Code | |
| Loan Amount | 500,000.00 |

I/we, the undersign bind myself/ourselves to the Arcanum Master Loan Agreement as defined thereunder by executing this Schedule "A" – Lender's Document, and wish to lend the amount indicated above to Arcanum Equity Fund, LLC pursuant to the terms and conditions of the Arcanum Master Loan Agreement.

I/we qualify as "accredited investors" as indicated below:

| Initial One Below | |
|---|---|
| | Corporation that have net assets of at least $5,000,000. |
| | Limited Partnership or Limited Liability Company that have net assets of at least $5,000,000. |
| | Individual who, either alone or jointly with a spouse, beneficially owns, directly or indirectly, financial assets (i.e. cash, securities, real estate) having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds $1,000,000; or<br><br>Whose net income before taxes exceeded $200,000 in each of the two most recent years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the two most recent years or who, in either case, reasonably expects to exceed that net income level in the current year. |

| | Please initial here if you are not a Unites States citizen or entity. |
|---|---|

LENDER CONTACT INFORMATION

| Name(s) | EIMT Properties, LLC – Anthony Vassallo |
|---|---|
| Address | 4150 Creekwood Ct. Suite 202 |
| | Pleasanton, CA  94588 |
| Phone | 925 734-6305 or 916 880-0008 |
| Fax | 925 462-6887 |
| Email | Info@eimt.org or Anthony200012@yahoo.com |

_____          _____
Lender's Signature                                       Lender's Signature

**Arcanum Equity Fund, LLC**
13116 Harriers Place
Bradenton, FL  34212
acfdbforms@gmail.com



## SCHEDULE A - LENDER'S DOCUMENT DB

| Date | 16 June 2008 |
|---|---|
| Transaction Code | |
| Loan Amount | $200,000.00 – Two Hundred Thousand Dollars and no/100 |

I/we, the undersign bind myself/ourselves to the Arcanum Master Loan Agreement as defined thereunder by executing this Schedule "A" – Lender's Document, and wish to lend the amount indicated above to Arcanum Equity Fund, LLC pursuant to the terms and conditions of the Arcanum Master Loan Agreement.

I/we qualify as "accredited investors" as indicated below:

| Initial One Below | |
|---|---|
| | Corporation that have net assets of at least $5,000,000. |
| | Limited Partnership or Limited Liability Company that have net assets of at least $5,000,000. |
| *KK* | Individual who, either alone or jointly with a spouse, beneficially owns, directly or indirectly, financial assets (i.e. cash, securities, real estate) having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds $1,000,000; or<br><br>Whose net income before taxes exceeded $200,000 in each of the two most recent years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the two most recent years or who, in either case, reasonably expects to exceed that net income level in the current year. |

| | Please initial here if you are not a Unites States citizen or entity. |
|---|---|

### LENDER CONTACT INFORMATION

| Name(s) | Kenitzer 24, LLC |
|---|---|
| Address | 4150 Creekwood Coutt |
| | Pleasanton, CA 94588 |
| Phone | 925 734-6305 |
| Fax | 925 426-6793 |
| Email | ken@kenitzer.com |

_____  
Lender's Signature

_____  
Lender's Signature

**...ity Fund, LLC**
13116 Harriers Place
Bradenton, FL 34212
aefdbforms@gmail.com

# EXHIBIT F

Account Overview

**Client Number:** 0304.3864 - 2120 333 01 USD CURRENT ACCOUNT
**Valuation date:** 13.03.2009 - Reference currency: USD

| DATE | DESCRIPTION | VALUE DATE | DEBIT | CREDIT | BALANCE |
|------|-------------|------------|-------|--------|---------|
| ██████ | ████████████ | ██████ | ██████ | | ██████ |
| ██████ | █████████████ | ██████ | ██████ | | ██████ |
| ██████ | ████████████ | ██████ | ██████ | | ██████ |
| 27.02.2009 | PAYMENT TO BPS090915086200 THE SPIRIT FOUNDATION | 27.02.2009 | 100'000.00 | | 11'176'698.44 C |
| ██████ | | ██████ | | ██████ | ██████ |
| ██████ | | ██████ | | ██████ | ██████ |
| ██████ | ██████████ | ██████ | ██████ | | ██████ |
| ██████ | ██ | ██████ | ██████ | | ██████ |
| ██████ | ███████████ | ██████ | | ██████ | ██████ |
| ██████ | █████████████ | ██████ | ██████ | | ██████ |
| ██████ | ████████████ | ██████ | ██████ | | ██████ |
| 09.02.2009 | PAYMENT TO BPS090732989300 PHLORIAN RACING LTD. | 09.02.2009 | 872'305.80 | | 4'335'219.94 C |
| ██████ | ██████████████ | ██████ | ██████ | | ██████ |
| ██████ | ███████████ | ██████ | ██████ | | ██████ |
| ██████ | ████████████ | ██████ | | | ██████ |
| ██████ | ████████████ | ██████ | | | ██████ |
| ██████ | █████████████ | ██████ | | ██████ | ██████ |
| ██████ | ██████████████ | ██████ | | | ██████ |
| ██████ | ██████████████ | ██████ | ██████ | | ██████ |
| ██████ | ████████████ | ██████ | | ██████ | ██████ |
| ██████ | ██████████████ | ██████ | | ██████ | ██████ |
| ██████ | ██████████████ | ██████ | ██████ | | ██████ |
| ██████ | ██████████████ | ██████ | | ██████ | ██████ |
| ██████ | ████████████ | ██████ | | | ██████ |
| ██████ | ██████████████ | ██████ | | | ██████ |
| ██████ | ██████████████ | ██████ | ██████ | | ██████ |
| ██████ | ████████████ | ██████ | | ██████ | ██████ |
| ██████ | █████████ | ██████ | ██████ | | ██████ |
| ██████ | █████████████ | ██████ | ██████ | | ██████ |
| ██████ | ███████████ | ██████ | | ██████ | ██████ |
| ██████ | █████████ | ██████ | | ██████ | ██████ |

# EXHIBIT  G

**THE LAW OFFICE OF C. DEAN HOMAYOUNI, ESQ.**
C. DEAN HOMAYOUNI, ESQ., CPA (225282)
7764 Painted Sunset Drive
Las Vegas, NV    89149
Telephone: (702) 368-0500
Facsimile: (702) 433-0700
Email: dean_homayouni@gmail.com

Attorney for Arcanum Equity Fund, LLC and  Vestium Management Group, LLC

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO.: CV 09-000665 LKK-DAD |
| Plaintiff, | **AFFIDAVIT OF ROBERT L. BUCKHANNON IN SUPPORT OPPOSITION TO RECEIVER'S MOTION TO ORDER DISGORGEMENT OF FUNDS FROM ARCANUM/VESTIUM** |
| v. | |
| ANTHONY VASSALLO, et. al, | Date:        December 7, 2009 |
| Defendants. | Time:        10:00 a.m.<br>Location:    Courtroom 4, 15th Floor<br>Judge:       Hon. Lawrence K. Karlton |

I, Robert L. Buckhannon (hereinafter referred to as "Robert Buckhannon"), being first duly sworn, deposes and says:

1.    I, am over eighteen years old and I am a resident of the State of Nevada, County of Clark.

2.    I am a Managing Member of Vestium Equity Fund, LLC (hereinafter referred to as "Vestium").

3.    In November 2008 and December 2008 Mr. Kenitzer and Mr. Vassallo began demanding that the $4,000,000 investment EIMT, LLC had made in Vestium Equity Fund, LLC be remitted.

4.     I participated in a series of telephone conference meetings with Anthony Vassallo, in which I told Mr. Vassallo that numerous investments that Vestium had made had significantly declined in value as a result of the worst financial Wall Street meltdown since the Great

AFFIDAVIT OF ROBERT L. BUCKHANNON IN SUPPORT OPPOSITION TO RECEIVER'S MOTION TO ORDER DISGORGEMENT OF FUNDS FROM ARCANUM/VESTIUM
CASE NO. CV  09-000665 LKK-DAD

1

The Law Office of
C. DEAN HOMAYOUNI
7764 Painted Sunset Drive,Las Vegas, Nevada 89149
Telephone (702) 368-0500, Facsimile (702) 433-0700

The Law Office of
C. DEAN HOMAYOUNI
7764 Painted Sunset Drive,Las Vegas, Nevada 89149
Telephone (702) 368-0500, Facsimile (702) 433-0700

1    Depression,  during the fourth quarter of 2008.

2    5.    I stated to Mr. Vassallo numerous times  that Vestium was not willing to cash out investments

3    that has unexpectedly declined in value and was not required to do so in accordance with the

4    terms of the Vestium Private Placement Memorandum.

5    6.     Mr. Vasallo  agreed that any losses to be incurred as a result of Vestium redeeming its

6    investments in order to satisfy EIMT's redemption request would be absorbed and allocated

7    to the EIMT account balance.

8    7.    On Thursday, December 18, 2008 Vestium sold $3,969,045.89 in WU bonds for

9    $3,054,612.97, incurring a loss of ($914,432.92).

10   8.     Mr. Vassallo had agreed that any losses to be incurred by Vestium to cash out the bonds

11   would be allocated to the EIMT balance outstanding.

12   9.     $2 million was wired to EIMT on Monday, December 22, 2009.

13   10.    Vestium wired the remaining $1.2 million to settle the EIMT Vestium account on January 12,

14   2009, two (2) days after Vassallo, as the authorized representative of Veritas and EIMT,

15   executed a Release Agreement to the settle the Veritas and EIMT accounts for the final

16   payment of $1.2 million.

17   11.    The Release Agreement attached as **Exhibit D** to the  Opposition to Receiver's Motion to

18   Order Disgorgement of Funds from Arcanum/Vestium for a true and correct copy of the

19   Release  Agreement  executed  by  Anthony  Vassallo,  in  his  capacity  as  an  authorized

20   representative of EIMT, LLC and Veritas.

21   12.    Mr. Vassallo, as the Manager and President of EIMT, agreed to absorb all losses that Vestium

22   incurred (that amounted to $914,432.92), and that Vestium would not have sold the bonds

23   except to satisfy the request of EIMT that funds be remitted.

24   13.    The Vestium Private Placement Memorandum (hereinafter referred to as the "Vestium PPM")

25   attached as **Exhibit E** to the Opposition to Receiver's Motion to Order Disgorgement of Funds

26   from Arcanum/Vestium is a true and correct copy of a document given to EIMT, LLC and was

27

28   AFFIDAVIT OF ROBERT L. BUCKHANNON IN SUPPORT OPPOSITION TO RECEIVER'S MOTION TO ORDER DISGORGEMENT OF FUNDS FROM
                                                                                    ARCANUM/VESTIUM
                                                                          CASE NO. CV  09-000665 LKK-DAD

2

The Law Office of
C. DEAN HOMAYOUNI
7764 Painted Sunset Drive, Las Vegas, Nevada 89149
Telephone: (702) 368-0500, Facsimile: (702) 433-0700

subsequently executed by an authorized representative of EIMT, LLC prior to Vestium accepting $4.0 million from EIMT, LLC.

14.  It is clear from the terms of the Vestium PPM that Vestium and its managers are not required to blindly redeem account balances.

15.  The PPM listed numerous risk factors that could result in redemptions being delayed or not made at all.

16.  The Vestium Equity Fund, LLC "Subscription Booklet" attached as **Exhibit F** to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium is a true and correct copy of a document given to EIMT, LLC and was subsequently executed by an authorized representative of EIMT, LLC prior to Vestium accepting $4.0 million from EIMT, LLC.

17.  The Vestium Equity Fund Limited Liability Operating Agreement attached as **Exhibit G** to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium is a true and correct copy of a document given to EIMT, LLC and was subsequently executed by an authorized representative of EIMT, LLC prior to Vestium accepting $4.0 million from EIMT, LLC.

18.  The Vestium Equity Fund, LLC federal income tax return attached as **Exhibit H** to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium is a true and correct copy of the Vestium 2008 tax return for the twelve months ended December 31, 2008.

19.  The financial statements comprised of a balance sheet and income statement attached as **Exhibit I** to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium is a true and correct copy of the Vestium "book" balance sheet and income statement for the twelve months ended December 31, 2008.

20.  EIMT Properties, LLC executed Arcanum Master Loan Agreement attached as **Exhibit J** to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium is a true and correct copy of the Arcanum Master Loan Agreement executed by EIMT

AFFIDAVIT OF ROBERT L. BUCKHANNON IN SUPPORT OPPOSITION TO RECEIVER'S MOTION TO ORDER DISGORGEMENT OF FUNDS FROM
ARCANUM/VESTIUM
CASE NO. CV 09-000665 LKK-DAD

3

Properties, LLC.

21.   Kenitzer 24, LLC executed Arcanum Master Loan Agreement attached as **Exhibit K** to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium is a true and correct copy of the Arcanum Master Loan Agreement executed by Kenitzer 24, LLC.

22.   The Kenitzer Family Foundation executed Arcanum Master Loan Agreement attached as **Exhibit L** to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium is a true and correct copy of the Arcanum Master Loan Agreement executed by The Kenitzer Family Foundation.

23.   On February 9, 2009 Mr. Vassallo instructed and confirmed that I was to wire $872,305.80 to Phlorian Racing, Ltd. The $872,305.80 was a partial redemption of the $1,330,000 investment in Arcanum by EIMT Properties, LLC, Kenitzer 24, LLC and The Kenitzer Family Foundation.

24.   A true and correct copy of a redacted USD current account is attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium as **Exhibit M** that reflects the $872,305.80 payment to Phlorian Racing, Ltd.

25.   On February 27, 2009 Mr. Vassallo instructed and confirmed that I was to wire $100,000 to The Spirit Foundation. The $100,000 was a partial redemption of the $1,330,000 investment in Arcanum by EIMT Properties, LLC, Kenitzer 24, LLC and The Kenitzer Family Foundation.

26.   A true and correct copy of a redacted USD current account is attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds from Arcanum/Vestium as **Exhibit M** that reflects the $100,000 payment to The Sprint Foundation.

27.   The two transactions on February 9, 2009 and February 27, 2009 resulted in $972,305.80 redemption of the $1,330,000 investment in the Arcanum by EIMT Properties, LLC, Kenitzer 24, LLC and The Kenitzer Family Foundation.

28.   I had informed both Mr. Kenitzer and Mr. Vassallo that the $972,305.80 would be applied to

AFFIDAVIT OF ROBERT L. BUCKHANNON IN SUPPORT OPPOSITION TO RECEIVER'S MOTION TO ORDER DISGORGEMENT OF FUNDS FROM ARCANUM/VESTIUM
CASE NO. CV 09-000665 LKK-DAD

The Law Office of
C. DEAN HOMAYOUNI
7764 Painted Sunset Drive,Las Vegas, Nevada 89149
Telephone (702) 368-0500, Facsimile (702) 433-0700

1    the EIMT, LLC, Kenitzer 24, LLC and The Kenitzer Family Foundation account balances held

2    in Arcanum.

3    29.    The $972,305.80 was held in a Suspense account until September 2009. A memo drafted by

4    Don Sowers, the Controller and Chief Accountant of Arcanum explains why the $972,305.80

5    was not recorded until September 2009. A true and correct copy of Mr. Sowers internal

6    memorandum is attached hereto as **Exhibit O.**

7    30.    **Exhibit P**, attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds

8    from Arcanum/Vestium, is a true and correct copy of a revised tax return for Arcanum Equity

9    Fund, LLC for the twelve (12) months ended December 31, 2008 that reflects a loss of

10    ($3,930,081).

11    31.    **Exhibit Q**, attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds

12    from Arcanum/Vestium is a true and correct copy of the financial statements, that includes a

13    balance sheet and income statement, for Arcanum Equity Fund, LLC for the 12 months ended

14    December 31, 2008 that reflects a loss of ($3,934,301.57).

15    32.    **Exhibit R**, attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds

16    from Arcanum/Vestium is a for a true and correct copy of the Accredited Investor

17    Acknowledgment completed by the Stewardship Group.

18    33.     **Exhibit S**, attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds

19    from Arcanum/Vestium is a for a true and correct copy of Schedule A – Lenders Document

20    DB completed by the Stewardship Group.

21    34.    **Exhibit T**, attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds

22    from Arcanum/Vestium is a for a true and correct copy of Schedule C – Limited Trading

23    Authorization DB completed by the Stewardship Group.

24    35.    **Exhibit U**, attached to the Opposition to Receiver's Motion to Order Disgorgement of Funds

25    from Arcanum/Vestium is a for a true and correct of an E-Mail from Charles Hooper, The

26    Stewardship Group, dated April 3, 2009.

27

28    AFFIDAVIT OF ROBERT L. BUCKHANNON IN SUPPORT OPPOSITION TO RECEIVER'S MOTION TO ORDER DISGORGEMENT OF FUNDS FROM
ARCANUM/VESTIUM
CASE NO. CV 09-000665 LKK-DAD

The Law Office of
C. DEAN HOMAYOUNI
7764 Painted Sunset Drive,Las Vegas, Nevada 89149
Telephone (702) 368-0500, Facsimile (702) 433-0700

5

Further affiant sayeth naught.

_____
ROBERT L. BUCKHANNON

November 21, 2009
_____
Date

State of Nevada
County of _____ Clark _____

Signed or attested before me on 11/21/09 by
Robert Lyle Buckhannon
(Notary Stamp)
_____
(Signature of notarial officer)

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
SARAH R. BONAS
No. 07-5300-1
My Appointment Expires Aug 10, 2011

The Law Office of
C. DEAN HOMAYOUNI
7764 Painted Sunset Drive,Las Vegas, Nevada 89149
Telephone (702) 368-0500, Facsimile (702) 433-0700

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFFIDAVIT OF ROBERT L. BUCKHANNON IN SUPPORT OPPOSITION TO RECEIVER'S MOTION TO ORDER DISGORGEMENT OF FUNDS FROM
ARCANUM/VESTIUM
CASE NO. CV 09-000665 LKK-DAD

# EXHIBIT  H

 **UKDATA**

Home    **Company Credit Reports**    Contact UK Data Ltd    Sample Reports    Prices    Help



**Not this company?**
Looking for a different company?
Search again.

## Company name - PHLORIAN RACING LIMITED

Company incorporation date - 01/02/2006

Monitor this company for changes to its credit score and for new Accounts filings and Director changes.

| Monitor this company |
| --- |

**This is a free service**

**Page Sponsor**



A secure online accounting system

| | |
| --- | --- |
| **Registered Number:** | 05693697 - Registered at Companies House on 01/02/2006 |
| **Type of business:** | Other sporting activities |
| **Address:** | HIGHER LOWTON FARM |
| | BONDLEIGH |
| | NORTH TAWTON |
| | DEVON |
| | EX20 2AL |
| | Telephone numbers may be available here |
| **Company Type:** | Private Limited with share capital ? |
| **Company Status:** | - ? |
| **Last Accounts Analysed:** | For the period ending - |
| **Useful links:** | Location map and aerial photograph |
| | PHLORIAN RACING LIMITED on Google |
| **Is this your company?** | Create your facebook page |
| | Tweet it! with twitter |
| **Telephone Number:** | Telephone numbers may be available here |

### Credit Reports:

As this company has either not or only recently filed, they are not yet analysed by our system, so we are unable to offer a credit report.
If you would like to be informed when reports are available, please click Monitor this company to receive email updates free of charge.

Click here to see all available documents



© UK Data Ltd | Company Credit Reports | Annual Accounts    A-Z  Site Map  Help



Case 2:09-cv-00665-LKK -DAD   Document 179-1   Filed 11/23/09   Page 26 of 147

- ○ » Life Insurance
- ENTERTAINMENT

- CATEGORY A-Z
- PREMIUM LISTINGS

SEARCH FOR:
e.g. florists
AND / OR COMPANY NAME:
e.g. UpMyStreet
LOCATED IN:
North Tawton

Search

## View map of Phlorian Racing Ltd in North Tawton

# Phlorian Racing Ltd

0%
0 votes

## Tel: 01837 880227

## Higher Lowton Farm, Bondleigh, North Tawton, EX20 2AL

## Categories: Bookmakers in North Tawton

Rate Phlorian Racing Ltd

Upgrade to a Premium Listing

Print Page |

## Be the first to review Phlorian Racing Ltd.

WRITE A REVIEW

Other Bookmakers near Phlorian Racing Ltd

- **Corals**, Exeter, 18.44 miles away
- **Dave Robinson**, Exeter, 18.97 miles away
- **Vickers Credit Ltd**, Barnstaple, 19.24 miles away
- **J P R Racing**, Newton Abbot, 22.22 miles away
- **Jimmyz Bookmakers**, Cullompton, 22.32 miles away

# EXHIBIT  I

# 𝔇epartment of 𝔍ustice

## Acting United States Attorney Lawrence G. Brown
## Eastern District of California

FOR IMMEDIATE RELEASE
Friday, May 22, 2009
www.usdoj.gov/usao/cae
Docket #: 2:09-cr-230-JAM

CONTACT: Lauren Horwood
PHONE: 916-554-2706
usacae.edcapress@usdoj.gov

### FOUR CHARGED IN BIZARRE SHAKE DOWN CONNECTED TO $40 MILLION PONZI SCHEME

SACRAMENTO, Calif.—Acting United States Attorney Lawrence G. Brown, FBI Special Agent-in-Charge Drew Parenti, and IRS-Criminal Investigation Special-Agent-in-Charge Scott O'Briant announced that MICHAEL DAVID SANDERS, aka David Dennis SANDERS, 41, of Fair Oaks, Calif.; CRAIG ANDERSON, 39, of Chicago; CASSANDRA MOORE, 26, of Beverly Hills, Calif.; and SEAN SMARTT, 41, of Sacramento, have been indicted in a conspiracy to impersonate an officer and employee of the United States.

This case is the product of a joint investigation by the FBI and the IRS-Criminal Investigation.

According to Assistant United States Attorney Robin R. Taylor, who is prosecuting the case, the defendants were attempting to recover funds for investors who lost money in a Ponzi investment fraud scheme carried out by ANTHONY VASSALLO, who was charged with mail fraud, wire fraud, and money laundering offenses on April 15, 2009. VASSALO's firm, Equity Investment Management and Trading Inc. (EIMT"), lost virtually all of the investors' money, and ceased trading in securities in about September 2007.

In what is alleged to be an attempt to recoup investor money, on or about March 8, 2009, SANDERS, ANDERSON, MOORE and SMARTT entered an office suite in Folsom, Calif. where a prearranged meeting was taking place with three hedge fund operators and two others. Several of the defendants wore bullet proof vests, ear pieces, hand cuffs, and badges. More than one of the defendants was carrying a radio and a gun. As they entered, SANDERS and ANDERSON announced loudly to the hedge fund operators that the defendants were with the FBI and the United States Security and Exchange Commission. ANDERSON stated that MOORE was on the "federal level," and it was up to her if charges would be filed in an ongoing investment fraud investigation of EIMT.

SANDERS and ANDERSON paced around the office, exposed their weapons, and blocked the entrances and exits of the office suite. One of the co-conspirators told the hedge fund operators that the defendants were there to collect funds taken from the EIMT account for victims of a fraud. ANDERSON told the hedge fund operators that they had until noon on Monday, March 9, 2009, to wire $378,300.16 to a Patelco Credit Union bank account in the name of the "Spirit Foundation" and to send an e-mail confirmation an email address they provided. The defendants left a sheet of paper with the wiring instructions, routing number, account number, bank name, amount, and an email address.

SMARTT appeared today in court before United States Magistrate Judge Gregory G.

Hollows and was released on bond. SANDERS, who was previously released on bond, has his next court appearance on June 5, 2009. Court dates for ANDERSON and MOORE have not yet been set.

The defendants face up to five years in prison for the conspiracy charge. However, the actual sentence will be dictated by the Federal Sentencing Guidelines, which take into account a number of factors, and will be imposed at the discretion of the court. The charges in the criminal complaints are only allegations and the defendants are presumed innocent until and unless proven guilty beyond a reasonable doubt.

# # # #

# EXHIBIT J

| Form **1065** | | **U.S. Return of Partnership Income** | | OMB No. 1545-0099 |
|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | For calendar year 2008, or tax year beginning _____ , 2008, ending _____ , 20 _____ .  ► See separate instructions. | | **2008** |

| **A** Principal business activity | **Use the IRS label. Other-wise, print or type.** | Name of partnership  Arcanum Equity Fund, LLC | | **D** Employer identification number  26-0589446 |
|---|---|---|---|---|
| Other Service | | Number, street, and room or suite number. If a P.O. box, see the instructions. | | **E** Date business started |
| **B** Principal product or service | | 13116 Harriers Place | | 01/01/08 |
| Investments | | City or town                              State    ZIP code | | **F** Total assets (see instrs) |
| **C** Business code number  523900 | | Bradenton                             FL  34212 | | $   20,675,242. |

**G** Check applicable boxes: **(1)** [X] Initial return **(2)** [ ] Final return **(3)** [ ] Name change **(4)** [ ] Address change **(5)** [ ] Amended return
       **(6)** [ ] Technical termination - also check (1) or (2)

**H** Check accounting method: **(1)** [X] Cash **(2)** [ ] Accrual **(3)** [ ] Other (specify) ..... ►

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ................. ►  ____ 4

**J** Check if Schedule M-3 attached ...................................................................................... [X]

**Caution.** Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| I N C O M E | **1a** Gross receipts or sales ................................. | **1a** | | |
| | **b** Less returns and allowances ......................... | **1b** | **1c** | |
| | **2** Cost of goods sold (Schedule A, line 8) ................................................ | | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c ............................................ | | **3** | |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) ................................................................. | | **4** | |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)) ................................. | | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) ............ | | **6** | |
| | **7** Other income (loss) (attach statement) .....*..STMT ............................. | | **7** | −790,955. |
| | **8** Total income (loss). Combine lines 3 through 7 ..................................... | | **8** | −790,955. |
| D E D U C T I O N S  (SEE INSTRUCTIONS FOR LIMITATIONS) | **9** Salaries and wages (other than to partners) (less employment credits) ............ | | **9** | |
| | **10** Guaranteed payments to partners ................................................... | | **10** | 1,073. |
| | **11** Repairs and maintenance ............................................................ | | **11** | 0. |
| | **12** Bad debts ........................................................................... | | **12** | 0. |
| | **13** Rent ................................................................................. | | **13** | 2,349. |
| | **14** Taxes and licenses .................................................................. | | **14** | 1,083. |
| | **15** Interest ............................................................................. | | **15** | |
| | **16a** Depreciation (if required, attach Form 4562) ............. **16a** | 0. | | |
| | **b** Less depreciation reported on Schedule A and elsewhere on return ..... **16b** | | **16c** | 0. |
| | **17** Depletion (Do not deduct oil and gas depletion.) ................................. | | **17** | |
| | **18** Retirement plans, etc. ............................................................. | | **18** | |
| | **19** Employee benefit programs .......................................................... | | **19** | |
| | **20** Other deductions (attach statement) .......................................*..STMT | | **20** | 3,134,621. |
| | **21** Total deductions. Add the amounts shown in the far right column for lines 9 through 20 ............ | | **21** | 3,139,126. |
| | **22** Ordinary business income (loss). Subtract line 21 from line 8 ..................... | | **22** | −3,930,081. |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member manager) is based on all information of which preparer has any knowledge.

► _____     ► _____
Signature of general partner or limited liability company member manager          Date

May the IRS discuss this return with the preparer shown below (see instrs)?   [ ] Yes  [ ] No

| **Paid Preparer's Use Only** | Preparer's signature | | Date | | Check if self-employed ► [ ] | Preparer's SSN or PTIN |
|---|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | Self-Prepared | | | EIN ► | |
| | | | | | Phone no. | |

**BAA For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.**     PTPA0112  03/05/09     Form **1065** (2008)

Form **1065** (2008)  Arcanum Equity Fund, LLC                                26-0589446                  Page **4**

## Schedule K — Partners' Distributive Share Items

| | | | | Total amount |
|---|---|---|---|---:|
| **Income (Loss)** | **1** Ordinary business income (loss) (page 1, line 22) | | **1** | -3,930,081. |
| | **2** Net rental real estate income (loss) (attach Form 8825) | | **2** | |
| | **3a** Other gross rental income (loss) | 3a | | |
| | **b** Expenses from other rental activities (attach stmt) | 3b | | |
| | **c** Other net rental income (loss). Subtract line 3b from line 3a | | **3c** | |
| | **4** Guaranteed payments | | **4** | 1,073. |
| | **5** Interest income | | **5** | |
| | **6** Dividends: **a** Ordinary dividends | | **6a** | |
| | **b** Qualified dividends | 6b | | |
| | **7** Royalties | | **7** | |
| | **8** Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | | **8** | |
| | **9a** Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | | **9a** | |
| | **b** Collectibles (28%) gain (loss) | 9b | | |
| | **c** Unrecaptured section 1250 gain (attach statement) | 9c | | |
| | **10** Net section 1231 gain (loss) (attach Form 4797) | | **10** | |
| | **11** Other income (loss) (see instructions)  Type ► | | **11** | |
| **Deductions** | **12** Section 179 deduction (attach Form 4562) | | **12** | |
| | **13a** Contributions | | **13a** | |
| | **b** Investment interest expense | | **13b** | |
| | **c** Section 59(e)(2) expenditures: **(1)** Type ► _____ **(2)** Amount ► | | **13c (2)** | |
| | **d** Other deductions (see instructions) Type ► Medical insurance payments for partners | | **13d** | 1,073. |
| **Self-Employ-ment** | **14a** Net earnings (loss) from self-employment | | **14a** | -3,929,008. |
| | **b** Gross farming or fishing income | | **14b** | |
| | **c** Gross nonfarm income | | **14c** | -790,955. |
| **Credits** | **15a** Low-income housing credit (section 42(j)(5)) | | **15a** | |
| | **b** Low-income housing credit (other) | | **15b** | |
| | **c** Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) | | **15c** | |
| | **d** Other rental real estate credits (see instructions) Type ► | | **15d** | |
| | **e** Other rental credits (see instructions) ......... Type ► | | **15e** | |
| | **f** Other credits (see instructions) .............. Type ► | | **15f** | |
| **Foreign Trans-actions** | **16a** Name of country or U.S. possession ... ► | | | |
| | **b** Gross income from all sources | | **16b** | |
| | **c** Gross income sourced at partner level | | **16c** | |
| | Foreign gross income sourced at partnership level | | | |
| | **d** Passive category ► _____ **e** General category ► _____ **f** Other ► | | **16f** | |
| | Deductions allocated and apportioned at partner level | | | |
| | **g** Interest expense ► _____ **h** Other ► | | **16h** | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | | |
| | **i** Passive category ► _____ **j** General category ► _____ **k** Other ...... ► | | **16k** | |
| | **l** Total foreign taxes (check one): ► Paid ☐  Accrued ☐ | | **16l** | |
| | **m** Reduction in taxes available for credit (attach statement) | | **16m** | |
| | **n** Other foreign tax information (attach statement) | | | |
| **Alternative Minimum Tax (AMT) Items** | **17a** Post-1986 depreciation adjustment | | **17a** | 0. |
| | **b** Adjusted gain or loss | | **17b** | |
| | **c** Depletion (other than oil and gas) | | **17c** | |
| | **d** Oil, gas, and geothermal properties — gross income | | **17d** | |
| | **e** Oil, gas, and geothermal properties — deductions | | **17e** | |
| | **f** Other AMT items (attach stmt) | | **17f** | |
| **Other Infor-mation** | **18a** Tax-exempt interest income | | **18a** | |
| | **b** Other tax-exempt income | | **18b** | |
| | **c** Nondeductible expenses | | **18c** | 4,335. |
| | **19a** Distributions of cash and marketable securities | | **19a** | 0. |
| | **b** Distributions of other property | | **19b** | 0. |
| | **20a** Investment income | | **20a** | |
| | **b** Investment expenses | | **20b** | |
| | **c** Other items and amounts (attach stmt) | | | |

**BAA**                                                                                         Form **1065** (2008)

*Draft 11.18.2009*

Form **1065** (2008)  Arcanum Equity Fund, LLC                    26-0589446                    Page **5**

## Analysis of Net Income (Loss)

| | | | | | | |
|---|---|---|---|---|---|---|
| **1** | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16l | | | | **1** | -3,930,081. |

| **2** Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|
| **a** General partners | | | | | | |
| **b** Limited partners | | -3,930,081. | | | | |

## Schedule L — Balance Sheets per Books

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| **1** Cash | | 0. | | 16,625,371. |
| **2a** Trade notes and accounts receivable | | | | |
| **b** Less allowance for bad debts | | | | |
| **3** Inventories | | | | |
| **4** U.S. government obligations | | | | |
| **5** Tax-exempt securities | | | | |
| **6** Other current assets (attach stmt) . . . Ln..6..Stmt | | | | 1,144,375. |
| **7** Mortgage and real estate loans | | | | |
| **8** Other investments (attach stmt) . . . . . Ln..8..Stmt | | | | 2,899,379. |
| **9a** Buildings and other depreciable assets | 0. | | 6,117. | |
| **b** Less accumulated depreciation | | | | 6,117. |
| **10a** Depletable assets | | | | |
| **b** Less accumulated depletion | | | | |
| **11** Land (net of any amortization) | | | | |
| **12a** Intangible assets (amortizable only) | | | | |
| **b** Less accumulated amortization | | | | |
| **13** Other assets (attach stmt) | | | | |
| **14** Total assets | | 0. | | 20,675,242. |
| **Liabilities and Capital** | | | | |
| **15** Accounts payable | | 0. | | 0. |
| **16** Mortgages, notes, bonds payable in less than 1 year | | | | |
| **17** Other current liabilities (attach stmt) | | | | |
| **18** All nonrecourse loans | | 0. | | 24,609,560. |
| **19** Mortgages, notes, bonds payable in 1 year or more | | | | |
| **20** Other liabilities (attach stmt) | | | | |
| **21** Partners' capital accounts | | 0. | | -3,934,318. |
| **22** Total liabilities and capital | | 0. | | 20,675,242. |

## Schedule M-1 — Reconciliation of Income (Loss) per Books With Income (Loss) per Return

**Note.** Schedule M-3 may be required instead of Schedule M-1 (see instructions).

| | | | | | |
|---|---|---|---|---|---|
| **1** | Net income (loss) per books | -4,848,851. | **6** | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | |
| **2** | Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | | **a** Tax-exempt interest .. $ _ _ _ _ _ _ _ _ | |
| **3** | Guaranteed pmts (other than health insurance) | | **7** | Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | |
| **4** | Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | | **a** Depreciation .... $ _ _ _ _ _ _ _ _ | |
| | **a** Depreciation . . . . . . $ _ _ _ _ _ | | | | |
| | **b** Travel and entertainment . . . . . $ _ _ _ _ _ | | **8** | Add lines 6 and 7 | |
| **5** | Add lines 1 through 4 | | **9** | Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | |

## Schedule M-2 — Analysis of Partners' Capital Accounts

| | | | | | |
|---|---|---|---|---|---|
| **1** | Balance at beginning of year | 0. | **6** | Distributions: **a** Cash | 0. |
| **2** | Capital contributed: **a** Cash | 100. | | **b** Property | 0. |
| | **b** Property | 0. | **7** | Other decreases (itemize): | |
| **3** | Net income (loss) per books | -4,848,851. | | _ _ _ _ _ _ _ _ _ _ _ | |
| **4** | Other increases (itemize): | | | | |
| | _ _ _ _ _ _ _ _ _ _ | | **8** | Add lines 6 and 7 | 0. |
| **5** | Add lines 1 through 4 | -4,848,751. | **9** | Balance at end of year. Subtract line 8 from line 5 | -4,848,751. |

PTPA0134  08/04/08                                      Form **1065** (2008)

# EXHIBIT  K

2:14 PM

11/20/09

Accrual Basis

# AEF,LLC  Master
# Balance Sheet
### As of December 31, 2008

|  | Dec 31, 08 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **Bank of America** | |
| **BA 3105** | 383.00 |
| **BA 4895** | 10,008.00 |
| **BA 4905** | 100.00 |
| **BA 4918** | 73.00 |
| **BA 4947** | 5,088.00 |
| **Bank of America - Other** | 3,000.00 |
| **Total Bank of America** | 18,652.00 |
| **Deutsche Bank** | 106,548.57 |
| **Julius Bar** | 14,936,118.24 |
| **UBS** | 1,037,453.09 |
| **Wachovia Bank** | 526,599.44 |
| **Total Checking/Savings** | 16,625,371.34 |
| **Other Current Assets** | |
| **CMO's** | |
| **FNMA $75,000,000** | 1,749,391.53 |
| **GNMA $50,000,000** | 1,149,987.03 |
| **Total CMO's** | 2,899,378.56 |
| **Loan to Global Commodity Part** | 300,000.00 |
| **Loan to Partners** | |
| **Buckhannon** | 192,718.66 |
| **Rawstern** | 115,000.00 |
| **St. Jean** | 25,000.00 |
| **Tindall** | 25,000.00 |
| **Loan to Partners - Other** | 50,000.00 |
| **Total Loan to Partners** | 407,718.66 |
| **Loan to VMG** | 381,655.92 |
| **Retainer Bracewell Guiliani** | 50,000.00 |
| **Total Other Current Assets** | 4,038,753.14 |
| **Total Current Assets** | 20,664,124.48 |
| **Fixed Assets** | |
| **Furniture and Equipment** | 6,117.04 |
| **Total Fixed Assets** | 6,117.04 |
| **Other Assets** | |
| **Equity Investment VMG** | 5,000.00 |
| **Total Other Assets** | 5,000.00 |
| **TOTAL ASSETS** | **20,675,241.52** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| **Redemption Payable** | 124,527.56 |
| **Total Accounts Payable** | 124,527.56 |
| **Other Current Liabilities** | |
| **AEF Investor Notes** | |
| **AEF Investors Loans** | 23,378,430.00 |
| **AEF Notes Redemption** | -3,379,081.95 |
| **Total AEF Investor Notes** | 19,999,348.05 |

2:14 PM

11/20/09

Accrual Basis

# AEF,LLC  Master
# Balance Sheet
### As of December 31, 2008

|  | Dec 31, 08 |
|---|---|
| Loan from VEF | 4,485,567.08 |
| **Total Other Current Liabilities** | 24,484,915.13 |
| **Total Current Liabilities** | 24,609,442.69 |
| **Total Liabilities** | 24,609,442.69 |
| **Equity** |  |
| Members Equity | 100.00 |
| Net Income | -3,934,301.17 |
| **Total Equity** | -3,934,201.17 |
| **TOTAL LIABILITIES & EQUITY** | **20,675,241.52** |

2:13 PM

11/20/09

Accrual Basis

# AEF,LLC  Master
# Profit & Loss
### January through December 2008

|  | Jan - Dec 08 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Coupon Interest on Bonds** | 356,546.25 |
| **Coupon Interest on CMO's** | |
| **$50,000,000** | 59,235.00 |
| **$75,000,000** | 123,380.25 |
| **Coupon Interest on CMO's - Other** | 580,221.00 |
| **Total Coupon Interest on CMO's** | 762,836.25 |
| **Gain on Account Settlements** | 54,556.14 |
| **Gain/(Loss) FX Trades** | 1,747,783.92 |
| **Gains/(Losses) on Bond Trades** | -3,845,239.71 |
| **MMF Interest** | |
| **DB Alex Brown** | 6,096.35 |
| **Penson Financial** | 123,987.14 |
| **MMF Interest - Other** | 2,478.09 |
| **Total MMF Interest** | 132,561.58 |
| **Total Income** | -790,955.57 |
| **Expense** | |
| **AEF Operating Expenses** | |
| **Advertising and Promotion** | 10,000.00 |
| **Business Licenses and Permits** | 1,082.65 |
| **Computer and Internet Expenses** | 13,198.74 |
| **Contractual Services** | 26,500.00 |
| **Dues and Subscriptions** | 81.90 |
| **Legal Fees** | 24,702.38 |
| **Meals and Entertainment** | 8,669.69 |
| **Medical Reimbursement** | 1,072.89 |
| **Miscellaneous Expenses** | 15,557.45 |
| **Office Supplies** | 9,527.40 |
| **Postage and Delivery** | 2,499.48 |
| **Rent Expense** | 2,349.02 |
| **Telephone Expense** | 9,004.37 |
| **Travel Expense** | |
| **Airfare** | 24,218.76 |
| **Auto Rental** | 786.95 |
| **Fuel** | 2,546.20 |
| **Lodging** | 13,185.70 |
| **Misc Expenses** | 3,406.85 |
| **Travel Expense - Other** | 21,837.16 |
| **Total Travel Expense** | 65,981.62 |
| **Total AEF Operating Expenses** | 190,227.59 |
| **Bank Fees** | |
| **Bank Fees FX Trades** | 60,109.27 |
| **Bank Fees Overseas** | 132.53 |
| **Bank Service Charges** | 47,869.43 |
| **Total Bank Fees** | 108,111.23 |
| **Client Management Services** | 814,141.46 |
| **Commissions** | |
| **Bond Trades** | 77,752.00 |
| **Commissions Changing the Plant** | 115,025.00 |
| **Commissions FX Trades** | 908,589.18 |
| **Fees to NFS** | 5,000.00 |
| **Total Commissions** | 1,106,366.18 |
| **Interest Expense** | |
| **Arcanum Penson Accounts MMF** | 123,987.14 |
| **VEF Interest** | 211,000.00 |
| **Interest Expense - Other** | 0.00 |
| **Total Interest Expense** | 334,987.14 |

**2:13 PM**

**11/20/09**

**Accrual Basis**

# AEF,LLC  Master
# Profit & Loss
### January through December 2008

|  | Jan - Dec 08 |
|---|---|
| **Investment Management** | |
| **Fees to Imperium** | 80,512.00 |
| **GPK** | 509,000.00 |
| **Total Investment Management** | 589,512.00 |
| **Professional Fees** | 0.00 |
| **Total Expense** | 3,143,345.60 |
| **Net Ordinary Income** | -3,934,301.17 |
| **Other Income/Expense** | |
| **Other Expense** | |
| **Accrued AEF Interest Expense** | 0.00 |
| **Ask My Accountant** | 0.00 |
| **Total Other Expense** | 0.00 |
| **Net Other Income** | 0.00 |
| **Net Income** | **-3,934,301.17** |

# EXHIBIT L

3:36 PM

11/20/09

Accrual Basis

# AEF,LLC  Master
## Profit & Loss
### January through October 2009

|  | Jan - Oct 09 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Coupon Interest on CMO's** | |
| **$50,000,000** | 174,230.06 |
| **$75,000,000** | 1,054,262.76 |
| **Total Coupon Interest on CMO's** | 1,228,492.82 |
| **Gain on Account Settlements** | 31,760.40 |
| **Gain on Forward Purchase Metals** | 0.00 |
| **Gains on Diamond Trades** | 400,000.00 |
| **Gains/(Losses) on Bond Trades** | -766,573.19 |
| **Global Com. Group Tonapah Pjt** | 0.00 |
| **King Snake Ore Project** | 0.00 |
| **Permapave** | 15,000.00 |
| **Transcap Platform** | 49,985.00 |
| **Total Income** | 958,665.03 |
| **Expense** | |
| **AEF Operating Expenses** | |
| **Automobile Expense** | 400.00 |
| **Business Licenses and Permits** | 2,965.32 |
| **Computer and Internet Expenses** | 24,841.37 |
| **Contractual Services** | 4,500.00 |
| **Legal Fees** | 22,500.00 |
| **Meals and Entertainment** | 7,894.24 |
| **Medical Reimbursement** | 1,100.00 |
| **Miscellaneous Expenses** | 4,875.91 |
| **Office Supplies** | 10,232.77 |
| **Postage and Delivery** | 2,002.29 |
| **Telephone Expense** | 12,086.90 |
| **Travel Expense** | |
| **Airfare** | 31,371.22 |
| **Auto Rental** | 900.16 |
| **Fuel** | 1,863.98 |
| **Lodging** | 12,386.75 |
| **Misc Expenses** | 8,532.15 |
| **Travel Expense - Other** | 3,494.90 |
| **Total Travel Expense** | 58,549.16 |
| **AEF Operating Expenses - Other** | 25.76 |
| **Total AEF Operating Expenses** | 151,973.72 |
| **Allowance for Doubtful Accounts** | 0.00 |
| **Bank Fees** | |
| **Bank Fees Overseas** | 305.06 |
| **Bank Service Charges** | 79,211.39 |
| **Total Bank Fees** | 79,516.45 |
| **Client Management Services** | 174,889.71 |
| **Interest Expense** | |
| **VEF Interest** | 0.00 |
| **Interest Expense - Other** | 3,199.99 |
| **Total Interest Expense** | 3,199.99 |
| **Investment Management** | |
| **GPK** | 33,000.00 |
| **Total Investment Management** | 33,000.00 |
| **Total Expense** | 442,579.87 |
| **Net Ordinary Income** | 516,085.16 |

3:36 PM

11/20/09

Accrual Basis

**AEF,LLC  Master**

**Profit & Loss**

**January through October 2009**

|  | Jan - Oct 09 |
|---|---|
| **Other Income/Expense** | |
| **Other Expense** | |
| **Accrued AEF Interest Expense** | 0.00 |
| **Ask My Accountant** | 0.00 |
| **Charitable Donations** | 100.00 |
| **Total Other Expense** | 100.00 |
| **Net Other Income** | -100.00 |
| **Net Income** | **515,985.16** |

# EXHIBIT  M



13116 Harriers Place  .  Bradenton, FL 34212
941.527.1417   Fax 941.761.5805

**EIMT Properties**
**4150 Creekwood Ct.**
**Pleasanton, CA 94588**

**STATEMENT OF ACCOUNT #10255**                    **August 31, 2009**

| | | |
|---|---|---|
| Beginning Balance: | $ | - |
| Additions to Capital | $ | - |
| Account Adjustments | $ | - |
| Avg. Investment Balance | $ | - |
| Allocated Profit: | $ | - |
| Ending Balance | $ | - |
| Monthly Return | | #DIV/0! |

| Account Summary | | | | |
|---|---|---|---|---|
| **Date** | **Description** | **Credits** | **Withdrawals** | **Account Total** |
| | | | | 0 |
| 30-Jun | Capital Deposit | $    500,000.00 | | $          500,000.00 |
| 31-Jul | Profit Allocation | $          - | | $          500,000.00 |
| 31-Aug | Profit Allocation | $          - | | $          500,000.00 |
| 30-Sep | Profit Allocation | $          - | | $          500,000.00 |
| 31-Oct | Profit Allocation | $          - | | $          500,000.00 |
| 29-Nov | Profit Allocation | $          - | | $          500,000.00 |
| 30-Dec | Profit Allocation | $          - | | $          500,000.00 |
| 31-Jan | Profit Allocation | $          - | | $          500,000.00 |
| 27-Feb | Account Adjustment | | $    500,000.00 | $                  - |
| 28-Feb | Profit Allocation | $          - | | $                  - |
| 31-Mar | Profit Allocation | $          - | | $                  - |
| 30-Apr | Profit Allocation | $          - | | $                  - |
| 30-May | Profit Allocation | $          - | | $                  - |
| 30-Jun | Profit Allocation | $          - | | $                  - |
| 31-Jul | Profit Allocation | $          - | | $                  - |
| 31-Aug | Loss Allocation | $          - | | $                  - |



13116 Harriers Place . Bradenton, FL 34212
941.527.1417   Fax 941.761.5805

**Kenitzer 24, LLC**
**4150 Creekwood Ct**
**Pleasanton, CA 94588**

**STATEMENT OF ACCOUNT #10483**                    **August 31, 2009**

.

| | | |
|---|---|---|
| Beginning Balance: | $ | 38,751.19 |
| Additions to Capital | $ | - |
| Adjustments | $ | - |
| Avg. Investment Balance | $ | 38,751.19 |
| Allocated Profit: | $ | - |
| Ending Balance | $ | 38,751.19 |
| Monthly Return | | 0.00% |

| Account Summary | | | | | |
|---|---|---|---|---|---|
| **Date** | **Description** | | **Credits** | **Withdrawals** | **Account Total** |
| 30-Jun | Capital Deposit | | $ 330,000.00 | | $ 330,000.00 |
| 31-Jul | Profit Allocation | | $ - | | $ 330,000.00 |
| 31-Aug | Profit Allocation | | $ - | | $ 330,000.00 |
| 30-Sep | Profit Allocation | | $ - | | $ 330,000.00 |
| 31-Oct | Profit Allocation | | $ - | | $ 330,000.00 |
| 29-Nov | Profit Allocation | | $ - | | $ 330,000.00 |
| 30-Dec | Profit Allocation | | $ - | | $ 330,000.00 |
| 31-Jan | Profit Allocation | | $ - | | $ 330,000.00 |
| 27-Feb | Account Adjustment | | | $ 241,248.81 | $ 88,751.19 |
| 28-Feb | Profit Allocation | | $ - | | $ 88,751.19 |
| 31-Mar | Profit Allocation | | $ - | | $ 88,751.19 |
| 30-Apr | Profit Allocation | | $ - | | $ 88,751.19 |
| 30-May | Profit Allocation | | $ - | | $ 88,751.19 |
| 29-Jun | Profit Withdrawal | | $ - | $ 50,000.00 | $ 38,751.19 |
| 30-Jun | Profit Allocation | | $ - | | $ 38,751.19 |
| 31-Jul | Profit Allocation | | $ - | | $ 38,751.19 |
| 31-Aug | Loss Allocation | | $ - | | $ 38,751.19 |



13116 Harriers Place  .  Bradenton, FL 34212
941.527.1417   Fax 941.761.5805

**Kenitzer Family Foundation**
**4150 Creekwood Court**
**Pleasanton, CA 94588**

**STATEMENT OF ACCOUNT #10485**                    **August 31, 2009**

| | | |
|---|---|---|
| Beginning Balance: | $ | 216,616.51 |
| Additions to Capital | $ | - |
| Adjustments | $ | - |
| Avg. Investment Balance | $ | 216,616.51 |
| Allocated Profit: | $ | - |
| Ending Balance | $ | 216,616.51 |
| Monthly Return | | |

| Account Summary | | | | | |
|---|---|---|---|---|---|
| Date | Description | | Credits | Withdrawals | Account Total |
| | | | | | 0 |
| 30-Jun | Capital Deposit | | $   500,000.00 | | $         500,000.00 |
| 31-Jul | Profit Allocation | | $              - | | $         500,000.00 |
| 31-Aug | Profit Allocation | | $              - | | $         500,000.00 |
| 30-Sep | Profit Allocation | | $              - | | $         500,000.00 |
| 31-Oct | Profit Allocation | | $              - | | $         500,000.00 |
| 29-Nov | Profit Allocation | | $              - | | $         500,000.00 |
| 30-Dec | Profit Allocation | | $              - | | $         500,000.00 |
| 31-Jan | Profit Allocation | | $              - | | $         500,000.00 |
| 27-Feb | Account Adjustment | | | $    283,383.49 | $         216,616.51 |
| 28-Feb | Profit Allocation | | $              - | | $         216,616.51 |
| 31-Mar | Profit Allocation | | $              - | | $         216,616.51 |
| 30-Apr | Profit Allocation | | $              - | | $         216,616.51 |
| 30-May | Profit Allocation | | $              - | | $         216,616.51 |
| 30-Jun | Profit Allocation | | $              - | | $         216,616.51 |
| 31-Jul | Profit Allocation | | $              - | | $         216,616.51 |
| 31-Aug | Loss Allocation | | $              - | | $         216,616.51 |

# EXHIBIT N

## ACCREDITED INVESTOR ACKNOWLEDGMENT
## FOUNDATION  DB

| Foundation | The Stewardship Group |
|---|---|
| | 501(C)(2)) EIN# 20-4152375 |
| Authorized Signatories | Charles Hooper,  Brian Denman |
| Position(s) | Trustees |
| Address | 1914 Deep Springs Lane |
| | Lincoln. CA 95648 |

THE UNDERSIGNED hereby acknowledges and agrees that:

1. The Foundation is a body trust, in trust pursuant to the laws of the jurisdiction as stated herein;

2. The undersigned is a duly authorized signatory of the Foundation as stated herein;

3. The Foundation has entered, or will be entering, into a loan agreement with Arcanum Equity Fund, LLC (the "Issuer") which loan will be evidenced by one or more promissory notes (the "Notes") issued by the Issuer which Notes may be considered securities under the Securities Act;

4. The Foundation is an "accredited investor" as such term is defined in applicable securities legislation in that it is a Trust that had net assets of at least $5,000,000 on its most recently prepared financial statements;

5. The Foundation has not received, nor has it requested, any form of Offering Memorandum or Private Placement Memorandum describing the Issuer or the Notes;

6. The Foundation is making the Loan as principal and on the closing of the loan agreement it will be the beneficial owner of the Notes;

7. There are restrictions the ability to transfer or resell the Notes.

DATED this 22nd day of April, 2008

_V.CNS ⊬⊱⊂T._

Signature of Authorized Signatory

Signature of Authorized Signatory

Arcanum Equity Fund, LLC
11316 Harriers Place
Bradenton, FL  34212
aefdbforms@gmail.com



## SCHEDULE A - LENDER'S DOCUMENT DB

| Date | April 21, 2008 |
|------|---------------|
| Transaction Code | AEFDB04192008208100K |
| Loan Amount | $100,000.00 |

I/we, the undersign bind myself/ourselves to the Arcanum Master Loan Agreement as defined thereunder by executing this Schedule "A" – Lender's Document, and wish to lend the amount indicated above to Arcanum Equity Fund, LLC pursuant to the terms and conditions of the Arcanum Master Loan Agreement.

I/we qualify as "accredited investors" as indicated below:

| Initial One Below | |
|---|---|
| *BD* | Foundation that have net assets of at least $5,000,000. |
| | Limited Partnership or Limited Liability Company that have net assets of at least $5,000,000. |
| | Individual who, either alone or jointly with a spouse, beneficially owns, directly or indirectly, financial assets (i.e. cash, securities, real estate) having an aggregate realizable value that before taxes, but net of any related liabilities, exceeds $1,000,000; or |
| | Whose net income before taxes exceeded $200,000 in each of the two most recent years or whose net income before taxes combined with that of a spouse exceeded $300,000 in each of the two most recent years or who, in either case, reasonably expects to exceed that net income level in the current year. |

| | Please initial here if you are not a Unites States citizen or entity. |
|---|---|
| | |

## LENDER CONTACT INFORMATION

| Attention | |
|-----------|--|
| Lender(s) | The Stewardship Group Foundation |
| Care/Of | Charles Hooper |
| Address | 1914 Deep Springs Lane |
| | Lincoln, CA 95648 |
| Phone | 916 543.3205 |
| Fax | 1866 253 6753 |
| Email | stewardshipgroup@yahoo.com |

_V.Cnts / De T._

Lender's Signature                                    Lender's Signature

**Arcanum Equity Fund, LLC**
11316 Harriers Place
Bradenton, FL 34212
aefubforms@gmail.com



## SCHEDULE C
### LIMITED TRADING AUTHORIZATION DB

To Arcanum Equity Fund, LLC

The undersigned hereby authorizes Dale E. St. Jean and/or Robert L. Buckhannon, Managing Members of Arcanum Equity Fund, LLC, and/or their assigns as the undersigned's agent and attorney-in-fact ("Authorized Agent") to engage the funds loaned to Arcanum Equity Fund LLC, by the undersigned, on deposit in the Arcanum Equity Fund, LLC Deutsche Bank Custody account ("Deposit") to purchase Deutsche Bank Medium term notes or any other A+ rated security that can be bought at a discount to market and to sell these securities at a profit, thus ensuring the account always has an equivalent value of or greater than the Deposit. This authorization is limited only to the foregoing.

In all matters and things aforementioned, as well as in all other things necessary or incidental to the furtherance or conduct of the account of the undersigned, the Authorized Agent is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do.

This authorization and indemnity is in addition to (and in no way limits or restricts) any rights, which the Authorized Agent may have under any other agreement or agreements between the undersigned and the Authorized Agent. This authorization and indemnity is also a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice actually received by the Authorized Agent addressed to the attention of the compliance officer, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

If any provision of this authorization or indemnity shall be rendered invalid for any reason, the provisions of this agreement shall be deemed modified or superseded as the case may be and these provisions shall in all respects continue and be in full force and effect.

**Undersigned:**        X _V.Chesh3eT._

_Bru P. Du_

**Transaction Code** AEFDB04192008208100K

| Name(s) | The Stewardship Group Foundation |
|---------|----------------------------------|
| Address | 1914 Deep Springs Lane |
|         | Lincoln, CA 95648 |
| Phone   | 916 543.3205  352-396-1195 |
| Fax     | 18662536753 |
| Email   | stewardshipgroup@yahoo.com |

Arcanum Equity Fund, LLC
11316 Harriers Place
Bradenton, FL 34212
aefdbforms@gmail.com

# EXHIBIT O

**Don Sowers**

| | |
|---|---|
| **From:** | rpres1@aol.com |
| **Sent:** | Friday, April 03, 2009 11:17 AM |
| **To:** | Don Sowers; rbuckhannon@gmail.com |

Don,

As you know you instructed myself (Charles Hooper) the proper procedure for requesting and receiving a distribution of funds invested with Arcanum. All of your instructions were followed with a confirmation on your part of acceptance. You stated that the distribution would be a wire transfer and would be in the account of The Stewardship Group no later than April 2. The transfer never occurred with no communication and when we contacted you the afternoon of April 2 ....you stated that it would be delayed by a couple of days. When I confirmed a couple of days being Monday or Tuesday you then mentioned that the account may be held upon review and we needed to speak with Terry or Rob. This was bewildering to say the least as you took the problems of "Ken and Anthony" and applied them to this investment and The Stewardship Group. Upon your advice we have called Terry three times and left messages the second and third times. Rob is in Europe until the 12th. We have left a message with him as well. The contracts that The Stewardship Group and Arcanum has is strictly with The Stewardship Group. It has nothing to do with Ken or Anthony. The Stewardship Group has requested a distribution of interest earned on the investment. You agreed to that distribution because it is TSG monies. We have two contracts with Arcanum that expire on May 2 and July 2 of this year. It has been advised by our counsel that if there is any disruption or delay in any distributions that the damages may far exceed what is held in the investment and we would be entitled to those damages. TSG has a number of 501(c)(3) organizations that are relying on your organization honoring and keeping the contracts that were offered and accepted. We have a recorded conversation with Rob while he was in Zurich where we explained our situation and he assured us of assistance in any way that he could. He offered an early redemption of which we felt would not be necessary. We have our recorded conversation with Don requesting an interest distribution which Don clearly stated no problem and explained what to do to make that happen. We have been open and forthcoming in sharing what was happening with "one" of our clients. That is our responsibility. We are counting on this distribution to remedy the contractual obligation to that client as well the others. Your cooperation is required and the contracts that are in place honored. We look forward to the agreed upon distributions. Thank you in advance.

The Stewardship Group
Charles Hooper


-----Original Message-----
From: Don Sowers <don.sowers@vestiumgroup.com>
To: rpres1@aol.com; trawstern@tampabay.rr.com
Cc: hoopscoopinpv@yahoo.com
Sent: Mon, 23 Mar 2009 1:26 pm
Subject: RE: Account #10820TSG

Gentlemen,

Rob and I have not had a chance to discuss this. Please outline precisely what you have in mind.

Don

1

# EXHIBIT P

7700 W. Wigwam Avenue
Las Vegas, NV  89113
(702) 617-9954 Fax (702) 617-1595
Cell  (702) 595-2643
E-Mail: Steve@SteveMartinCPA.us
Web: SteveMartinCPA.us

# Steven E. Martin, CPA/ABV/CFF, CFE, CVA

**PROFILE:**

30 plus years of business, accounting and management experience. Uniquely qualified in the litigation of accounting issues, having participated in eighty plus litigation engagements

- ➢ Performed accounting and fraud audit functions regarding civil and criminal fraud investigations with subsequent litigation for the Securities and Exchange Commission ("SEC"), the Florida Department of Insurance, and others.
- ➢ Involved with shareholder and contract disputes, bankruptcy, receivership and insolvency matters, commercial litigation, professional malpractice actions, assessments of damages in wrongful death and personal injury actions, and antitrust issues.
- ➢ Business valuations engagements for estate and divorce, with business damage assessments for casinos, restaurants, commercial orange groves, and other business entities in eminent domain actions for the Florida Department of Transportation, and other purposes.
- ➢ Performed Audit and tax work for international companies.

Formerly Nevada State Controller. Experience in all areas of accounting: Accounts Receivables, Accounts Payables, Payroll, Financial Statements, Cash Flow analysis and projections for numerous types of businesses, both large and small. Has advised many organizations on business development issues.

Formerly an adjunct professor for the Accounting Department of the College of Southern Nevada teaching accounting, tax , investment, and personal finance courses.

**EDUCATION/
CREDINTIALS:**

- ➢ Certified Public Accountant (CPA)
- ➢ Certified Fraud Examiner (CFE)
- ➢ Certified Valuation Analyst (CVA)
- ➢ Accredited in Business Valuation  by the AICPA (ABV)
- ➢ Certified in Financial Forensics  by the AICPA (CFF)
- ➢ Certified QuickBooks Pro Advisor
- ➢ Master in Accounting, Nova/Southeastern University, Ft. Lauderdale, FL
- ➢ Bachelor of Science, Business Administration, George Washington Univ., Washington D. C.

**EXPERIENCE:**

**Steve Martin, C.P.A., Ltd., Las Vegas, NV.**                                    **2007-2009**

- ➢ Comprehensive accounting litigation with emphasis on Fraud and Business Valuation, auditing and consulting issues, and accounting systems. Cases include: Forensic Accounting, Bank Fraud, Business Valuation, Personal Injury and Wrongful Death, Eminent Domain, Personal Injury, Damages & Lost Profits, Federal Grant Fraud, and Employment Termination Damages.

**State Controller, State of Nevada, Carson City, NV.**        **2006**
> Appointed by Governor Guinn to complete the term of the late State Controller Kathy Augustine. Prepared the 2006 Comprehensive Annual Financial Report and the Popular Annual Financial Report for Nevada, designed a computer back-up system, proposed legislation regarding state financial administration, served on the Board of the Nevada Department of Transportation, the State Board of Finance, and the Governor's Internal Audit Committee, and administered the accounting system for the $7 Billion State Budget.

**Steve Martin, C.P.A., Ltd., Las Vegas, NV.**        **1999 - 2006**
> Litigation, general accounting, auditing and consulting issues, tax, and accounting systems.

**Adjunct Professor, Accounting Department, Community College of**     **2000 - 2002**
**Southern Nevada, Las Vegas, NV**
> Part time position teaching Accounting, Investments, Personal Finance, and Taxation.

**Sr. Manager, Litigation Support, Morrison, Brown, Argiz & Company,**     **1995 - 1999**
**Miami, FL**
> Handled special projects such as developing accounting issues in litigation cases, conduct of a fraud audit for Securities and Exchange Commission and the Miami Police Pension Fund, and numerous other clients.
> Performed business valuation for restaurants, auto dealerships, broadcast stations, professional medical and legal practices. Performed business damage calculations relating to lost profits from Hurricane Andrew, burglary losses, and shareholder disputes.

**President, Martin Accounting & Auditing, Inc. Miami, FL**        **1994**
> Contracted with the Receiver, Florida Department of Insurance Civil Division regarding issues of Insurance Companies in Receivership.
> Provided criminal investigation services to the Criminal Division, Florida Department of Insurance, resulting in convictions and fines.
> Provided Services regarding the $300 Million Premium Sales Fraud (Ponzi Scheme) for the Receiver.

**Controller for three Corporations, Black & White Labs of Dallas, TX, BWC Chrome**
**Labs, Miami, Miami Beach**        **1992 – 1993**
> Controller for commercial photo labs companies.

**President and CFO, M-Ports, Inc., Houston, Tx**        **1983 – 1991**
> President and CFO of international import company.

**Distribution Manager, Drillchem, Inc., Houston, Tx**        **1981 – 1982**
> Distribution Manager for oil field services company.

**Credit Manager and Distribution Manager, American Hospital Supply.**    **1979 - 1980**
> Credit Manager and then Distribution Manager for the Northwest States Area out of San Francisco, CA.

**United States Marine Corps**        **1968 - 1978**
> Attained the rank of Major in 12 years of active and reserve service. Top Secret Clearance, and had assignments such as Battalion Executive Officer, Battalion Operations Officer, Company Commander, Computer Systems Analyst

## PROFESSIONAL MEMBERSHIP:
> Certified Public Accountant: State of Nevada
> Accredited in Business Valuation ("ABV") American Institute of Certified Public Accountants
> Certified in Financial Forensics by the AICPA (CFF)
> Nevada Society of Certified Public Accountants
> Certified Fraud Examiner ("CFE"), Association of Certified Fraud Examiners
> Certified Valuation Analyst ("CVA"), National Association of Certified Valuation Analysts
> Associate Member of the Clark County Bar Association. Received the 2002 CCBA President's Award.

## COMMUNITY INVOLVEMENT:
> Past Treasurer, Nevada State Republican Party
> Clark County Delegate to the Nevada Republican Party Central Committee.
> Nevada Delegate to the Republican National Convention 2004 and 2008
> Member Marine Corps League
> Life Member of the Veterans of Foreign Wars.
> Treasurer, Clark County Young Republican Foundation

## LECTURES, SEMINARS, AND ARTICLES:
> Contributing Author to "Computer Fraud Casebook, The Bytes that Bite" published by John Wiley & Sons for the Association of Certified Fraud Examiners, 2009
> 2005 – 2006 spoke extensively to groups around Nevada regarding Nevada fiscal issues.
> "A View From the Senate Floor", a summary of the 2005 Nevada Legislature debate on Property Taxes, as published in the August 2005 "Commique" of the Clark County Bar Association.
> Adjunct Professor, Accounting, Tax and Investment Courses, Community College of Southern Nevada.
> Guest Lecturer on Fraud for the Institute of Management Accounting Association, Las Vegas, NV
> Guest Lecturer, 13th Annual Accounting Show Sponsored by the Florida Institute of Certified Public Accountants.
> Guest Lecturer, Fraud Course, Nova/Southeastern University
> Panelist, BETA ALPHA PSI, The National Accounting Fraternity, Southeast Regional Conference
> Guest Lecturer, Florida International University, College of Business Administration School of Accounting, Center for Accounting, Auditing and Tax Studies
> Guest Lecturer, Florida Institute of Certified Public Accountants, Accounting Conference Seminar on Litigation Support and Fraud Update
> Guest Lecturer, Seminar on Fraud and Litigation Support, Cuban American CPA Association Seminar on Fraud Litigation Support.

SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|------|---------------|-------------|
| Abilio Leon and Maria Leon v. Danka Industries, Inc. and A'Leon Business Machines, Inc. | Consultant / Analyst | Shareholder Dispute |
| Aircraft Tool and Maintenance, Inc. | Consultant / Valuation Analyst | Valuation and Sale |
| Alfred M. Allen, Donn Allen and Clarence Allen v. Roberto Gonzalez and Joe's Moving and Storage | Consultant / Lead Analyst | Personal Injury |
| All Right Parking v. Universal National Bank & Arturo Morales | Consultant / Analyst | Lender Liability , Civil Fraud, and Diversion of Funds |
| Avakian Orient Express, Inc. and Fireman's Fund Insurance Company | Consultant / Analyst / Umpire | Review of two CPA valuations of Inventory Loss |
| Bellini's Inc. vs Perless Roth Jonas & Hartney, CPA, P.A. | Consultant / Analyst | Malpractice resulting from Employee Theft |
| Bigelow Management, Inc. vs Kelly D. McNamara | Expert Witness | Forensic Accounting - Misappropriation of assets. |
| Brighton Group, Ltd. d/b/a Dominion Towers vs Cleanco, Inc. (Coinmach Corporation) | Consultant / Analyst | Forensic Accounting - Misappropriation of assets. |
| Caremed Medical Management, Inc. | Consultant / Analyst | Forensic Accounting - Misappropriation of assets. |
| Caremed Medical Management, Inc. and Paul Cejas | Consultant / Analyst | Tax and other Analysis of $100 Million Stock Portfolio |
| Cayon & Machado v. Jaime & Robles | Consultant / Analyst with Mediation | Dissenting Stockholder/Forensic Accounting – Misappropriation of assets and diversion of profits, Civil Fraud |
| City of Hollywood v. Rachlin & Cohen; & v. Arthur Andersen | Consultant / Analyst | Professional Malpractice |
| Click v Tire Kingdom, Inc. | Consultant / Analyst | Wrongful Termination |
| Coral Springs Honda v General Electric Capital Corp. | Consultant / Analyst | Damages and Lost Profits |
| Crousillat v. Crousillat | Consultant / Analyst | Marital Dissolution Business Valuation |
| DEMCO v ENDE (Arbitration Case) | Testified before a three Judge Arbitration Panel | Fraud and Contract Dispute |
| Dr. Alan L. Berke v. Lee L. Engel, CPA | Consultant / Analyst | Malpractice |

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|------|---------------|--------------|
| Dr. Stoner | Consultant / Analyst | Criminal Theft and Embezzlement |
| State of Nevada v Dr. Fred Stoner | Court Appearance | Failure to Pay State Business Taxes |
| Emerson Fittipaldi | Consultant / Analyst | Fraud and Embezzlement |
| Emerson Fittipaldi & Fittipaldi Cigars v Biarritz Cigars and George Suarez | Consultant / Analyst | Shareholder Dispute |
| Estate of Bertha Aragon v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of Eric C. Hemphill v American Airlines | Consultant / Analyst | Wrongful Death |
| Estate of John Edward May v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of John G. Bull v. Holy Cross Hospital | Consultant / Analyst | Wrongful Death |
| Estate of Juan Carlos Gomez v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of Maggie Claudia Villalobos Mejia v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of Marco T. Betancourt, Sr. v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Florida Department of Insurance v. Guardian Property & Casualty Insurance Company | Consultant / Analyst / Investigator | Insurance Fraud –Forensic accounting related to fraudulent loss ratios and related revenues. |
| Florida Department of Insurance v. TransFlorida Casualty Insurance Company | Consultant / Analyst / Investigator | Insurance Fraud and Misappropriation of Assets |
| Florida Department of Insurance v. Deloitte & Touche | Consultant / Analyst | Malpractice relating to Insurance Audit |
| Florida Department of Insurance v. Usher Insurance Company (Plaintiff) (1995) | Consultant / Analyst / Investigator | Insurance Fraud and Misappropriation of Assets |
| Florida Department of Transportation vs A & H Equipment Repair, Inc. | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Bonded Air Conditioning, Inc. | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Carmine's Texaco, II | Consultant / Valuation Analyst | Eminent Domain |

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|---|---|---|
| Florida Department of Transportation vs Casino Real Estate | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Cycle Lab, Inc. | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Cut & Curl | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Dukes Insurance Agency | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Elite Air Conditioning | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Franklin Finance | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Golden Rainbow Jewelry | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs S.E. Bible | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Spykes Grove | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Sunshine Food & Beverage | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Southern Transmission | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Triple B Corp. DBA Best Auto | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs University Griffin Mobil | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Viele Grove | Consultant / Valuation Analyst | Eminent Domain |
| Guillermo Rodriguez-Kramer and Humberto Vazquez v. Martino Tire Co. | Consultant / Valuation Analyst | Slander Lost Wages |
| Henry H. McFlicker v All State Insurance Company | Consultant / Analyst | Financial Evaluation-Insurance Company refused to pay loss. Plaintiff accused of arson |
| Ivan Go V Nico Guzom, Michelle Guzom, Juan Fabian Guzom, Vincent Guzom, Claudia Johnson, and Does 1-10, inclusive | Consultant/Expert Witness | Criminal Fraud, Falsification of Document |

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|------|---------------|--------------|
| Jerry L. Dennis DBA Sin City Fashions vs Frank Habibian, etal | Consultant/Expert Witness | Lost Profits |
| John Munshower v. Dove Creek Co. d/b/a Snappers Restaurant & Raw Bar, Linda Kolbenheyer and Harold Kolbenheyer | Consultant / Valuation Analyst | Dissenting Stockholder Business Valuation |
| John Sliman v. Deel Corporation d/b/a Deel Ford | Consultant / Analyst | Breach of Contract |
| Kupferberg, Andrew Scott v. San Francisco Forty Niners, LTD, Deion Sanders and the National Football League | Consultant / Analyst | Personal Injury |
| Las Americas V Corp. V Public Service Mutual | Consultant / Analyst | Business Interruption Claim |
| Lisette Medina v Manny Medina | Consultant / Analyst | Divorce |
| Matthew Wohl, Trustee d/b/a Great Southern Hotel v. City of Hollywood | Consultant / Analyst | Business Damages |
| Ed McWilliams v Linda Davis (2008) Defendent | Consultant / Expert Witness | Civil Conspiracy, Misrepresentation, Embezzlement |
| Miami Police Pension Fund vs Ronald K. Stern, CPA | Consultant / Analyst / Investigator | Criminal Fraud, Falsification of Documents and Embezzlement |
| Moda Mario, Inc. V. Nationwide Mutual Insurance Company | Consultant / Valuation Analyst | Lost Profits |
| Mt Sinai Hospital vs Dr. Lionel Resnick | Consultant / Analyst | Federal Grant Fraud and Destruction of Property |
| Nerren v Jennings, Case NO. 98-12516 CA 11, Nerren v. Jennings, Arbitration Proceeding | Consultant / Analyst | Contract Dispute |
| Nevada Mobile Concrete v Progressive Insurance | Consultant / Expert Witness | Business Damages and Lost Profits |
| Nevada Oil and Land Development vs Bashar Ahmad Elyousef | Consultant / Expert Witness | Misappropriation of Assets |
| Oak Feed Market and Restaurant, Inc. | Consultant / Analyst | Business Damages |
| Premium Sales | Consultant / Analysis of Claims totaling $1 Billion | Criminal Fraud, Falsification of Documents and Embezzlement |
| Puente v. Puente | Consultant / Valuation Analyst | Business Valuation Marital Dissolution |

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|---|---|---|
| Randall J. Kalik v. AON Risk Services, Inc. | Consultant / Analyst | Employment Termination Damages |
| Richard B. Negley and Peck Hayne v. Harold T. Chittum, et.al | Consultant / Analyst | Civil Fraud |
| Ronald Goldberg v. Carl R. Santangelo & McCrory & Santangelo PA | Consultant / Analyst | Malpractice |
| S.A. & R.A. v. South Florida Blood Service, Inc. | Consultant / Analyst | Wrongful Death |
| SouthwestUSA Bank vs Framing Brokers, Inc. | Consultant / Analyst | Bank Fraud |
| Securities and Exchange Commission v. Gerald and Marie Levine | Consultant / Expert Witness | Receivership Action/Asset Search |
| Securities and Exchange Commission v. United Benefit Group | Consultant / Analyst / Investigator | Investor Fraud related to Viatical Insurance policies. |
| STMKC vs H & H et. Al | Consultant / Expert Witness | Contract Dispute and Misappropriation of Assets |
| Strata Communications vs Ron Vallone | Consultant / Expert Witness | Fraud and Misappropriation of Assets |
| State of Florida v. Dale C. Branham and Charter American Insurance Company | Consultant / Analyst | Insurance Fraud and Misappropriation of Assets |
| Stocks Mill & Supply Co., Inc. v United States Bankruptcy Court, District of Nevada | Consultant / Analyst | Work for Creditor |
| Telectronics v. Medtronics | Consultant / Analyst | Antitrust |
| Tzanetopoulos V Tzanetopoulos | Expert Witness Business Valuation of a Casino Interest | Divorce |
| U.S. Sales & Trade Consultants Co., Inc. d/b/a Miami "B" Goods v. Toshiba America Information System, Inc. | Consultant / Analyst | Civil Fraud |
| United Parcel Service of America, Inc. v Lynn Strickland Tire, Inc. - Miami and Bandag, Inc. | Consultant / Analyst | Civil Fraud |
| United States of America v. Robert Miller and Robert Wohleber | Consultant / Analyst | Criminal Fraud |
| University Fitness of Miami, Inc. d/b/a Cross Training Fitness Center v. Lennar Mayfair, Ltd. and Lennar Mayfair Holdings, Inc. and Tiger Mayfair, L.L.C. | Consultant / Analyst | Lost Profits |
| Williams V Williams | Consultant / Analyst Business Valuation | Divorce |

# EXHIBIT C

**THE LAW OFFICE OF C. DEAN HOMAYOUNI, ESQ.**
C. DEAN HOMAYOUNI, ESQ., CPA (225282)
7764 Painted Sunset Drive
Las Vegas, NV   89149
Telephone: (702) 658-0969
Facsimile: (702) 966-3707
Email: deanhomayouni@gmail.com

Attorney for Arcanum Equity Fund, LLC and  Vestium Management Group, LLC

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ANTHONY VASSALLO, et. al, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CASE NO.: CV 09-000665 LKK-DAD

**EXPERT WITNESS DISCLOSURE**

Date:        December 7, 2009
Time:        10:00 a.m.
Location:    Courtroom 4, 15th Floor
Judge        Hon. Lawrence K. Karlton

Arcanum Equity Fund and Vestium Management Group, LLC, by and through their attorneys of record, C. DEAN HOMAYOUNI, ESQ., CPA, hereby discloses their expert in this matter as follows:

### LIST OF EXPERT WITNESSES

1.    Steven E. Martin, CPA, CFE, CVA
      7700 W. Wigwam Avenue
      Las Vegas, Nevada 89113

Please refer to his attached curriculum vitae for qualifications.

### CERTIFICATION

To the best of counsel's knowledge, information, and belief formed after reasonable inquiry the disclosure is complete and correct as of the date made.  Disclosures discovered to be incorrect shall be corrected within a reasonable time after their inaccuracy is discovered.

The Law Office of
C. DEAN HOMAYOUNI
7764 Painted Sunset Drive,Las Vegas, Nevada 89149
Telephone (702) 658-0969, Facsimile (702) 966-3707

1

2   DATED this 23rd day of November, 2009.

3

4                            **THE LAW OFFICE OF C. DEAN HOMAYOUNI, ESQ.**

5                    By:    /s/ C. Dean Homayouni

6                           _____
                            C. DEAN HOMAYOUNI, ESQ., CPA
7                           California Bar No.: 225282
                            7764 Painted Sunset Drive
8                           Las Vegas, NV 89149
                            Telephone: (702) 658-0969
9                           Facsimile: (702) 966-3707
                            E-Mail: deanhomayouni@gmail.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Law Office of
**C. DEAN HOMAYOUNI**
7764 Painted Sunset Drive,Las Vegas, Nevada 89149
Telephone (702) 658-0969, Facsimile (702) 966-3707

EXPERT WITNESS DISCLOSURE
CASE NO. CV-09-000665 LLK-DAD

Steve Martin, CPA, Ltd.
7700 W. Wigwam Avenue
Las Vegas, NV 89113
(702) 617-9954 Fax (702) 617-1595
Cell (702) 595-2643
E-Mail: Steve@SteveMartinCPA.us
Web: SteveMartinCPA.us

# Steven E. Martin, CPA/ABV/CFF, CFE, CVA

**PROFILE:**    30 plus years of business, accounting and management experience. Uniquely qualified in the litigation of accounting issues, having participated in eighty plus litigation engagements

> - Performed accounting and fraud audit functions regarding civil and criminal fraud investigations with subsequent litigation for the Securities and Exchange Commission ("SEC"), the Florida Department of Insurance, and others.
> - Involved with shareholder and contract disputes, bankruptcy, receivership and insolvency matters, commercial litigation, professional malpractice actions, assessments of damages in wrongful death and personal injury actions, and antitrust issues.
> - Business valuations engagements for estate and divorce, with business damage assessments for casinos, restaurants, commercial orange groves, and other business entities in eminent domain actions for the Florida Department of Transportation, and other purposes.
> - Performed Audit and tax work for international companies.

Formerly Nevada State Controller. Experience in all areas of accounting: Accounts Receivables, Accounts Payables, Payroll, Financial Statements, Cash Flow analysis and projections for numerous types of businesses, both large and small. Has advised many organizations on business development issues.

Formerly an adjunct professor for the Accounting Department of the College of Southern Nevada teaching accounting, tax , investment, and personal finance courses.

**EDUCATION/
CREDINTIALS:**

> - Certified Public Accountant (CPA)
> - Certified Fraud Examiner (CFE)
> - Certified Valuation Analyst (CVA)
> - Accredited in Business Valuation by the AICPA (ABV)
> - Certified in Financial Forensics by the AICPA (CFF)
> - Certified QuickBooks Pro Advisor
> - Master in Accounting, Nova/Southeastern University, Ft. Lauderdale, FL
> - Bachelor of Science, Business Administration, George Washington Univ., Washington D. C.

**EXPERIENCE:**

### Steve Martin, C.P.A., Ltd., Las Vegas, NV.                              2007-2009

> - Comprehensive accounting litigation with emphasis on Fraud and Business Valuation, auditing and consulting issues, and accounting systems. Cases include: Forensic Accounting, Bank Fraud, Business Valuation, Personal Injury and Wrongful Death, Eminent Domain, Personal Injury, Damages & Lost Profits, Federal Grant Fraud, and Employment Termination Damages.

Steven E. Martin, CPA/ABV/CFF, CFE, CVA, Continued

**State Controller, State of Nevada, Carson City, NV.**                    **2006**
> Appointed by Governor Guinn to complete the term of the late State Controller Kathy Augustine. Prepared the 2006 Comprehensive Annual Financial Report and the Popular Annual Financial Report for Nevada, designed a computer back-up system, proposed legislation regarding state financial administration, served on the Board of the Nevada Department of Transportation, the State Board of Finance, and the Governor's Internal Audit Committee, and administered the accounting system for the $7 Billion State Budget.

**Steve Martin, C.P.A., Ltd., Las Vegas, NV.**                    **1999 - 2006**
> Litigation, general accounting, auditing and consulting issues, tax, and accounting systems.

**Adjunct Professor, Accounting Department, Community College of**    **2000 - 2002**
**Southern Nevada, Las Vegas, NV**
> Part time position teaching Accounting, Investments, Personal Finance, and Taxation.

**Sr. Manager, Litigation Support, Morrison, Brown, Argiz & Company,**    **1995 - 1999**
**Miami, FL**
> Handled special projects such as developing accounting issues in litigation cases, conduct of a fraud audit for Securities and Exchange Commission and the Miami Police Pension Fund, and numerous other clients.
> Performed business valuation for restaurants, auto dealerships, broadcast stations, professional medical and legal practices. Performed business damage calculations relating to lost profits from Hurricane Andrew, burglary losses, and shareholder disputes.

**President, Martin Accounting & Auditing, Inc. Miami, FL**                    **1994**
> Contracted with the Receiver, Florida Department of Insurance Civil Division regarding issues of Insurance Companies in Receivership.
> Provided criminal investigation services to the Criminal Division, Florida Department of Insurance, resulting in convictions and fines.
> Provided Services regarding the $300 Million Premium Sales Fraud (Ponzi Scheme) for the Receiver.

**Controller for three Corporations, Black & White Labs of Dallas, TX, BWC Chrome**
**Labs, Miami, Miami Beach**                    **1992 – 1993**
> Controller for commercial photo labs companies.

**President and CFO, M-Ports, Inc., Houston, Tx**                    **1983 – 1991**
> President and CFO of international import company.

**Distribution Manager, Drillchem, Inc., Houston, Tx**                    **1981 – 1982**
> Distribution Manager for oil field services company.

**Credit Manager and Distribution Manager, American Hospital Supply.**    **1979 - 1980**
> Credit Manager and then Distribution Manager for the Northwest States Area out of San Francisco, CA.

**United States Marine Corps**                    **1968 - 1978**
> Attained the rank of Major in 12 years of active and reserve service. Top Secret Clearance, and had assignments such as Battalion Executive Officer, Battalion Operations Officer, Company Commander, Computer Systems Analyst

**Steven E. Martin, CPA/ABV/CFF, CFE, CVA, Continued**

## PROFESSIONAL MEMBERSHIP:

- ➢ Certified Public Accountant: State of Nevada
- ➢ Accredited in Business Valuation ("ABV") American Institute of Certified Public Accountants
- ➢ Certified in Financial Forensics by the AICPA (CFF)
- ➢ Nevada Society of Certified Public Accountants
- ➢ Certified Fraud Examiner ("CFE"), Association of Certified Fraud Examiners
- ➢ Certified Valuation Analyst ("CVA"), National Association of Certified Valuation Analysts
- ➢ Associate Member of the Clark County Bar Association. Received the 2002 CCBA President's Award.

## COMMUNITY INVOLVEMENT:

- ➢ Past Treasurer, Nevada State Republican Party
- ➢ Clark County Delegate to the Nevada Republican Party Central Committee.
- ➢ Nevada Delegate to the Republican National Convention 2004 and 2008
- ➢ Member Marine Corps League
- ➢ Life Member of the Veterans of Foreign Wars.
- ➢ Treasurer, Clark County Young Republican Foundation

## LECTURES, SEMINARS, AND ARTICLES:

- ➢ Contributing Author to "Computer Fraud Casebook, The Bytes that Bite" published by John Wiley & Sons for the Association of Certified Fraud Examiners, 2009
- ➢ 2005 – 2006 spoke extensively to groups around Nevada regarding Nevada fiscal issues.
- ➢ "A View From the Senate Floor", a summary of the 2005 Nevada Legislature debate on Property Taxes, as published in the August 2005 "Commique" of the Clark County Bar Association.
- ➢ Adjunct Professor, Accounting, Tax and Investment Courses, Community College of Southern Nevada.
- ➢ Guest Lecturer on Fraud for the Institute of Management Accounting Association, Las Vegas, NV
- ➢ Guest Lecturer, 13th Annual Accounting Show Sponsored by the Florida Institute of Certified Public Accountants.
- ➢ Guest Lecturer, Fraud Course, Nova/Southeastern University
- ➢ Panelist, BETA ALPHA PSI, The National Accounting Fraternity, Southeast Regional Conference
- ➢ Guest Lecturer, Florida International University, College of Business Administration School of Accounting, Center for Accounting, Auditing and Tax Studies
- ➢ Guest Lecturer, Florida Institute of Certified Public Accountants, Accounting Conference Seminar on Litigation Support and Fraud Update
- ➢ Guest Lecturer, Seminar on Fraud and Litigation Support, Cuban American CPA Association Seminar on Fraud Litigation Support.

STEVEN E. MARTIN

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|---|---|---|
| Abilio Leon and Maria Leon v. Danka Industries, Inc. and A'Leon Business Machines, Inc. | Consultant / Analyst | Shareholder Dispute |
| Aircraft Tool and Maintenance, Inc. | Consultant / Valuation Analyst | Valuation and Sale |
| Alfred M. Allen, Donn Allen and Clarence Allen v. Roberto Gonzalez and Joe's Moving and Storage | Consultant / Lead Analyst | Personal Injury |
| All Right Parking v. Universal National Bank & Arturo Morales | Consultant / Analyst | Lender Liability , Civil Fraud, and Diversion of Funds |
| Avakian Orient Express, Inc. and Fireman's Fund Insurance Company | Consultant / Analyst / Umpire | Review of two CPA valuations of Inventory Loss |
| Bellini's Inc. vs Perless Roth Jonas & Hartney, CPA, P.A. | Consultant / Analyst | Malpractice resulting from Employee Theft |
| Bigelow Management, Inc. vs Kelly D. McNamara | Expert Witness | Forensic Accounting - Misappropriation of assets. |
| Brighton Group, Ltd. d/b/a Dominion Towers vs Cleanco, Inc. (Coinmach Corporation) | Consultant / Analyst | Forensic Accounting - Misappropriation of assets. |
| Caremed Medical Management, Inc. | Consultant / Analyst | Forensic Accounting - Misappropriation of assets. |
| Caremed Medical Management, Inc. and Paul Cejas | Consultant / Analyst | Tax and other Analysis of $100 Million Stock Portfolio |
| Cayon & Machado v. Jaime & Robles | Consultant / Analyst with Mediation | Dissenting Stockholder/Forensic Accounting – Misappropriation of assets and diversion of profits, Civil Fraud |
| City of Hollywood v. Rachlin & Cohen; & v. Arthur Andersen | Consultant / Analyst | Professional Malpractice |
| Click v Tire Kingdom, Inc. | Consultant / Analyst | Wrongful Termination |
| Coral Springs Honda v General Electric Capital Corp. | Consultant / Analyst | Damages and Lost Profits |
| Crousillat v. Crousillat | Consultant / Analyst | Marital Dissolution Business Valuation |
| DEMCO v ENDE (Arbitration Case) | Testified before a three Judge Arbitration Panel | Fraud and Contract Dispute |
| Dr. Alan L. Berke v. Lee L. Engel, CPA | Consultant / Analyst | Malpractice |

# STEVEN E. MARTIN

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|------|---------------|--------------|
| Dr. Stoner | Consultant / Analyst | Criminal Theft and Embezzlement |
| State of Nevada v Dr. Fred Stoner | Court Appearance | Failure to Pay State Business Taxes |
| Emerson Fittipaldi | Consultant / Analyst | Fraud and Embezzlement |
| Emerson Fittipaldi & Fittipaldi Cigars v Biarritz Cigars and George Suarez | Consultant / Analyst | Shareholder Dispute |
| Estate of Bertha Aragon v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of Eric C. Hemphill v American Airlines | Consultant / Analyst | Wrongful Death |
| Estate of John Edward May v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of John G. Bull v. Holy Cross Hospital | Consultant / Analyst | Wrongful Death |
| Estate of Juan Carlos Gomez v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of Maggie Claudia Villalobos Mejia v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Estate of Marco T. Betancourt, Sr. v. American Airlines, Inc. | Consultant / Analyst | Wrongful Death |
| Florida Department of Insurance v. Guardian Property & Casualty Insurance Company | Consultant / Analyst / Investigator | Insurance Fraud –Forensic accounting related to fraudulent loss ratios and related revenues. |
| Florida Department of Insurance v. TransFlorida Casualty Insurance Company | Consultant / Analyst / Investigator | Insurance Fraud and Misappropriation of Assets |
| Florida Department of Insurance v. Deloitte & Touche | Consultant / Analyst | Malpractice relating to Insurance Audit |
| Florida Department of Insurance v. Usher Insurance Company (Plaintiff) (1995) | Consultant / Analyst / Investigator | Insurance Fraud and Misappropriation of Assets |
| Florida Department of Transportation vs A & H Equipment Repair, Inc. | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Bonded Air Conditioning, Inc. | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Carmine's Texaco, II | Consultant / Valuation Analyst | Eminent Domain |

# STEVEN E. MARTIN

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|------|---------------|--------------|
| Florida Department of Transportation vs Casino Real Estate | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Cycle Lab, Inc. | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Cut & Curl | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Dukes Insurance Agency | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Elite Air Conditioning | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Franklin Finance | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Golden Rainbow Jewelry | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs S.E. Bible | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Spykes Grove | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Sunshine Food & Beverage | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Southern Transmission | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Triple B Corp. DBA Best Auto | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs University Griffin Mobil | Consultant / Valuation Analyst | Eminent Domain |
| Florida Department of Transportation vs Viele Grove | Consultant / Valuation Analyst | Eminent Domain |
| Guillermo Rodriguez-Kramer and Humberto Vazquez v. Martino Tire Co. | Consultant / Valuation Analyst | Slander Lost Wages |
| Henry H. McFlicker v All State Insurance Company | Consultant / Analyst | Financial Evaluation- Insurance Company refused to pay loss. Plaintiff accused of arson |
| Ivan Go V Nico Guzom, Michelle Guzom, Juan Fabian Guzom, Vincent Guzom, Claudia Johnson, and Does 1-10, inclusive | Consultant/Expert Witness | Criminal Fraud, Falsification of Document |

# STEVEN E. MARTIN

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|------|---------------|--------------|
| Jerry L. Dennis DBA Sin City Fashions vs Frank Habibian, etal | Consultant/Expert Witness | Lost Profits |
| John Munshower v. Dove Creek Co. d/b/a Snappers Restaurant & Raw Bar, Linda Kolbenheyer and Harold Kolbenheyer | Consultant / Valuation Analyst | Dissenting Stockholder Business Valuation |
| John Sliman v. Deel Corporation d/b/a Deel Ford | Consultant / Analyst | Breach of Contract |
| Kupferberg, Andrew Scott v. San Francisco Forty Niners, LTD, Deion Sanders and the National Football League | Consultant / Analyst | Personal Injury |
| Las Americas V Corp. V Public Service Mutual | Consultant / Analyst | Business Interruption Claim |
| Lisette Medina v Manny Medina | Consultant / Analyst | Divorce |
| Matthew Wohl, Trustee d/b/a Great Southern Hotel v. City of Hollywood | Consultant / Analyst | Business Damages |
| Ed McWilliams v Linda Davis (2008) Defendent | Consultant / Expert Witness | Civil Conspiracy, Misrepresentation, Embezzlement |
| Miami Police Pension Fund vs Ronald K. Stern, CPA | Consultant / Analyst / Investigator | Criminal Fraud, Falsification of Documents and Embezzlement |
| Moda Mario, Inc. V. Nationwide Mutual Insurance Company | Consultant / Valuation Analyst | Lost Profits |
| Mt Sinai Hospital vs Dr. Lionel Resnick | Consultant / Analyst | Federal Grant Fraud and Destruction of Property |
| Nerren v Jennings, Case NO. 98-12516 CA 11, Nerren v. Jennings, Arbitration Proceeding | Consultant / Analyst | Contract Dispute |
| Nevada Mobile Concrete v Progressive Insurance | Consultant / Expert Witness | Business Damages and Lost Profits |
| Nevada Oil and Land Development vs Bashar Ahmad Elyousef | Consultant / Expert Witness | Misappropriation of Assets |
| Oak Feed Market and Restaurant, Inc. | Consultant / Analyst | Business Damages |
| Premium Sales | Consultant / Analysis of Claims totaling $1 Billion | Criminal Fraud, Falsification of Documents and Embezzlement |
| Puente v. Puente | Consultant / Valuation Analyst | Business Valuation Marital Dissolution |

STEVEN E. MARTIN

## SUMMARY OF CASE ACTIVITIES

| CASE | PARTICIPATION | TYPE OF CASE |
|------|---------------|--------------|
| Randall J. Kalik v. AON Risk Services, Inc. | Consultant / Analyst | Employment Termination Damages |
| Richard B. Negley and Peck Hayne v. Harold T. Chittum, et.al | Consultant / Analyst | Civil Fraud |
| Ronald Goldberg v. Carl R. Santangelo & McCrory & Santangelo PA | Consultant / Analyst | Malpractice |
| S.A. & R.A. v. South Florida Blood Service, Inc. | Consultant / Analyst | Wrongful Death |
| SouthwestUSA Bank vs Framing Brokers, Inc. | Consultant / Analyst | Bank Fraud |
| Securities and Exchange Commission v. Gerald and Marie Levine | Consultant / Expert Witness | Receivership Action/Asset Search |
| Securities and Exchange Commission v. United Benefit Group | Consultant / Analyst / Investigator | Investor Fraud related to Viatical Insurance policies. |
| STMKC vs H & H et. Al | Consultant / Expert Witness | Contract Dispute and Misappropriation of Assets |
| Strata Communications vs Ron Vallone | Consultant / Expert Witness | Fraud and Misappropriation of Assets |
| State of Florida v. Dale C. Branham and Charter American Insurance Company | Consultant / Analyst | Insurance Fraud and Misappropriation of Assets |
| Stocks Mill & Supply Co., Inc. v United States Bankruptcy Court, District of Nevada | Consultant / Analyst | Work for Creditor |
| Telectronics v. Medtronics | Consultant / Analyst | Antitrust |
| Tzanetopoulos V Tzanetopoulos | Expert Witness Business Valuation of a Casino Interest | Divorce |
| U.S. Sales & Trade Consultants Co., Inc. d/b/a Miami "B" Goods v. Toshiba America Information System, Inc. | Consultant / Analyst | Civil Fraud |
| United Parcel Service of America, Inc. v Lynn Strickland Tire, Inc. - Miami and Bandag, Inc. | Consultant / Analyst | Civil Fraud |
| United States of America v. Robert Miller and Robert Wohleber | Consultant / Analyst | Criminal Fraud |
| University Fitness of Miami, Inc. d/b/a Cross Training Fitness Center v. Lennar Mayfair, Ltd. and Lennar Mayfair Holdings, Inc. and Tiger Mayfair, L.L.C. | Consultant / Analyst | Lost Profits |
| Williams V Williams | Consultant / Analyst Business Valuation | Divorce |

# EXHIBIT D

# RELEASE

## To all to whom these Presents shall come or may Concern, Know That

**Vestium Equity Fund, LLC (Vestium)**, a corporation organized under the laws of the State of Delaware, and its affiliates, subsidiaries, officers, directors, shareholders and assigns, **Arcanum Equity Fund, LLC (Arcanum)** a corporation organized under the laws of the State of Nevada, and its affiliates, subsidiaries, officers, directors, shareholders and assigns, , **Veritas Investments, LLC (Veritas)** and **EIMT Properties, LLC (EIMT)**;

In consideration of the sum $1,200,000.00 (One Million Two Hundred Thousand USD) received from **Vestium**, remitted to **Veritas** for the following:

Payment will be delivered to Veritas Investments, LLC no later than January 13th, 2009.

In receipt whereof is hereby acknowledged, Veritas and EIMT release and discharge Vestium and Arcanum, their heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEES, the RELEASOR, RELEASOR'S successors and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by any reason from the beginning of the world to the day of the date of this RELEASE.

The words "RELEASOR" and "RELEASEES" include all releasors and all releasees under this RELEASE.

This RELEASE may not be charged orally.

**In Witness Whereof**, the RELEASOR *has caused this RELEASE to be executed by its duly authorized officers and its corporate seal to be hereunto affixed on*

In presence of:

By: _____          January 10, 2009
Robert L. Buckhannon                           Date
Representing Vestium and Arcanum

By: _____          January 10,2009
Anthony Vassallo                               Date
Representing EIMT and Veritas

# EXHIBIT E

**Confidential Private Placement Memorandum**                    Copy No. _211_____



**Maximum Offering: $100,000,000.00 (One Hundred Million Dollars)**
**Minimum Subscription:  $500,000.00 (Five Hundred Thousand Dollars)**

## FOR ACCREDITED INVESTORS ONLY

**Vestium Equity Fund, LLC,** a Delaware limited liability company (the "Fund"), is offering up to One Hundred Million Dollars ($100,000,000.00) of Limited Liability Company Membership Interests (the "LLC Interests" or the "Securities"), to Accredited Investors, as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Securities Act").  This Confidential Private Placement Offering Memorandum (the "Memorandum") relates to the offer and sale (the "Offering") of up to One Hundred Million Dollars ($100,000,000.00) of LLC Interests pursuant to Rule 506 of Regulation D of the Securities Act.  The minimum subscription amount is Five Hundred Thousand Dollars ($500,000.00).  There is no aggregate minimum subscription requirement for the Offering to become effective.  The LLC Interests will be offered on a continuous basis.  The Fund reserves the right, subject to applicable securities laws, to begin applying "dollar one" of the proceeds from the Offering towards its investment program and other uses as more specifically set forth in this Memorandum.  There is no escrow applicable to the Offering.  All dollar amounts referred to herein refer to United States dollars.

**THE SECURITIES OFFERED HEREBY ARE HIGHLY SPECULATIVE, AND AN INVESTMENT IN THE SECURITIES INVOLVES A HIGH DEGREE OF RISK.  INVESTORS SHOULD BE ABLE TO WITHSTAND THE TOTAL LOSS OF THEIR ENTIRE INVESTMENT IN THE SECURITIES THAT ARE THE SUBJECT OF THIS MEMORANDUM.  THE FUND IS OFFERING THE SECURITIES SOLELY TO INVESTORS THAT SATISFY CERTAIN SUITABILITY STANDARDS, INCLUDING THE ABILITY TO AFFORD A COMPLETE LOSS OF THEIR INVESTMENT.  (SEE "RISK FACTORS")**

**THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR APPLICABLE STATE SECURITIES LAWS, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THESE LAWS.  THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE REGULATORY AUTHORITY NOR HAS THE SEC OR ANY STATE REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THE SECURITIES MAY NOT BE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL IN FORM AND SUBSTANCE ACCEPTABLE TO THE FUND AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.**

**The date of this Confidential Private Placement Memorandum is June 9, 2008**

_____
Name of Offeree

## INVESTOR NOTICES

THIS MEMORANDUM IS BEING FURNISHED TO PROSPECTIVE INVESTORS ON A CONFIDENTIAL BASIS FOR USE SOLELY IN CONNECTION WITH THE CONSIDERATION OF AN INVESTMENT IN THE LLC INTERESTS (HEREINAFTER THE "LLC INTERESTS" OR THE "SECURITIES") OFFERED BY **VESTIUM EQUITY FUND, LLC**, A LIMITED LIABILITY COMPANY ORGANIZED ON MAY 19, 2008 UNDER THE LAWS OF THE STATE OF DELAWARE (THE "FUND"). THIS OFFERING IS INTENDED TO BE EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT").

THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, AS AMENDED, OR THE SECURITIES LAWS OF THE STATE OF DELAWARE OR ANY OTHER STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY, ASSIGNMENT AND RESALE AND MAY NOT BE TRANSFERRED, ASSIGNED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECUR-ITIES ACT AND SUCH STATE SECURITIES LAWS, PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM. THE SALE OF THE LLC INTERESTS HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC"), ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THESE AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORA-NDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL AND IS A CRIMINAL OFFENSE.

DUE TO ITS CONFIDENTIAL NATURE, THIS MEMORANDUM MAY NOT BE REPRODUCED, IN WHOLE OR PART, OR DELIVERED TO ANY PERSON OTHER THAN THE PROSPECTIVE INVESTOR'S FINANCIAL ADVISOR, ACCOUNTANT OR COUNSEL WITHOUT THE PRIOR WRITTEN CONSENT OF THE FUND'S MANAGER. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES TO THE FOREGOING AND TO RETURN THIS MEMORANDUM TO THE FUND'S MANAGER IF SUCH INVESTOR DOES DETERMINE NOT TO MAKE AN INVESTMENT IN THE FUND.

AN INVESTMENT IN THE FUND IS HIGHLY SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. INVESTORS SHOULD HAVE THE FINANCIAL ABILITY AND HAVE THE WILLINGNESS TO ACCEPT SUCH RISKS AS WELL AS THE LACK OF LIQUIDITY THAT IS CHARACTERISTIC OF THE INVESTMENTS DESCRIBED HEREIN. ONLY PERSONS WHO CAN AFFORD TO LOSE THE ENTIRE INVESTMENT SHOULD PURCHASE THE SECURITIES.

THE SECURITIES DESCRIBED HEREIN ARE BEING OFFERED PURSUANT TO REGULATION D OF THE SECURITIES ACT, AND ARE THEREFORE "RESTRICTED SECURITIES" AS THAT TERM IS DEFINED IN RULE 144(A)(3) OF THE SECURITIES ACT. AN ORGANIZED MARKET FOR THE SECURITIES DESCRIBED HEREIN IS NOT EXPECTED TO DEVELOP AT ANY TIME.  EVEN IF SUCH MARKET DEVELOPS, THE SECURITIES CANNOT BE PUBLICLY SOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AS AMENDED, UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.  NO SUCH REGISTRATION IS CURRENTLY CONTEMPLATED, AND IT IS NOT ANTICIPATED THAT AN EXEMPTION FROM REGISTRATION WILL EVER BE AVAILABLE. ACCORDINGLY, ONLY PERSONS WHO DO NOT REQUIRE LIQUIDITY WITH RESPECT TO THEIR INVESTMENT SHOULD PURCHASE THE SECURITIES.

THIS MEMORANDUM IS CONFIDENTIAL AND PROPRIETARY AND IS BEING FURNISHED BY THE FUND'S MANAGER TO PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING OF SECURITIES EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT SOLELY FOR SUCH INVESTORS' CONFIDENTIAL USE WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT PRIOR WRITTEN PERMISSION FROM THE FUND'S MANAGER, SUCH PERSONS WILL NOT RELEASE THIS MEMORANDUM OR DISCUSS THE INFORMATION CONTAINED HEREIN OR MAKE REPRODUCTION OF OR USE THIS MEMORANDUM FOR ANY PURPOSE OTHER THAN EVALUATION OF POTENTIAL INVESTMENT IN THE SECURITIES.  THIS MEMORANDUM IS INDIVIDUALLY DIRECTED TO EACH PROSPECTIVE INVESTOR AND DOES NOT CONSTITUTE AN OFFER TO ANY OTHER PERSON OR TO THE PUBLIC GENERALLY TO SUBSCRIBE FOR OR OTHERWISE ACQUIRE THE SECURITIES.  DISTRIBUTION OF THIS MEMORANDUM TO ANY PERSON OTHER THAN THE PROSPECTIVE INVESTOR WHOSE NAME APPEARS ON THE COVER PAGE HEREOF, AND THOSE PERSONS, IF ANY, RETAINED TO ADVISE SUCH PROSPECTIVE INVESTOR WITH RESPECT THERETO, IS UNAUTHORIZED, AND ANY DISCLOSURE OF ANY OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE FUND'S MANAGER, IS PROHIBITED.

EXCEPT AS OTHERWISE INDICATED, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF.  NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE STATUS OR AFFAIRS OF THE FUND AFTER THE DATE HEREOF.

THE INFORMATION PRESENTED HEREIN WAS PREPARED OR OBTAINED BY THE FUND'S MANAGER AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING.  THE FUND'S MANAGER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.  NOTHING CONTAINED HEREIN IS, OR SHOULD BE RELIED ON AS, A PROMISE OR REPRESENTATION AS TO THE FUTURE PERFORMANCE OF THE FUND.

THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN EVALUATING THE FUND AND ITS BUSINESS STRATEGY.  EACH INVESTOR MUST CONDUCT AND RELY ON ITS OWN EVALUATION OF THE FUND AND THE TERMS OF THE OFFERING,

INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE SECURITIES. INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, BUSINESS OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT SUCH INVESTOR'S OWN ATTORNEY, BUSINESS ADVISOR AND TAX ADVISORS AS TO THE LEGAL, BUSINESS, TAX AND RELATED MATTERS CONCERNING THE INVESTMENT DESCRIBED IN THIS MEMORANDUM AND ITS SUITABILITY FOR SUCH PROSPECTIVE INVESTOR. SEE "RISK FACTORS."

CERTAIN PROVISIONS OF VARIOUS AGREEMENTS AND DOCUMENTS ARE SUMMARIZED IN THIS MEMORANDUM, BUT PROSPECTIVE INVESTORS SHOULD NOT ASSUME THAT SUCH SUMMARIES ARE COMPLETE. SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXT OF SUCH AGREEMENTS.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OTHER THAN THAT CONTAINED IN THIS MEMORANDUM, OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THE OFFERING, AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND'S MANAGER. THE FUND'S MANAGER DISCLAIMS ANY AND ALL LIABILITIES FOR REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, CONTAINED IN OR OMISSIONS FROM, THIS MEMORANDUM OR ANY OTHER WRITTEN OR ORAL COMMUNICATION TRANSMITTED OR MADE AVAILABLE TO THE RECIPIENT. EACH INVESTOR WILL BE ENTITLED TO RELY SOLELY UPON THOSE WRITTEN REPRESENTATIONS AND WARRANTIES THAT MAY BE MADE TO IT IN ANY FINAL SUBSCRIPTION AGREEMENT RELATING TO THE SECURITIES REFERRED TO IN THIS MEMORANDUM.

NO SALE WILL BE MADE TO ANY PERSON WHO CANNOT DEMONSTRATE COMPLIANCE WITH THE SUITABILITY STANDARDS DESCRIBED IN THIS MEMORANDUM. IF YOU ARE IN ANY DOUBT AS TO THE SUITABILITY OF AN INVESTMENT IN THE LLC INTERESTS, DETAILS OF WHICH ARE GIVEN IN THIS MEMORANDUM, YOU SHOULD CONSULT YOUR INVESTMENT ADVISER.

THE FUND'S MANAGER RESERVES THE RIGHT, IN ITS SOLE DISCRETION AND FOR ANY REASON WHATSOEVER, TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE OFFERING AND/OR TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT IN THE SECURITIES OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AMOUNT OF LLC INTERESTS THAT SUCH INVESTOR DESIRES TO PURCHASE. THE FUND'S MANAGER SHALL HAVE NO LIABILITY WHATSOEVER TO ANY OFFEREE AND/OR INVESTOR IN THE EVENT THAT ANY OF THE FOREGOING SHALL OCCUR.

EACH PROSPECTIVE INVESTOR MAY MAKE INQUIRIES OF THE FUND'S MANAGER WITH RESPECT TO THE FUND'S BUSINESS OR ANY OTHER MATTER RELATING TO THE FUND OR AN INVESTMENT IN THE SECURITIES OFFERED HEREUNDER, AND MAY OBTAIN ANY ADDITIONAL INFORMATION THAT SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THAT THE FUND'S MANAGER POSSESSES SUCH INFORMATION OR

CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH AN INQUIRY, ANY DOCUMENT THAT A PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE FUND'S MANAGER IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER.   ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTATION SHOULD BE MADE IN WRITING TO THE FUND'S MANAGER ADDRESSED AS FOLLOWS:

**VESTIUM MANAGEMENT GROUP, LLC**
**ATTENTION:  MR. ROBERT L. BUCKHANNON**
**13116 HARRIERS PLACE**
**BRADENTON, FLORIDA 34212**
**(941) 527-1417**

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR THE SECURITIES DESCRIBED HEREIN UNLESS SATISFIED THAT HE/SHE OR HE/SHE AND HIS/HER INVESTMENT REPRESENTATIVE HAS ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE HIM/HER OR BOTH OF THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

**FOR ALABAMA RESIDENTS**

THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT.  A REGISTRATION STATEMENT RELATING TO THESE SECURITIES *HAS NOT BEEN FILED WITH THE ALABAMA* SECURITIES COMMISSION.  THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, *NOR DOES IT PASS UPON* THE ACCURACY OR COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**FOR ARKANSAS RESIDENTS**

THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 14(B)(14) OF THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE; APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**FOR CALIFORNIA RESIDENTS**

THE SALE OF THE SECURITIES THAT ARE THE SUBJECT OF THIS MEMORANDUM HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA.  THEREFORE, THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OF ANY PART OF THE CONSIDERATION FOR THOSE SECURITIES PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SECURITIES AND THE SALE THEREOF ARE EXEMPT FROM THE QUALIFICATION REQUIREMENT BY §§ 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES AS DESCRIBED IN THIS MEMORANDUM ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION THEREFROM.

**FOR CONNECTICUT RESIDENTS**

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SECTION 36b-16 OF THE CONNECTICUT UNIFORM SECURITIES ACT AND MAY NOT BE TRANSFERRED OR SOLD BY A PURCHASER THEREOF EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER THE CONNECTICUT UNIFORM SECURITIES ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION THEREUNDER.

**FOR FLORIDA RESIDENTS**

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT.  EACH PROSPECTIVE INVESTOR WHO IS A FLORIDA RESIDENT SHOULD BE AWARE THAT SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "...WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN THIS STATE, ANY SALE MADE PURSUANT TO THIS SUBSECTION. . . SHALL BE VOIDABLE BY THE PURCHASER. . . WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR ANY ESCROW AGENT. . ."  EACH PERSON ENTITLED TO EXERCISE THE RIGHT TO WITHDRAW GRANTED BY SECTION 517.061(11)(a)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT MUST WITHIN THREE DAYS AFTER THE TENDER OF HIS PURCHASE PRICE TO THE FUND'S MANAGER, CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE FUND'S MANAGER.  SUCH LETTER OR TELEGRAM MUST BE SENT AND POSTMARKED ON OR PRIOR TO THE AFOREMENTIONED THIRD DAY.  IF AN OFFEREE CHOOSES TO WITHDRAW BY LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.  AN OFFEREE MAKING AN ORAL REQUEST FOR WITHDRAWAL MUST ASK FOR WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED.

**FOR NEW JERSEY RESIDENTS**

NEW JERSEY STATE LAW PROVIDES AN EXEMPTION FROM REGISTRATION FOR SECURITIES THAT ARE SOLD TO NO MORE THAN 35 PURCHASERS WITHIN THE STATE WHERE EACH PURCHASER HAS BEEN PROVIDED WITH AN OFFERING MEMORANDUM

AND NO GENERAL SOLICITATION OR ADVERTISEMENT HAS BEEN EMPLOYED IN THE OFFERING.  THE SECURITIES DESCRIBED HEREIN ARE BEING OFFERED TO RESIDENTS OF NEW JERSEY IN RELIANCE ON THE FOREGOING EXEMPTION.  ACCORDINGLY, NEITHER THE OFFICE OF THE ATTORNEY GENERAL NOR ANY OTHER GOVERNMENTAL AGENCY OF THE STATE OF NEW JERSEY HAS REVIEWED OR PASSED UPON THE MERITS OF THE OFFERING.

**FOR NEW YORK RESIDENTS**

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE.  ACCORDINGLY, NEITHER THE OFFERING MEMORANDUM NOR THE SECURITIES DESCRIBED HEREIN HAVE BEEN ENDORSED BY THE ATTORNEY GENERAL OR ANY OTHER AGENCY OF THE STATE OF NEW YORK.  THE SECURITIES ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE NEW YORK STATE SECURITIES LAWS (NY GENERAL BUSINESS LAW CH. 20, ARTICLE 23-A ET. SEQ.) THAT EXEMPTS FROM REGISTRATION A PRIVATE OFFERING OF SECURITIES TO A LIMITED NUMBER OF ACCREDITED INVESTORS WITHIN THE STATE OF NEW YORK.

**FOR NEVADA RESIDENTS**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE NEVADA SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING.  THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

PRESENCE OF A LEGEND OF ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN THAT AN OFFER OR SALE MAY BE MADE IN ANY PARTICULAR STATE.  THIS MEMORANDUM MAY BE SUPPLEMENTED BY ADDITIONAL STATE LEGENDS.  IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE ADVISED TO CONTACT THE FUND'S MANAGER` FOR A CURRENT LIST OF STATES IN WHICH OFFERS OR SALES MAY BE LAWFULLY MADE.

**FOR NORTH CAROLINA RESIDENTS**

IN MAKING AN INVESTMENT DECISION, INVESTOR MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE

APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIA RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR OREGON RESIDENTS**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVLOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1993, AS AMENDED, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR SOUTH CAROLINA RESIDENTS**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR SOUTH DAKOTA RESIDENTS**

THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 4731, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS MEMORANDUM IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF,

RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**FOR TENNESSEE RESIDENTS**

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR WASHINGTON RESIDENTS**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY MISREPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR WYOMING RESIDENTS**

PROSPECTIVE INVESTORS ARE ADVISED THAT ANYONE OWNING MORE THAN FIVE PERCENT (5%) OF THE SECURITIES OF THE COMPANY AS A RESULT OF THIS OFFERING MAY BE DEEMED TO HAVE ACQUIRED CHEAP STOCK SUBJECT TO ESCROW IN THE EVENT OF A SUBSEQUENT REGISTERED OFFERING.

**PRESENCE OF A LEGEND OF ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN THAT AN OFFER OR SALE MAY BE MADE IN ANY PARTICULAR STATE.  THIS MEMORANDUM MAY BE SUPPLEMENTED BY ADDITIONAL STATE LEGENDS.  IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE ADVISED TO CONTACT THE COMPANY FOR A CURRENT LIST OF STATES IN WHICH OFFERS OR SALES MAY BE LAWFULLY MADE.**

**INVESTMENT COMPANY ACT DISCLOSURE STATEMENT**

THE FUND IS NOT PRESENTLY, AND DOES NOT INTEND IN THE FUTURE TO BECOME, REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED.  (SEE "FUND POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940")  THE MANAGER IS NOT REGISTERED AS AN INVESTMENT ADVISER UNDER THE INVESTMENT ADVISERS ACT OF 1940, AS AMENDED, BUT MAY BECOME SO REGISTERED IN THE FUTURE (SEE "STATUS OF MANAGER UNDER THE INVESTMENT ADVISERS ACT OF 1940").

**INVESTOR SUITABILITY STANDARDS**

THE SECURITIES ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER BY THE SEC IMPOSE LIMITATIONS ON THE PERSONS WHO MAY PARTICIPATE IN THIS OFFERING AND FROM WHOM SUBSCRIPTIONS MAY BE ACCEPTED.  ACCORDINGLY, THIS OFFERING AND THE SALE OF THE SECURITIES ARE LIMITED TO PERSONS WHO ARE "ACCREDITED INVESTORS" AS THAT TERM IS DEFINED IN RULE 501 OF REGULATION D PROMULGATED UNDER THE ACT.  A PERSON WHO IS AN ACCREDITED INVESTOR MAY SUBSCRIBE FOR SECURITIES BY (1) EXECUTING THE SUBSCRIPTION AGREEMENT AND PURCHASER QUESTIONNAIRE ATTACHED TO THIS MEMORANDUM UNDER THE CAPTION "APPENDICES" AND (2) DELIVERING SUCH DOCUMENTS TO THE FUND'S MANAGER ALONG WITH THE SUBSCRIPTION PAYMENTS FOR THE SECURITIES PURCHASED.

AN ACCREDITED INVESTOR IS ANY PERSON OR ENTITY REASONABLY DESCRIBED IN ANY OF THE FOLLOWING CATEGORIES OR, WHO THE FUND'S MANAGER REASONABLY BELIEVES, IN RELIANCE ON REPRESENTATIONS MADE BY THE INVESTOR IN THE SUBSCRIPTION AGREEMENT AND PURCHASER QUESTIONNAIRE, IS REASONABLY DESCRIBED IN ANY OF THE FOLLOWING CATEGORIES AT THE TIME OF THE SALE OF THE SECURITIES TO THAT PERSON:

A.   A BANK OR SAVINGS AND LOAN ASSOCIATION, AS DEFINED IN THE SECURITIES ACT, WHETHER ACTING IN ITS INDIVIDUAL OR FIDUCIARY CAPACITY.

B.   A BROKER OR DEALER REGISTERED PURSUANT TO THE SECURITIES AND EXCHANGE ACT OF 1934.

C.   AN INSURANCE COMPANY, AS DEFINED IN THE SECURITIES ACT.

D.   AN INVESTMENT COMPANY REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940.

E.   A BUSINESS DEVELOPMENT COMPANY, AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940.

F.    A SMALL BUSINESS INVESTMENT COMPANY LICENSED BY THE U.S. SMALL BUSINESS ADMINISTRATION.

G.    A PLAN ESTABLISHED AND MAINTAINED BY A STATE, ITS POLITICAL SUBDIVISIONS, OR AN AGENCY OR INSTRUMENTALITY OF A STATE OR ITS POLITICAL SUBDIVISIONS FOR THE BENEFIT OF ITS EMPLOYEES, IF SUCH PLAN HAS TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS (USD).

H.    AN EMPLOYEE BENEFIT PLAN WITHIN THE MEANING OF TITLE I OF THE EMPLOYMENT RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA), IF THE INVESTMENT DECISION WITH RESPECT TO THIS INVESTMENT IS MADE BY A PLAN FIDUCIARY AS DEFINED IN ERISA, WHICH IS EITHER A BANK, INSURANCE COMPANY, OR REGISTERED INVESTMENT ADVISOR, <u>OR</u> IF THE EMPLOYEE BENEFIT PLAN HAS TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS.

I.    A PRIVATE BUSINESS DEVELOPMENT COMPANY, AS DEFINED IN THE INVESTMENT ADVISORS ACT OF 1940.

J.    A TAX EXEMPT ORGANIZATION DEFINED IN SECTION 501(C)(3) OF THE INTERNAL REVENUE CODE, OR A CORPORATION, MASSACHUSETTS OR SIMILAR BUSINESS TRUST, OR PARTNERSHIP, NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES, WITH TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS.

K.    A DIRECTOR OR OFFICER OF THE FUND'S MANAGER.

L.    A NATURAL PERSON WHO'S INDIVIDUAL NET WORTH (OR JOINT NET WORTH WITH THAT PERSON'S SPOUSE) EXCEEDS ONE MILLION ($1,000,000.00) DOLLARS.

M.    A NATURAL PERSON WHO HAD AN INDIVIDUAL INCOME IN EXCESS OF $200,000 IN EACH OF THE TWO MOST RECENT YEARS AND WHO REASONABLY EXPECTS AN INCOME IN EXCESS OF $200,000 IN THE CURRENT YEAR.

N.    A TRUST, WITH TOTAL ASSETS IN EXCESS OF FIVE MILLION ($5,000,000.00) DOLLARS, NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING  THE SECURITIES OFFERED, WHOSE PURCHASE IS DIRECTED BY A SOPHISTICATED PERSON AS DESCRIBED IN RULE  506(b)(2)(II) UNDER THE SECURITIES ACT.

O.    AN ENTITY ALL THE EQUITY OWNERS OF WHICH MAY RESPOND AFFIRMATIVELY TO ANY OF THE PRECEDING PARAGRAPHS.

## FORWARD-LOOKING STATEMENTS

CERTAIN STATEMENTS IN THIS MEMORANDUM INCLUDING BUT NOT LIMITED TO STATEMENTS, ESTIMATES AND PROJECTIONS OF FUTURE TRENDS AND OF THE ANTICIPATED FUTURE PERFORMANCE OF THE FUND CONSTITUTE "FORWARD-LOOKING STATEMENTS".  SUCH FORWARD-LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF THE FUND, OR INDUSTRY RESULTS, TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENT IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS.

STATEMENTS IN THIS MEMORANDUM THAT ARE FORWARD-LOOKING, INVOLVE NUMEROUS RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM EXPECTED RESULTS AND ARE BASED ON THE FUND'S MANAGER'S CURRENT BELIEFS AND ASSUMPTIONS REGARDING A LARGE NUMBER OF FACTORS AFFECTING ITS BUSINESS.  ACTUAL RESULTS MAY DIFFER MATERIALLY FROM EXPECTED RESULTS.  THERE CAN BE NO ASSURANCE THAT (I) THE FUND'S MANAGER HAS CORRECTLY MEASURED OR IDENTIFIED ALL OF THE FACTORS AFFECTING ITS BUSINESS OR THE EXTENT OF THEIR LIKELY IMPACT, (II) THE PUBLICLY AVAILABLE INFORMATION WITH RESPECT TO THESE FACTORS ON WHICH THE FUND'S MANAGER'S ANALYSIS IS BASED IS COMPLETE OR ACCURATE, (III) THE FUND'S MANAGER'S ANALYSIS IS CORRECT OR (IV) THE FUND'S STRATEGY, WHICH IS BASED IN PART ON THIS ANALYSIS, WILL BE SUCCESSFUL.

## NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THE LLC INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD, EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## NOTICE REGARDING AGREEMENT TO ARBITRATE

THIS MEMORANDUM REQUIRES THAT ALL INVESTORS ARBITRATE ANY DISPUTE ARISING OUT OF THEIR INVESTMENT IN THE LLC INTERESTS.  YOU FURTHER AGREE THAT THE ARBITRATION WILL BE BINDING AND HELD IN NEW YORK, NEW YORK. YOU AGREE THEREBY, TO WAIVE ANY RIGHTS TO A JURY TRIAL.  OUT OF STATE

ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES.  IT MAY ALSO COST YOU MORE TO ARBITRATE A SETTLEMENT OF A DISPUTE.

**IRS CIRCULAR 230 DISCLOSURE**

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, PROSPECTIVE INVESTORS ARE HEREBY NOTIFIED THAT: ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS DOCUMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

## IMPORTANT NOTICE TO ALL INVESTORS:

THE SECURITIES ARE NOT DEPOSITS OR OBLIGATIONS, OR GUARANTEED OR ENDORSED BY, ANY BANK OR OTHER INSURED DEPOSITORY INSTITUTION, AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION (THE "FDIC"), THE FEDERAL RESERVE BOARD OR ANY OTHER GOVERNMENTAL AGENCY.

*This space intentionally left blank.*

## SUMMARY

**Vestium Equity Fund, LLC**, (the "Fund") is offering the Securities privately pursuant to Rule 506 of Regulation D of the Securities Act of 1933 (the "Securities Act") to its qualified investors who, upon the Fund's acceptance of their subscription for Securities, will become members of the Fund (the "Members"). The following summary is qualified in its entirety by the detailed information appearing elsewhere in this Private Placement Offering Memorandum (the "Memorandum"), in the Fund's Certificate of Formation, as amended, Limited Liability Company Operating Agreement, as amended, Indenture of Trust, as amended, and in the Subscription Agreement and Confidential Purchaser Questionnaire. See "Risk Factors" for information to be considered by prospective investors.

## The Fund

### Introduction

**Vestium Equity Fund, LLC,** (the "Fund" or "Vestium"), is a limited liability company organized on May 19, 2008, under the laws of the State of Delaware. The Fund operates pursuant to its Operating Agreement dated May 19, 2008. The Fund will be managed by its Manager, **Vestium Management Group, LLC** (hereinafter, the "Manager"), pursuant to the Fund's Operating Agreement. Vestium Management Group, LLC is a Delaware Limited Liability Company formed on March 24, 2008 for the purpose of acting as the Fund's Manager. The Manager will have the exclusive right and power to manage and operate the investments of the Fund.

The Fund will be engaged in the business of purchasing, managing and selling Medium Term Notes ("MTNs"). An MTN is a debt security issued by a corporation with a maturity ranging from 1 to 10 years. MTNs typically have higher interest rates associated with them when compared with short term notes, but also typically have lower interest rates associated with them when compared with long term MTNs. The Fund will only acquire MTNs issued by corporations whose obligations are rated "A" or better by Moody's Investors Service, Inc. ("Moody's") or the equivalent Standard & Poor's ("S&P") rating.

The Fund will generally invest in Medium Term Notes of issuing corporations involved in a wide range of industries in an effort to diversify. However, in the Manager's discretion, there may exist economic situations whereby the Manager deems it worthwhile to focus investment in one particular industry or region of the world.

This Memorandum sets forth the objectives and method of operation of the Fund and certain other pertinent information. Each prospective investor should examine this Memorandum, the Confidential Purchaser Questionnaire and the Subscription Agreement (collectively the "Offering Materials") in order to assure his/her self that the Offering Materials and Fund's investment objectives and method of operation are satisfactory. Prospective investors are invited to review any materials available to the Fund's management relating to the operations of the Fund and any matters regarding this Memorandum. All such materials will be made available at the Manager's offices located at 13116 Harriers Place, Bradenton, Florida 34212, telephone (941) 527-1417. Representatives of the Manager will be available to answer questions and provide any additional information to the extent it can be acquired without unreasonable effort or expense.

# OFFERING SUMMARY

*The following summary is qualified in its entirety by the more detailed information appearing elsewhere in this Memorandum, including any Exhibits or attachments hereto. Particular attention is directed to the Section entitled "Risk Factors," commencing on page 21.*

| | |
|---|---|
| **Fund Formation** | The Fund, Vestium Equity Fund, LLC, is a Limited Liability Company formed on May 19, 2008 under the laws of the State of Delaware. The Fund operates pursuant to its Certificate of Formation filed on May 19, 2008, and its Operating Agreement dated May 19, 2008. The Fund's office is located at 13116 Harriers Place, Bradenton, Florida 34212, telephone (941) 527-1417. |
| **Investment Objective** | The Fund's investment strategy is to achieve an above-average rate of return by allocating its assets to a trading strategy that involves the buying and selling of Medium Term Notes ("MTNs"), which are debt securities issued by corporations with a maturity ranging from 1 to 10 years. The Fund will only acquire MTNs from certain approved counterparties, and will only acquire MTNs issued by corporations whose obligations are rated "A" or better by Moody's Investors Service, Inc. ("Moody's") or the equivalent Standard & Poor's ("S&P") rating. |
| **The Manager** | The Fund will be managed by its Manager, Vestium Management Group, LLC (hereinafter, the "Manager"), pursuant to the Fund's Operating Agreement. Vestium Management Group, LLC is a Delaware Limited Liability Company formed on March 24, 2008 for the purpose of acting as the Fund's Manager. The Manager will have the exclusive right and power to manage and operate the investments of the Fund. Investors acquiring the LLC Interests offered hereby will have no right to participate in the management of the Fund, to act for the Fund, or to vote on Fund matters except as specifically provided under applicable law or in the Fund's Operating Agreement. The officers, directors and managers of Vestium Management Group, LLC are Robert L. Buckhannon, Dale St. Jean, Terry Rawstern and Greg D. Tindall. |
| **Securities Being Offered And Amount of Offering** | This Offering is for an aggregate of One Hundred Million Dollars ($100,000,000.00) gross proceeds from the sale of Limited Liability Company Membership Interests (the "LLC Interests" or "Securities"). The minimum subscription amount is Five Hundred Thousand Dollars ($500,000.00). |
| **Maximum Offering** | One Hundred Million Dollars ($100,000,000.00) gross proceeds from the sale of LLC Interests (the "LLC Interests" or "Securities"). LLC Interests may not be sold to or held by more than Ninety-Nine (99) beneficial owners. |

**Minimum Subscription**

The minimum subscription per subscriber is Five Hundred Thousand Dollars ($500,000.00).  Lesser amounts may only be accepted subject to the prior approval of the Fund's Manager.  The Manager reserves the right to reject any subscription, in whole or in part, in its sole discretion.  The Manager will not unreasonably reject any subscription.   All subscriptions for the LLC Interests are irrevocable.

**Fund Term**

The Fund commenced on May 19, 2008, the effective date of filing of the Certificate of Formation with the State of Delaware, and shall continue indefinitely as per the terms of the Fund's Operating Agreement and the Delaware Limited Liability Company Act.   However, the Manager may terminate the Fund at any time and for any reason.

**Management Fee**

The Fund will pay a management fee (the "Management Fee") to its Manager equal to Two Percent (2.0%) per annum, calculated and paid on a monthly basis.  The Management Fee shall be paid to the Manager on a monthly basis in an amount equal to 0.1667% of the Beginning Value, as defined in the Fund's Operating Agreement, of the net assets of the Fund allocable to the Members' Capital Accounts as of the first day of each calendar month (which will include subscriptions for LLC Interests accepted as of such first day).  The Manager may pay a portion of this Management Fee, only in accordance with and as permitted by applicable laws and regulations, to third parties under the arrangements agreed between the Fund and such third parties.

**Performance Fee**

The Manager will receive, for each calendar month, an allocation of twenty percent (20%) of the Fund's net capital appreciation allocable to the Members' Capital Accounts, as provided by the Fund's Operating Agreement (the "Performance Fee"), calculated on a "high water mark" basis.  The remaining net capital appreciation of the Fund (which is net of the Performance Fee) and any net capital depreciation from the Fund's investment activities will be allocated to all of the Members in proportion to their respective capital accounts.

Allocations for income tax purposes generally will be made among the Members so as to reflect equitably amounts credited or debited to each Member's capital account for the current and prior fiscal years. (SEE "TAX ASPECTS".)

The Manager may pay a portion of this Performance Fee, only in accordance with and as permitted by applicable laws and regulations, to third parties under the arrangements agreed between the Fund and such third parties.

**Trustee Fee**

The Fund will pay a fee to the Trustee (the "Trust Services Fee") equal to Two Percent (2.0%) per annum, calculated and paid on a monthly basis, for the services provided to the Fund by the Trustee.

**Suitability Standards**  The Fund is offering the Securities solely to investors that satisfy certain suitability standards, including the ability to afford a complete loss of their investment (See "TERMS OF THE OFFERING").  Purchasers (sometimes referred to herein as "Subscribers") will be limited to "Accredited Investors" as that term is defined in Rule 501 of Regulation D of the Securities Act.  (See "SUITABILITY STANDARDS")

**Investment Limitations**  The Fund will only acquire MTNs from corporations whose debt obligations are rated "A" or better by Moody's or Standard & Poor's. Proceeds from the sale of the LLC Interests that not immediately employed pursuant to the Investment Objective of the Fund will only be invested in permitted cash-equivalent investments.

**Bank**  U.S. Bank National Association

**Fund Administrator**  U.S. Bank Fund Services, LLC

**Trustee**  All offering proceeds will be deposited into a corporate custody account with U.S. Bank National Association ("U.S. Bank").  The custody account will be governed by a trust indenture agreement (the "Trust Indenture Agreement") between the Fund and Maximum Financial Investment Group, Inc., that contains certain terms and provisions, and criteria to be met before funds and securities can be released from the account.  (See "The Trust Indenture Agreement" attached hereto as Exhibit B)

**Acquisition Counterparty**  Arcanum Equity Fund LLC

**Use of Proceeds**  The Fund expects to receive aggregate gross proceeds from the Offering of approximately One Hundred Million Dollars ($100,000,000.00) that will be used exclusively to purchase portfolios of Medium Term Notes ("MTN's").

**Expenses**  All proposed purchasers of the Securities would be responsible for their own costs, fees, and expenses, including the costs, fees and expenses of their counsel and other advisors.  The purchasers of the Securities will be required to indemnify the Fund for any finder's fees for which such purchasers may be responsible.

**Sales Commissions**  Investors will not bear any sales commission or sales "load" with respect to their acquisition of the LLC Interests offered hereby.  All compensation to the entities assisting with the placement of the LLC Interests will be borne by the Manager by sharing a portion of its share of the profits derived from its investment program in accordance with and as permitted by applicable laws and regulations.

**Operating Agreement**  The Fund operates pursuant to its Limited Liability Company Operating Agreement (the "Operating Agreement") that is attached hereto as

Exhibit B and incorporated herein by reference.  Prospective Investors are advised that any references to the Operating Agreement in this Memorandum do not purport to be a complete statement and are qualified in their entirety by reference to the complete Operating Agreement.

**Withdrawals**

Ninety (90) days after the making of any capital contribution (the "Lock-Up Period"), a Member may, upon thirty (30) days' prior written notice, withdraw any or all of its initial capital contribution from its capital account, or withdraw from the Fund, to the extent that such withdrawal is allocable to such capital contribution.  Investors will be permitted to withdraw profit allocations (in excess of their initial capital contribution) on a monthly basis commencing thirty (30) days from their initial capital contribution upon thirty (30) days' prior written notice to the Manager.  (SEE "RISK FACTORS – RESTRICTIONS ON TRANSFERS AND WITHDRAWALS – THE LOCK-UP PERIOD")  The Manager has the right to require any Member to withdraw from the Fund at any time and for any reason.  (SEE – "REQUIRED WITHDRAWALS")  Payment of ninety percent (90%) of the proceeds of a complete withdrawal shall be made within thirty (30) business days after the effective date of withdrawal, at the end of the Fund's next quarterly accounting period, with the balance being paid thirty (30) days after the completion of the Fund's annual audit.  No fees will be charged in connection with a Member's withdrawal from the Fund.  The Manager's Capital Account is not subject to the Lock-Up Period.

**Required Withdrawals**

The Manager may require withdrawal of all or any portion of a Member's Interest on five (5) days' notice to the Member, if the Manager determines that continued participation of such Member might cause the Fund or any other Member to violate any law, rule or regulation, that would require the Fund or the Manager to register under the Investment Company Act, if litigation is commenced or threatened against the Fund, the Manager or any Member, arising out of or relating to the participation of such Member, or for any other reason that, in the Manager's sole discretion, adversely affects the Fund, the Manager, or any Member of the Fund.

**Member Reports**

The Fund's accountant will review the Fund's books and records as of the end of each fiscal year in order to prepare the Fund's income tax returns to be filed with the Internal Revenue Service ("IRS").  Monthly statements to the Members will be prepared by the Fund's Administrator.  After the end of each fiscal year, in accordance with IRS imposed deadlines, the Manager (or the Administrator at the direction of the Manager) will mail to the Members the Member's Form K-1 and any other information necessary for inclusion in his, her or its federal income tax return.

**Prior Performance of the Manager & the Fund**   The Fund and the Manager have no historical performance or prior investment results.

**Risk Factors**   AN INVESTMENT IN THE LLC INTERESTS THAT ARE THE SUBJECT OF THE MEMORANDUM IS HIGHLY SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK.  INVESTORS SHOULD BE ABLE TO WITHSTAND THE TOTAL LOSS OF THEIR ENTIRE INVESTMENT IN THE LLC INTERESTS. PROSPECTIVE PURCHASERS SHOULD CAREFULLY REVIEW THE INFORMATION SET FORTH UNDER "RISK FACTORS" AS WELL AS OTHER INFORMATION CONTAINED IN THIS MEMORANDUM.  THERE CAN BE NO ASSURANCE THAT THE FUND'S OBJECTIVES CAN BE ACHIEVED.   (SEE "RISK FACTORS")

**Regulatory Matters**   The Fund is not presently, and does not intend in the future to become, registered as an investment company under the Investment Company Act of 1940, as amended and, therefore, will not be required to adhere to certain investment policies under that act.  The Manager is not currently registered as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940, as amended, but may become so registered in the future.

**The Subscription Agreement**   The purchase of the Securities will be made pursuant to a Subscription Agreement and Confidential Purchaser Questionnaire that will contain, among other things, customary representations and warranties by the Manager, certain covenants of the Fund, investment representations of the purchasers, including representations that may be required by the Securities Act and applicable state "blue sky" laws, and appropriate conditions to closing, including, but not limited to, qualification of the offer and sale of the Securities under applicable state "blue sky," laws.  A form of such Subscription Agreement and accompanying Confidential Purchaser Questionnaire are being delivered along with this Memorandum.

**Subscription Procedure**   In order to subscribe for the LLC Interests, a Subscriber must (1) complete, execute and deliver to the Manager the Confidential Purchaser Questionnaire and Subscription Agreement in the form annexed hereto as Exhibit A, (2) complete, execute and deliver to the Manager the Operating Agreement and Counterpart Signature Page (attached thereto) in the form attached hereto as Exhibit B, and (3) a wire transfer or cashier's check made payable to Vestium Equity Fund, LLC   (See "SUBSCRIPTION PROCEDURES")

**Financial Projections**
**Require Caution**  Subscribers are urged to consider that the financial projections discussed, if any, were prepared by the Fund's Manager assuming a conservative position in the marketplace for the Fund and the completion of this Offering.   Such projections are not guarantees of future financial performance, nor should they be understood as such by Subscribers. Subscribers should be aware of the inherent inaccuracies of forecasting. Although the Manager has a reasonable basis for these projections and has provided them herewith in good faith, Subscribers may wish to consult independent market professionals about the Fund's future performance.

**Tax Consequences**  A prospective investor should consider carefully all of the potential tax consequences of an investment in LLC Interests and should consult with his tax advisor before subscribing.

---

*This space intentionally left blank.*

## RESTRICTIONS ON TRANSFER

The Securities will be restricted as to transferability under state and federal laws regulating securities.  The Securities have not been registered under the Securities Act, or any similar state statute, in reliance upon exemptions from the registration requirements contained therein.  Accordingly, all of the Securities will be considered "restricted securities" as defined in Rule 144 of the Securities Act.  As "restricted securities," an investor must hold them indefinitely and may not dispose or otherwise sell them without registration under the Securities Act and without registration under any applicable state securities laws, unless an exemption from registration is available.

In the event that an investor desires to sell or otherwise dispose of any of the Securities, the investor will be required to furnish the Manager with an opinion letter of counsel that, after review by the Fund's Counsel, is satisfactory to the Manager.  To be acceptable to the Manager, the opinion letter of counsel must conclude that the proposed transfer would not violate the registration requirements of the federal or state securities laws.  The Manager has the absolute right, in its sole discretion, to approve or disapprove such transfer.  All certificates and documentation evidencing investors' Securities will bear bold legends giving notice of these restrictions.

## FORWARD LOOKING STATEMENTS

This Memorandum contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, which reflect the Manager's current judgment on certain issues.  Those statements appear in a number of places in this Memorandum and in the documents incorporated by reference, if any, and may include statements regarding, among other matters, the Fund's growth opportunities and other factors affecting the Fund's financial condition or results of operations.  Because such statements apply to future events, they are subject to risks and uncertainties that could cause the actual results to differ materially from those anticipated in this Memorandum.  Important factors that could cause actual results to differ materially include, but are not limited to: as fluctuations in interest rates, changes in global credit and derivatives markets, revisions to laws pertaining to the rating of corporate obligations, changes in local and national unemployment rates, variations in the local and national economy and occurrences of natural disasters or other such disasters.  The Fund is a newly formed entity and has a limited operating history.  Actual results may differ materially from these statements as a result of risk factors inherent in the Fund's business, industry, or other factors.  Risk factors that are applicable to the Fund are more fully described below.

## IMPORTANT NOTICE TO ALL INVESTORS:

**THE FUND IS NOT SUBJECT TO STATE OR FEDERAL STATUTES OR REGULATIONS APPLICABLE TO COMMERCIAL BANKS AND/OR SAVINGS AND LOAN ASSOCIATIONS WITH REGARD TO INSURANCE, THE MAINTENANCE OF RESERVES, THE QUALITY OR CONDITION OF ITS ASSETS OR OTHER MATTERS.**

## RISK FACTORS

**THE INVESTMENT OFFERED HEREBY IS HIGHLY SPECULATIVE, AND PROSPECTIVE PURCHASERS SHOULD BE AWARE THAT AN INVESTMENT IN THE SECURITIES INVOLVES A HIGH DEGREE OF RISK.  ACCORDINGLY, PROSPECTIVE PURCHASERS SHOULD CAREFULLY CONSIDER THE FOLLOWING RISK FACTORS IN ADDITION TO THE OTHER INFORMATION IN THIS MEMORANDUM.**

**Lack of Liquidity.**

The Securities are being offered without registration under the Securities Act, in reliance upon an exemption contained in Section 4(2) of the Securities Act and/or Regulation D under the Securities Act.  Certain restrictions on transferability will preclude disposition and transfer of Securities other than pursuant to an effective registration statement or in accordance with an exemption from registration contained in the Securities Act.  In addition, the Fund's Operating Agreement sets forth certain restrictions on the transfer of the Securities.  In light of the restrictions imposed on a transfer of the Securities, an investment in the Fund's LLC Interests should be viewed as illiquid and subject to risk.

**The determination of the amount of the offering has been arbitrarily determined by the Manager.**

The amount of the Securities of the Fund offered hereby has been arbitrarily determined by the Manager and is not based on the Fund's book value, assets, earnings or any other recognizable standard of value.  As such, no prospective investor should infer that the Manager has chosen to offer the amount of Securities described herein because of the Fund's assets or book value.  If profitable results are not achieved from the Fund's operations, of which there can be no assurance, the Fund may not have sufficient resources to make distributions to the Members.

**Absence of Public Market; Transferability and Liquidity of Investment.**

There is no public market for the Securities described herein, and no market is expected to develop for the Securities in the future.  The Securities are not being registered under the Securities Act or the securities laws of any other appropriate jurisdiction in reliance on exemptions from such registration requirements.  The Securities may not be resold or otherwise transferred unless the Securities are later registered under the Securities Act or the securities laws of any other appropriate jurisdiction, or unless an exemption from such registration requirements is available.  Accordingly, an investor may be unable to liquidate an investment in the Securities and should be prepared to bear the economic risk of an investment in the Securities for an indefinite period.  In addition, an investor should be able to withstand the total loss of his/her or its investment.

**The Securities are being offered by the Fund on a "best efforts" basis and no minimum amount of proceeds is required to be raised before the Fund may use the proceeds of this Offering.**

No assurance can be given that all or any specific portion of Securities offered hereby will be sold.  The description of "Use of Proceeds" set forth herein shows the proposed use of the net proceeds assuming the sale of all of the Securities offered hereby.  To the extent that less than all of the

Securities offered hereby are sold, the Fund will need to adjust its investment strategy to compensate for the reduction in receipt of funds.  (See "USE OF PROCEEDS").

**There is no minimum capitalization applicable to the offering.**

The Fund does not have a minimum capitalization, and it may use the proceeds from the issuance of the Securities once the corresponding subscription agreements are accepted.  The Fund may only raise a minimum of capital, which could leave it with insufficient capital to implement its business plan effectively.  There can be no assurance that alternative capital or financing would be available.

**Risk that offering exemptions are not available.**

In making this Offering, the Fund is relying upon the availability Rule 506 of Regulation D to exempt its offerings from registration under the Securities Act.  If the private placement exemptions relied upon are not available to the Fund and/or its Manager for any reason, the Fund and its Manager may be required to offer to the investors the right to rescind their purchase of the LLC Interests, which could have a material adverse effect on the Fund, its business, and its financial condition.  There is also no assurance that the Fund and/or its Manager would have adequate funds to repay its Members if rescission were required.  Any related litigation with the Securities and Exchange Commission or other state, federal or local agencies or parties would also have a material adverse impact on the Fund.

**Fund Not Registered Under the Investment Company Act of 1940.**

The Fund is not, nor is it intended to be, registered under the Investment Company Act of 1940 (the "1940 Act").  The 1940 Act contains certain provisions, among others, relating to boards of directors of mutual funds, which govern the election of directors by mutual fund shareholders, set forth standards for disqualification of certain individuals from serving as directors, and list requirements for disinterested directors.  None of these provisions apply to the Fund, which is within the absolute control of the Manager.

The 1940 Act also contains provisions, among others, relating to conflicts of interest, and requires investor and disinterested director approval of investment advisory agreements, while the terms of any such agreements (or similar agreements) entered into by the Fund are within the discretion of the Manager.  None of the prohibitions on transactions with affiliates or certain other conflicts of interest provisions contained in the 1940 Act apply to the Fund.

While the Fund expects to keep appropriate records, it is not subject to the record-keeping or custodianship requirements of the 1940 Act.  The Securities and Exchange Commission (the "SEC") requires reports and makes inspections of the books and records of mutual funds, neither of which are the case with respect to the Fund.

**Risk that exemption from the Manager's Registration as an Investment Advisor is not Available.**

The Manager is not registered as an Investment Advisor under the Investment Advisors Act of 1940 (the "Advisors Act").  The Manager has chosen not to register as an Investment Advisor in reliance upon certain exemptions contained in the Advisors Act.  Specifically, the Manager has elected to rely on Section 203(b)(3) of the Advisors Act which permits persons or entities advising fewer than

fifteen clients and neither holding themselves out generally to the public as an investment adviser nor acting as an investment adviser to any investment company registered under Title I of the Act.  In order to qualify under Section 203(b)(3) of the Advisors Act, the Manager is relying on Advisers Act Rule 203(b)(3)-1 which provides that any "legal organization" (such as the Fund) may be considered a single client.  Compliance with these exemptions requires that the Manager provide investment decisions to the Fund (based on the Fund's overall investment objectives) and not to any Member individually.  Ongoing compliance with this exemption requires great care on the part of the Manager to ensure the Fund's continuing eligibility for the exemption.  If the Manager were to fail to qualify as a Section 203(b)(3) exempt investment advisor, the Fund and its Manager could be subject to enforcement action by state or federal securities regulators.  Such enforcement action could result in the termination of the Fund's operations and liquidation of the Fund, as well as significant fines and penalties.

**Absence of Insurance and Regulation.**

The LLC Interests offered hereby are not insured by any governmental or private agency, and they are not guaranteed by any public or private entity other than the Fund.  Likewise, the Fund is not regulated or subject to examination in the same manner as commercial banks and thrift institutions.  The Fund is not a commercial bank or savings/thrift institution.  The Fund is dependent upon proceeds from the acquisition and management of its MTN portfolios to make distributions to its Members and to conduct its ongoing operations.  The Fund's revenues from operations, including the acquisition, servicing and management of its MTN portfolio and the Fund's working capital represent the sources of funds for distributions to its Members.

**The Fund has a limited operating history.**

The Fund was formed on May 19, 2008, and accordingly has a limited history of operation.  There can be no assurance that the Fund will be able to successfully implement its business plan.  For these and other unforeseeable factors, there can be no assurance that the Fund will achieve or sustain profitable operations.

**Restrictions on Transfers and Withdrawals – Suspension of Withdrawals.**

The right of any Member to withdraw monies from the Fund is subject to the provision by the Manager for Fund liabilities in accordance with generally accepted accounting principles and reserves for contingencies.  In addition, the Manager may, in its sole discretion during the existence of any state of affairs that, in the opinion of the Manager, make the determination that the price, value or disposition of the Fund's investments is impractical or prejudicial to the non-withdrawing Members.

**There is no assurance that the Fund will turn a profit.**

There is no assurance as to whether the Fund will be profitable, or earn revenues, or whether the Fund will be able to return any investment funds, to make cash distributions or to meet its operating expenses.

*This space intentionally left blank.*

**There is no assurance that the Fund will generate immediate revenues.**

The Fund anticipates that it will incur substantial expenses relating to the acquisition and servicing of its portfolios of MTN's. The Fund currently expects the initial expenses it incurs to result in operating losses for the Fund for the foreseeable future. Furthermore, no assurance can be made that a Subscriber for the Securities offered hereby will not lose his or her entire investment.

**The Fund will be subject to substantial fees and expenses regardless of the profitability of the Fund.**

The Fund will pay various fees and expenses related to its ongoing operations regardless of whether or not the Fund's investment activities are profitable. These fees and expenses include, but are not limited to, the Management Fee paid to its Manager equal to Two Percent (2.0%) per annum, calculated and paid on a monthly basis, and the Trust Services Fee, to the Fund's Trustee equal to Two Percent (2.0%) per annum, calculated and paid on a monthly basis. These fees and expenses will require that the Fund's investment activities generate sufficient revenues in excess of these expenses.

**Dependence on Third-Party Relationships.**

The Fund is generally dependent on relationships with third parties including financial institutions with which the Manager has agreements for the purchase of MTNs as a means of managing and implementing its investment program. The Manager must be successful in securing and maintaining its third party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Manager as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Manager or after their relations with the Manager or the Fund expire. Accordingly, there can be no assurance that the Manager's existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Fund.

**Dependence on Relationship with Arcanum Equity Fund, LLC.**

Arcanum Equity Fund, LLC ("Arcanum"), an entity owned and operated by the principals of the Manager, has contracts with third parties for the purchase and sale of the MTNs to be acquired by the Fund. In the event that Arcanum is unable to serve in this capacity for any reason, or if Arcanum's contracts with these counterparties were terminated for any reason, the Fund's ability to acquire and dispose of MTNs pursuant to its investment strategy will be seriously compromised.

**Financial projections provided may prove inaccurate.**

Financial projections concerning the estimated operating results of the Fund may be prepared by the Fund's Managers. These projections would be based on certain assumptions which may prove to be inaccurate and which are subject to future conditions which may be beyond the control of the Manager, such as fluctuations in interest rates, changes in global credit and derivatives markets, revisions to laws pertaining to the rating of corporate obligations, changes in local and national unemployment rates, variations in the local and national economy and occurrences of natural disasters or other such disasters. The Fund has a limited operating history. The Fund may experience unanticipated costs, or anticipated agreements or contracts may not materialize, resulting in lower

revenues than forecasted. There is no assurance that the results that may be illustrated in financial projections would in fact be realized by the Fund. The financial projections would be prepared by the Manager of the Fund and would not be examined or compiled by independent certified public accountants. Accordingly, neither independent certified public accountants nor counsel to the Fund could provide any level of assurance on them.

**The Fund is entirely dependent on its Manager.**

The Fund's Manager makes all decisions with respect to the Fund's assets, including investment decisions and the day-to-day operations of the Fund. Other than as specified in the Fund's Operating Agreement, the Members have no right or power to take part in the management of the Fund. As a result, the success of the Fund for the foreseeable future will depend largely upon the ability of the principals of the Manager.

**PROSPECTIVE INVESTORS ARE HEREBY ADVISED THAT THE SUCCESS OF PREVIOUS VENTURES UNDERTAKEN BY THE FUND'S MANAGER CANNOT BE CONSTRUED AS A GUARANTEE OF THE SUCCESS OF THE VENTURE OUTLINED HEREIN.**

**Principals of the Fund's Manager may be subject to conflicts of interest.**

The principals of the Fund's Manager are associated with or employed by other Companies, which are engaged, or may become engaged, in operations similar to the operations engaged in by the Fund. Conflicts of interest between the principals of the Fund's Manager and the Fund may arise by reason of such relationships. The principals of the Fund's Manager intend to resolve any conflicts with respect to such operations in a manner equitable to the Members of the Fund, its Manager, and any of the Fund's affiliates.

**The Fund may not achieve its goals and objectives.**

All investments in the Fund risk the loss of capital. While the Fund's Manager believes that its experience and relationships will moderate this risk to some degree, no representation is made that the Fund's investment strategy will be successful.

**The Fund may become subject to litigation.**

There are many risks incident to acquiring and selling medium term debt instruments that may give rise to litigation. For example, the Fund may be named as a defendant in a lawsuit or regulatory action. The Fund may also incur uninsured losses for liabilities which arise in the ordinary course of business, or which are unforeseen, including, but not limited to, employment liability and business loss claims. There is no assurance that the Fund's Members will not lose their entire investment in the Fund as a result of unforeseen litigation.

**The Fund will indemnify its Manager.**

The Fund's Operating Agreement provides that the Fund will, within the limits of capital contributions and retained assets, hold its Manager and its principals harmless against certain claims arising from Fund activities, other than losses or damages incurred by it as a result of its gross

negligence, fraud or bad faith.  If the Fund were called upon to perform under its indemnification agreements, then the portion of its assets expended for such purpose would reduce the amount otherwise available for the implementation of its business plan, or for distributions to its Members.

**The Fund is subject to certain institutional risks.**

The institutions with which the Fund (directly or indirectly) does business, such as banks and other financial institutions, may encounter financial difficulties that impair the operational capabilities or the capital position of the Fund.  The Fund relies heavily on various counterparties to perform many of the functions required for the acquisition and disposition of MTNs.  Should any of these counterparties encounter financial, regulatory or other difficulties that effect its operations, the Fund's operational capabilities and financial position would be adversely affected.

**There may be changes in laws applicable to the Fund.**

The Fund must comply with various legal requirements, including requirements imposed by the state and federal securities laws, pension laws and state licensing requirements.  Should any of those laws change, the legal requirements to which the Fund may be subject could differ materially from current requirements.

**The Fund may face adverse tax consequences.**

While the Fund is advised in tax matters by its accountants, the Internal Revenue Service (the "IRS") may not accept the tax positions taken by the Fund.

**The Fund could be audited by the Internal Revenue Service.**

The IRS could audit the Fund's information and adjustments to the Fund's tax returns could occur as a result.  Any such adjustment could result in the Fund paying additional tax, interest and penalties, as well as incremental accounting and legal expenses.

**Considerations for ERISA investors.**

Most pension or profit-sharing plans, individual retirement accounts and tax-advantaged retirement funds are subject to provisions of the Code, the Employee Retirement Income Security Act of 1974 ('ERISA"), or both, which may be relevant to a decision as to whether such plans should invest in the Fund.  There may, for example, be issues as to whether such an investment is "prudent" or a "prohibited transaction."  An investment in the Fund may result in "unrelated business income."  Legal counsel should be consulted by such a retirement fund before investing in the Fund.  (See "ERISA CONSIDERATIONS").

**The Fund is subject to various economic risks.**

Local, national and international economic conditions may have a substantial adverse affect on the Fund's operations, including, but not limited to, the availability and pricing of portfolios of MTN's, and the rate of success in collection of corporate debt.  The Fund cannot guarantee its anticipated results of operations against the possible eventuality of any of these potential adverse conditions.

**The funds raised through the Offering may be inadequate to implement the Fund's investment strategy.**

The Fund will have limited capital available to it, to the extent that the Fund raises capital from this Offering.  The Fund's investment strategy is based in part on the assumption that this Offering will be fully subscribed.  If the Offering is less than fully subscribed, the Fund will be required to alter its current investment strategy to account for the reduction in available funds, which may have an adverse impact on the Fund's ability to implement and maximize its investment strategy.

**The Fund may suffer uninsured losses.**

The Fund does not have insurance coverage such as liability, fire or other similar policies as are customarily obtained for businesses similar to the Fund.  Certain types of losses of a catastrophic nature, such as losses resulting from floods, tornadoes, thunderstorms, and earthquakes, are uninsurable or not economically insurable to the full extent of potential loss.  Such Acts of God, work stoppages, regulatory actions or other causes, could adversely affect the Fund's business, results of operations, and profitability.

**Risks related to terrorist attack, war or natural disaster.**

The operations of the Manager, the Fund, and counterparties with which the Manager, Trading Advisor and the Fund do business could be severely disrupted in the event of a major terrorist attack or the outbreak, continuation or expansion of war or other hostilities.  The terrorist attacks of September 11, 2001, have heightened this concern substantially.  The situations in Iraq, Iran and North Korea, global anti-terrorism initiatives and political unrest in the Middle East and Southeast Asia continue to fuel this concern.  Additionally, a serious pandemic, such as avian influenza, or a natural disaster, such as a hurricane, could severely disrupt the global economy.

## RISK FACTORS – FUND OPERATIONS & INVESTMENT STRATEGY

**THE FOLLOWING RISK FACTORS UNIQUE TO THE FUND'S OPERATIONS AND INVESTMENT STRATEGY SHOULD BE CAREFULLY CONSIDERED IN EVALUATING AN INVESTMENT IN THE SECURITIES OFFERED HEREBY.**

Investments in the LLC Interests are subject to some risks. In consultation with your own financial and legal advisors, you should carefully consider, among other factors, the risks described below before deciding whether an investment program for investing in the LLC Interests is suitable for you and whether the investment program is suited to your particular circumstances.

**The credit ratings of the issuers of the MTNs to be acquired by the Fund may not reflect all risks of an investment in the MTNs.**

The credit ratings of the MTNs and their issuers may not reflect the potential impact of all risks related to the structure and other factors on the value of the MTNs.  In addition, actual or anticipated changes in the issuer's credit ratings will generally affect the market value of the MTNs.  The Fund will assume a risk that deterioration of the issuer's financial state and/or a decrease in the issuer's

credit rating may result in decreased demand for the issuer's debt securities, and thus the price of the MTNs placing downward pressure on the MTNs acquired by the Fund.

**Market risk.**

The Fund's investment in the MTNs investors will be subject to a risk of market interest rate fluctuations, which may cause rise or fall of the MTN note price.  When interest rates rise in the market, the market price of debt securities decreases, and vice versa.

**Taxation and legislation risk.**

Any changes in the legal acts concerning debt securities or any changes in taxation policy of relevant jurisdiction may affect the attractiveness of the MTNs acquired by the Fund.  Such changes may also reduce liquidity and/or price of the MTNs.

**General Market Risks.**

An investment in the LLC Interests offered hereby is not a deposit in a bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation ("FDIC") or any other governmental agency.  The Fund's net asset value ("NAV"), yield, and total return will fluctuate based upon changes in the value of its portfolio.  The Fund is not a complete investment program and there is no assurance that the Fund will achieve its investment objective.  Investors could lose money on their investment in the Fund or the Fund could under perform other investments due to, among other things, poor investment decisions by the Manager.

**Subordinated MTN Risks.**

Many of the MTNs acquired by the Fund will be subordinated debt of the MTN issuers.  In the event of any insolvency or liquidation of the issuer, holders of subordinated debt would receive payments on any outstanding subordinated MTNs only after senior Members and other senior creditors have been repaid in full, if and to the extent that there is still cash available for those payments.  Thus, holders of subordinated MTNs generally face a higher performance risk than holders of senior MTNs.  Such insolvency or liquidation may cause the Fund to lose some or all of the investment in that particular note or issuer's debt securities in general.

**The availability of MTNs that may be purchased by the Fund cannot be predicted.**

The success of the Fund and its investment strategy depend largely on the ongoing availability of MTNs for purchase.  The amount and pricing of MTNs available at any given point in time depends on numerous factors, most all of which are outside the Fund's control, including, but not limited to, competition from other companies with similar or identical investment methodologies, the amount of debt instruments being issued by banks and other corporations, and fluctuations in interest rates.  Increased competition and tightening global credit markets can result in decreased supply of MTNs available for purchase.

**Defaults on the MTNs the Fund acquires will reduce the value of its investment portfolio and will harm its results of operations.**

The Fund is subject to risks of issuer default on the MTNs.  In the event of any default under MTNs held by the Fund, it bears the risk of total loss of its principal investment in the MTN and will likely be unable to resell the MTN.  MTN issuer default would cause the Fund to lose money on its investment and could cause investors to lose money on their investment in the Fund.

**Special Risks of MTN investing.**

The business of buying and selling of MTNs between private parties on an off-exchange basis has experienced a high incidence of fraudulent conduct in recent years, particularly in connection with the sale of fraudulent or phony MTNs.  While the Manager believes that the limitations built into the Fund's investment program will significantly mitigate this risk (ie – the Fund is only permitted to acquire MTNs from A-rated issuers and trade MTNS with pre-approved counterparties), these measures cannot entirely eliminate these risks.  Moreover, the incidence of fraud that has occurred in connection with MTN trading increases the risk that the Fund or its Manager may be subject to inquiry by the SEC or other securities or financial regulatory authority, which could require the Fund to incur legal fees and expenses related to any such inquiry and/or require the Fund to suspend its investment activities pending the outcome of any such inquiry.

**Non-U.S. Investments.**

The Fund's current investment program involves acquiring MTNs from both domestic and foreign issuers and counterparties.  Investing in offshore securities involves certain risks not associated with investing in securities of U.S. companies or the U.S. government.  These risks include, but are not limited to, political and economic considerations, such as higher risk of nationalization, confiscatory taxation, difficulties involved in repatriating funds, social, political and economic instability, the low volume of trading and resulting lower liquidity present in offshore securities markets, difficulty in settling securities trades, fluctuations in exchange rates between currencies, lower levels of regulation of offshore securities markets and investment entities, and comparatively lower accounting standards.

**THE FOREGOING SPECIAL CONSIDERATIONS DO NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING.  PROSPECTIVE INVESTORS SHOULD READ THE ENTIRE MEMORANDUM BEFORE DETERMINING TO INVEST IN THE FUND.**

**THERE IS PRESENTLY NO PUBLIC MARKET FOR THE FUND'S SECURITIES AND NO MARKET IS EXPECTED TO DEVELOP FROM THIS PLACEMENT, NOR IS THERE ANY ASSURANCE THAT ONE WILL EVER DEVELOP.  THE TRANSFERABILITY OF THE FUND'S SECURITIES IS RESTRICTED UNDER FEDERAL AND STATE SECURITIES LAWS.  THE FUND MAY NOT BECOME A PUBLICLY TRADED COMPANY AND, EVEN IF IT DOES, THE TRANSFERABILITY OF THE FUND'S SECURITIES OR THE SECURITIES WOULD BE SUBJECT TO THE CONDITIONS OF RULE 144 OF THE SECURITIES ACT OF 1933, AS AMENDED.  CONSEQUENTLY, INVESTORS MAY NOT BE ABLE TO LIQUIDATE THEIR INVESTMENT IN THE FUND IF SUCH LIQUIDATION SHOULD BECOME NECESSARY OR DESIRED.**

# INVESTMENT PROGRAM

**Vestium Equity Fund, LLC,** (the "Fund" or "Vestium"), is a limited liability company organized on May 19, 2008, under the laws of the State of Delaware.  The Fund operates pursuant to its Certificate of Formation and its Operating Agreement dated May 19, 2008.

The Fund will be engaged in the business of purchasing, managing and selling Medium Term Notes ("MTNs").  An MTN is a debt security issued by a corporation with a maturity ranging from 1 to 10 years.  MTNs typically have higher interest rates associated with them when compared with short term MTNs, but also typically have lower interest rates associated with them when compared with long term MTNs.  The Fund will only acquire MTNs issued by corporations whose obligations are rated "A" or better by Moody's Investors Service, Inc. ("Moody's") or the equivalent by Standard & Poor's ("S&P").

The Fund will generally invest in Medium Term Notes of issuing corporations involved in a wide range of industries in an effort to diversify. However, in the Fund's discretion, there may exist economic situation whereby the Fund deems it worthwhile to focus investment in one particular industry or region of the world.

## The Trustee & Corporate Custodial Account.

All Offering proceeds will be deposited into a corporate custody account with U.S. Bank National Association ("U.S. Bank").  The custody account will be governed by a trust indenture agreement (the "Trust Indenture Agreement") between the Fund and Maximum Financial Investment Group, Inc. ("Maximum" or the "Trustee"), that contains certain terms and provisions, and criteria to be met before funds and securities can be released from the account.  The Indenture provides that all proceeds from this Offering will be used to purchase portfolios of Medium Term Notes ("MTN's") from sellers of MTNs that have been approved by the Manager and listed as approved counterparties in the Indenture.  The Indenture further provides that all distributions to investors and certain specified operating expenses will be paid from the revenues derived from the disposition of the MTNs.

## The Affiliated Acquisition Counterparty – Arcanum Equity Fund, LLC.

Arcanum Equity Fund, LLC ("Arcanum"), an entity owned and operated by the principals of the Manager, has contracts with various third parties for the purchase and sale of the MTNs to be acquired by the Fund.  Arcanum will acquire the MTNs for the benefit of the Fund pursuant to the terms of the Indenture.  Arcanum may also acquire portfolios of MTNs as a co-investor with the Fund in certain instances in the sole discretion of the Manager.

## Competition.

The business of purchasing MTN's is highly competitive and fragmented, and competition from new and existing companies is expected to increase.  Many of these competitors are larger and more established and may have substantially greater financial, technological, personnel and other resources than Vestium Equity Fund, LLC.  Moreover, future profitability will be directly related to the availability and cost of capital in relation to availability and cost of capital to competitors.  There can be no assurances that the Fund will be able to compete successfully against current or future

competitors or that competition will not have material adverse effect on our business, financial condition or results of operations.

**NOTHING CONTAINED HEREIN SHOULD BE CONSTRUED AS AN ENDORSEMENT OR APPROVAL OF THE SECURITIES OFFERED HEREIN BY U.S. BANK NATIONAL ASSOCIATION OR ANY OTHER BANK OR LENDING INSTITUTION.  THE FUND IS NOT SUBJECT TO STATE OR FEDERAL STATUTES OR REGULATIONS APPLICABLE TO COMMERCIAL BANKS AND/OR SAVINGS AND LOAN ASSOCIATIONS WITH REGARD TO INSURANCE, THE MAINTENANCE OF RESERVES, THE QUALITY OR CONDITION OF ITS ASSETS OR OTHER MATTERS. THE LLC INTERESTS OFFERED HEREUNDER ARE NOT CERTIFICATES OF DEPOSIT ("CDs").**

## EMPLOYEES

As of the date of this Memorandum, the Fund has no full time employees.  Mr. St. Jean, Mr. Buckhannon, Mr. Rawstern and Mr. Tinadall are the directors, officers and managers of the Manager of the Fund and serve as its primary employees.  The Manager may, in the future, hire executive officers, administrative employees and independent contractors as they become necessary.

## FACILITIES

The Fund and its Manager currently maintain and operate from their office located at 13116 Harriers Place, Bradenton, Florida 34212.

## LITIGATION AND ADMINISTRATIVE PROCEEDINGS

### Litigation

Neither the Fund nor the Fund's Manager is currently involved in any litigation believed to be material to the development of the Fund's business objectives or the Offering.

### Administrative Proceedings

While the Fund is not currently involved in any administrative proceedings, the U.S. Securities and Exchange Commission ("SEC") recently concluded an inquiry into the offering of Arcanum Equity Fund, LLC, an affiliate of the Fund's Manager, and a pooled investment vehicle sponsored and operated by the principals of the Fund's Manager.  The SEC informed Arcanum that on May 14, 2008 that the inquiry had been concluded without recommending enforcement action.

*This space intentionally left blank.*

## POTENTIAL CONFLICTS OF INTEREST &
## RELATED PARTY TRANSACTIONS

The principals of the Fund's Manager currently own, manage and operate other entities, including Arcanum, TransCap Corporation and other companies described below that may acquire MTN's. These entities may have similar or different objectives as those of the Fund. Such activities could detract from the time they allocate to the affairs of the Fund. In addition, directors & officers of the Manager or their affiliated entities may carry on investment activities for their own accounts. As a result, the principals of the Fund's Manager will be engaged in substantial activities other than on behalf of the Fund and may have differing economic interests in respect of such activities and may have conflicts of interest in allocating investment opportunities and their time between the Fund and the aforementioned entities.

**Allocation of Investment Opportunities & Competition with the Fund.**

The principals of the Fund's Manager will determine the allocation of investment opportunities among the entities with which they are affiliated including, but not limited to, the Fund and the other entities described in this section, on whatever basis they deem appropriate.

There may be circumstances under which the principals of the Fund's Manager will cause one or more of their investment entities to commit a larger percentage of their assets to an investment opportunity than the percentage of the Fund's assets they commit to such investment. There may also be circumstances where the principals of the Fund's Manager purchase or sell an investment for one of their affiliated entities, or a client thereof, and do not purchase or sell the same investment for the Fund, or purchase or sell an investment for the Fund and not for one of their affiliated entities or a client thereof. Competition may result as between the Fund and other entities affiliated with the principals of the Fund's Manager for, among other things, investment opportunities. It is the policy of the principals of the Fund's Manager that investment decisions for the Fund and all other entities affiliated with them be made based on a consideration of their respective investment objectives and policies, and other needs and requirements, and that investment transactions and opportunities be fairly allocated among them, at all times adhering to the fiduciaries owed to investors and sound principles and practices.

**Potential Future Projects.**

The principals of the Fund's Manager may serve in the future as an officer, director, manager or investor in other entities. Neither the Fund nor any Member would have any interest in these projects. The Managers believe that they have sufficient resources to fully discharge their responsibilities to all Projects they have organized or will organize in the future, if any. The Managers will devote only so much of its time to the business of the Fund as is required in its employment agreements, and beyond that only to the extent in its judgment is reasonably required.

**Compensation.**

The Managers establish the compensation structure of the Fund. Although this is not uncommon, there is an actual conflict of interest if one or more Managers vote on salary for themselves. Larger entities generally establish a compensation committee composed of persons who are not executives of the company. Although the Manager does intend to establish this practice in the future, at the present time, the

size of the Fund does not warrant the expense of such a committee.  For the present, investors must be aware of the conflict and of their dependence upon the Managers to honor the obligation to be fair and reasonable in the matters of compensation.

**Lack of Separate Legal Representation.**

Legal counsel for the Fund and its Manager will not represent the individual Members.  Each investor should accordingly consult with and rely on his/her/its own legal counsel regarding any investment in the Fund.  The attorneys, accountants, and other experts who perform services for the Fund may perform services for the Manager and its affiliates.

**Structure of Offering.**

As is the case with many private placements, the Offering itself is structured by the Managers, who themselves have a direct interest in the relative terms of the Offering structure.  This includes the rate of interest paid on the Securities and certain other structural matters required of the Fund in its future operations.  There is no way in which these can be negotiated on an arms-length basis.  This is one of the functions served by an independent securities underwriter in a public offering.  When an underwriter is present in a transaction, that underwriter acts, in part, as an advocate for the prospective investors.  Therefore, each prospective investor must himself carefully scrutinize the terms of this Offering and seek his or her own counsel on the fairness of the terms.  By choosing to invest in this Fund, an investor will be indicating his or her acceptance of its terms in the manner structured by the Managers.

**Due Diligence.**

Where an independent underwriter is present, as part of its duty it will make its own independent investigations of the principals, the venture, and the underlying assumptions.  Since no underwriter is present here, the only information set forth is that presented by the Fund itself.  Each investor should be aware of the conflicting interests inherent in such matters, notwithstanding all attempts at fairness and completeness, and make whatever due diligence efforts he or she deems prudent and necessary before undertaking an investment in the Fund.

**Related-Party Transactions.**

The agreements and arrangements among the Fund and certain of its affiliates have been established by the principals of the Manager and are not the result of arm's-length negotiations.  These conflicts include, but are not limited to, the Fund's agreement with Arcanum through which Arcanum will serve as the Fund's acquisition counterparty.  While the arrangement between Arcanum and the Fund provides that the Fund will not bear any expense of Arcanum's services in this regard, Arcanum, may receive substantial fees from third parties in connection with the acquisition activities it engages in on behalf of the Fund; Members of the Fund will not share in such fees.

The General Partner does not anticipate that any conflict would result from the Fund's agreement with Arcanum, as Arcanum is prohibited from charging fees to the Fund or "marking up" the cost of MTNs acquired on behalf of the Fund, however, prospective investors are advised that the principals of the Fund's Manager, who are also principals of Arcanum, may receive substantial fees derived from Arcanum's activities on behalf of the Fund.

**NO INDEPENDENT OR THIRD PARTY IS IN A POSITION TO CONFIRM THAT THE PRINCIPALS OF THE MANAGER ARE EQUITABLY RESOLVING THE ABOVE DESCRIBED CONFLICTS OF INTEREST, AND INVESTORS WILL HAVE NO MEANS OF KNOWING WHETHER THESE CONFLICTS ARE BEING EQUITABLY RESOLVED.  THE PRINCIPALS OF THE MANAGER WILL RESOLVE ALL CONFLICTS OF INTEREST IN ACCORDANCE WITH APPLICABLE LAW AND REGULATION AND THEIR FIDUCIARY DUITES TO THE FUND.**

## MANAGEMENT

In addition to its existing management, upon commencement of operations, the Manager intends to recruit key management personnel including but not limited to market researchers, human resources manager(s) and opening managers.

**The Fund's Manager**

The officers, directors, managers and sole members of the Fund's Manager, Vestium Management Group, LLC, as of the date of this Memorandum, as well as their ages and positions, are listed below:

| Name | Age | Positions |
|------|-----|-----------|
| Robert L. Buckhannon | 47 | President / Chief Executive Officer / Director */ Manager* |
| Dale E. St. Jean | 48 | Vice President / Treasurer / Director */ Manager* |
| Terry Rawstern | 59 | Vice President / Secretary / Director */ Manager* |
| Greg D. Tindall | 47 | Vice President / Director */ Manager* |

**Robert L. Buckhannon**
*President / Chief Executive Officer / Manager*

Dr. Buckhannon previously served as CEO of a multi-state neurology practice specializing in electro-diagnostic medicine, and has also developed, owned and operated multi-specialty physical medicine practices in Colorado, Texas, and Florida as well as diagnostic imaging and surgery centers. He holds degrees in microbiology and public health from Michigan State University. He has a doctorate degree in chiropractic medicine and is a member of the Academy of Molecular Imaging, the Society of Nuclear Medicine and the American Healthcare Radiology Administrators.

Dr. Buckhannon is also co-founder and CEO of Prism International Investments, LLC, an investment firm that services clients worldwide. He has raised funds for Specialty Hospitals, Diagnostic Imaging Centers and Out Patient Surgery Centers, resulting in excellent returns for the investors. Dr. Buckhannon also has extensive connections in the international Banking community, wherein he developed excellent access to primary issue investment grade instruments along with numerous institutional buyers.

**Dale E. St. Jean**
*Vice President / Treasurer/ Director / Manager*

Over the past 20-years, Mr. St. Jean has been a business development specialist in corporate training and development, investor relations, and has owned and operated a number of businesses. He is currently a co-founder and President of TransCap Corporation, a Canadian based company engaged in the trading of equities (stock), commodities, and currency markets, as well as in the purchasing of real and personal property, including goods, chattel paper, securities, documents of title, instruments, money and intangibles for resale.

The principals of TransCap have well over twenty (20) years experience as active market traders in the industry and have developed clients worldwide.  Mr. St. Jean is responsible for all business development including product and infrastructure development, recruiting, training, and support of management and agents to co-ordinate the sales and marketing efforts. He is also responsible for managing the overall affairs of the businesses, including such aspects as security issues, legal, and accounting matters.

**Terry D. Rawstern, PhD**
*Vice President / Secretary/ Director / Manager*

Dr. Rawstern has been the C.E.O. of large healthcare groups for the past 35 years.  A major part of this time was devoted to diagnostic imaging facilities.  He was the Division President for a large publicly traded diagnostic imaging company.  Dr. Rawstern also served as the National Director for Clinical Research for this company.  His expertise has been focused in the start-up and turn-around phases of healthcare institutions.  For the past 20 years he has been a Certified Medical Practice Executive as designated by Medical Group Management Association.  Dr Rawstern has a bachelor's degree from Northern State University, a Masters degree from the University of South Dakota and his Doctorate from St Regis University.

**Greg D. Tindall**
*Vice President / Director / Manager*

Over the past twenty years Mr. Tindall, as a private sector entrepreneur, has been active as a market trader for approximately 20 years both on his own behalf and on behalf of corporate and individual clients. He is a co-founder and director of TransCap Corporation, a Canadian based company engaged in the trading of equities (stock), commodities, and currency markets, as well as in the purchasing of real and personal property, including goods, chattel paper, securities, documents of title, instruments, money and intangibles for resale.

He is involved in the financial markets, namely, equities (stock), commodities, and currency markets both in Canada and elsewhere. Mr. Tindall is responsible for the overseeing, reviewing and approving of all trading / investment decisions for the TransCap Corporation.

*This space intentionally left blank.*

## INDEMNIFICATION OF OFFICERS AND DIRECTORS

The Fund's Operating Agreement indemnifies to the fullest extent permitted by Delaware law, the principals of the Fund's Manager who was or is a party or is threatened to be made a party to, any threatened, or pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, by reason of fact that he/she is or was acting as the incorporator, officer, director or nominee officer/director, or manager, or was serving in any capacity at any time.  Furthermore, it is the responsibility of the Fund to pay for all legal expenses that may occur on behalf of the party who may come under any such type of action.

The Manager of the Fund has indicated that it intends to offer indemnity agreements consistent with the foregoing to all principals of the Fund's Manager.  In this regard, investors should be aware of the position of the United States Securities and Exchange Commission respecting such indemnification, which position is as follows: "Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Act") may be permitted to directors, officers and controlling persons of the small business issuer pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable."

## USE OF PROCEEDS

The entire net proceeds from the sale of the LLC Interests will be deposited into the Fund's corporate custody account with U.S. Bank and will be available to the Fund in accordance with the program described in "INVESTMENT PROGRAM."

## RESTRICTED SECURITIES AND LIMITATIONS ON TRANSFERABILITY

No present market exists for the Securities.  The Securities have not been registered for sale under the Securities Act or registered or qualified under the securities laws of any state, in reliance upon available exemptions from such registration and qualification requirements.  The exemptions from registration and/or qualification relied upon by the Fund for this Offering may be dependent, in part, upon the "investment intent" of the investor and would not be available if any investor was acquiring the securities with a view to further sale or distribution.  Accordingly, each investor when executing a Subscription Agreement for the Securities will be required to represent that the purchase is for investment, for such investor's own account, and without any view to the sale or distribution thereof.  The Securities cannot be resold unless they are subsequently registered and/or qualified, or there are available exemptions from such registration and/or qualification requirements.  A restrictive legend will be placed on all certificates representing the Securities to insure the effectiveness of these restrictions.  The Fund reserves the right to require an opinion of legal counsel satisfactory to it regarding the availability of resale exemptions to be provided by a proposed seller of such securities.

**INVESTORS CONTEMPLATING A PURCHASE OF THE SECURITIES OFFERED HEREBY SHOULD SEEK THEIR OWN INDEPENDENT LEGAL ADVICE REGARDING THE EFFECT OF THESE RESTRICTIONS AND INVESTMENT REPRESENTATIONS.**

## SUMMARY OF THE OPERATING AGREEMENT

The following outline summarizes the material provisions of the Company's Operating Agreement.  This outline is not definitive, and each prospective Member should carefully read the Operating Agreement in its entirety. References herein to "Members" unless otherwise indicated refer to the Manager and the Members.

**Limited Liability.**  A Member will be liable for debts and obligations of the Company only to the extent of its interest in the Company in the fiscal year (or portion thereof) to which such debts and obligations are attributable.

**Term.**  The Company will terminate on the earlier of (a) the sale of all or substantially all of the assets of the Company (b) determination by the Manager that the Company should be dissolved (c) upon the withdrawal from Company by the Manager or (d) the dissolution or bankruptcy of the Manager (each of the foregoing a "Liquidating Event").  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its Assets and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.

**Capital Accounts.**  Each Member will have a capital account established on the books of the Company that will be credited with its capital contributions.  A "Company Percentage" will be determined for each Member for each calendar month, by dividing its capital account as of the beginning of such calendar month by the aggregate capital accounts of all Members as of the beginning of such calendar month.  The Company Percentages will be subject to adjustment by the Manager to reflect interim monthly additions and withdrawals, if any.

Each Member's capital account will be increased to reflect any additional capital contributions made by it and its share of the Company's Net Capital Appreciation, and will be decreased to reflect withdrawals of capital, distributions and such Member's share of Net Capital Depreciation.

Members are required to maintain a minimum balance of One Hundred Thousand Dollars ($100,000.00) in their respective capital accounts.  If the balance of a Member's capital account falls below One Hundred Thousand Dollars ($100,000.00), the Managers may, in their sole discretion, terminate such Member's LLC Membership Interest and return the balance of the funds contained in the Member's capital account.

**Additional Capital Contributions.**  Additional contributions may be made by Members as of the first day of any month, subject to the approval of the Manager.  Subscriptions or additional capital contributions by Members received during any monthly period will be held in escrow and will be accepted as of the first day of the following month (i.e., subscriptions or additional capital contributions received between January 1 and January 31 will be accepted as of February 1). Additional capital contributions from Members must be made in increments of One Hundred Thousand Dollars ($100,000.00), unless lesser amounts are accepted by the Manager in its sole discretion.

**Management.**  The management of the Company will be vested exclusively in the Manager. The Members will have no part in the management of the Company and will have no authority or right to act on behalf of the Company in connection with any matter.  Nothing will preclude the affiliates of

the Manager from exercising investment responsibility for its own accounts, or for the accounts of individual members of its family, friends, or other business relationships.  Neither the Company nor the Members shall have any first refusal, co-investment or other rights in respect of the investments for such accounts or in any fees, profits or other income earned otherwise derived therefrom.

**Salaries or Other Payments or Allocations to the Manager.**  The Company will make no payments to the Manager other than the Performance Fee, reimbursement of certain ongoing Partnership operating expenses, and the applicable return on the Manager's investment, if any, in the Company.

**Valuation of Company Assets**.  The LLC Interests will be valued in accordance with U.S. Generally Accepted Account Principals ("GAAP").  The Company's independent certified accountants will prepare the annual statements of net asset value for the Company and annual financial reporting documents to the Members.  Monthly statements to the Members will be prepared by the Manager.  All matters concerning valuation of assets, as well as allocation among the Members and accounting procedures not expressly provided by the Company's Operating Agreement will be determined by the independent certified accountants and the Manager, whose determination will be final and conclusive as to all Members.  The Manager may, from time to time, also establish or abolish reserves for estimated or accrued expenses and for unknown or contingent liabilities.

The Manager is not required to provide, nor will it provide, estimates or indications of Company or any Member's net asset value.

**Withdrawals in General.**  Ninety (90) days after the making of any capital contribution (the "Lock-Up Period"), a Member may, upon thirty (30) days' prior written notice, withdraw any or all of its initial capital contribution from its capital account, or withdraw from the Fund, to the extent that such withdrawal is allocable to such capital contribution.  Investors will be permitted to withdraw profit allocations (in excess of their initial capital contribution) on a monthly basis commencing thirty (30) days from their initial capital contribution upon thirty (30) days' prior written notice to the Manager.  The Manager has the right to require any Member to withdraw from the Fund at any time and for any reason.  Payment of ninety percent (90%) of the proceeds of a complete withdrawal shall be made within thirty (30) business days after the effective date of withdrawal, at the end of the Fund's next quarterly accounting period, with the balance being paid thirty (30) days after the completion of the Fund's annual audit.  No fees will be charged in connection with a Member's withdrawal from the Fund.  The Manager's Capital Account is not subject to the Lock-Up Period.

Withdrawals of initial capital contributions from a Member's Capital Account prior to the expiration of the Ninety (90) day period will only be made in circumstances considered by the Manager, after reasonable inquiry, to be extraordinary.  The following circumstances would be considered by the Manager to be extraordinary and warrant redemption prior to the end of the Ninety (90) day lock-up period:

a.  When the holding of the investment by a Member becomes impractical or illegal;

b.  in the event of a Member's death or total disability;

c.  in the event key personnel of the Manager die, become incapacitated, or cease to be involved in the management of the LLC for an extended period of time;

d. in the event of a merger or reorganization of the LLC;

e. in order to avoid a materially adverse tax or regulatory outcome; or

f. in order to keep the pool's assets from being considered "plan assets" under ERISA.

Amounts withdrawn (net of reserves and expenses for legal, accounting and administrative costs associated with such withdrawal) (the "Withdrawal Proceeds") generally will be paid in U.S. dollars within thirty (30) business days of the request for withdrawal.  Amounts withheld and reserved for contingencies or other matters will be distributed as promptly as practicable.

**Required Withdrawals.**  The Manager may require withdrawal of all or any portion of a Member's Interest on five (5) days' notice to the Member, if the Manager determines that continued participation of such Member might cause the Fund or any other Member to violate any law, rule or regulation, that would require the Fund or the Manager to register under the Investment Company Act, if litigation is commenced or threatened against the Fund, the Manager or any Member, arising out of or relating to the participation of such Member, or for any other reason that, in the Manager's sole discretion, adversely affects the Fund, the Manager, or any Member of the Fund.

**Suspension of Withdrawals.**  The Manager may suspend the payment of any withdrawals from the Members' capital accounts (i) for any period during which, as determined in good faith by the Manager, (a) any stock exchange or over–the-counter market on which a substantial part of the securities directly or indirectly owned by the Company are traded is closed (other than weekend and holiday closings) or trading on any such exchange or market is restricted or suspended, or (b) there exists a state of affairs that constitutes a state of emergency (a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Company), as a result of which disposal of the securities owned by the Company is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets, (ii) during the existence of any state of affairs which, in the sole opinion of the Manager, makes the determination of the price, value or disposition of the Company's investments impractical or prejudicial to the non-withdrawing Members, (iii) in the event that withdrawals or distributions, in the opinion of the Manager, results in violation of applicable law, or (iv) in the event that all Members, in the aggregate, request withdrawals of twenty-five (25%) percent or more of the Company's Net Worth as of any date of withdrawal.  All Members will be notified of any such suspension, and the termination of any such suspension, by means of a written notice.

**Transfers of Interests of Members.**  No mortgage, hypothecation, transfer, sale, assignment or other disposition, whether voluntary or otherwise, of all or a part of Member's Interest in the Company may be effected except with the consent of the Manager.

**Arbitration.**  The Company's Operating Agreement provides that all controversies arising in connection with the Operating Agreement will be submitted to arbitration in New York, New York in accordance with the rules of American Arbitration Association.  The Operating Agreement empowers the arbitrators to provide for specific performance or other injunctive or equitable relief.

**Reports to Partners.**  The Company's independent certified accountants (selected by the Manager) will review the Company's books and records as of the end of each fiscal year.  Within

ninety (90) days after the end of each fiscal year the Company will mail to the Members the Annual Report prepared by its independent certified public accountants setting forth a balance sheet of the Company, a profit and loss statement showing the results of operations of the Company and its Net Capital Appreciation or Net Capital Depreciation, a statement of such Company's capital account and the manner of its calculation and the Company Percentage as of the end of the prior fiscal year.  After the end of each fiscal year, each Member will be furnished the required tax information for preparation of their respective tax returns.  Following the end of each month in each fiscal year, each Member will be mailed unaudited financial information setting forth, *inter alia*, a statement of its Net Capital Appreciation or Net Capital Depreciation as determined by the Company's independent certified accountants.

## FEES, EXPENSES & OTHER CHARGES

The Fund is subject to the periodic charges, fees and expenses described below:

| Recipient | Form | Amount |
| --- | --- | --- |
| The Manager | Monthly Management Fees | The Manager will receive 0.1667% of the net asset value of the Members' Capital Accounts as of the first day of each calendar month for the preceding calendar month. The total annual management fee will be equal to two percent (2%). |
| The Manager | Performance Fee | The Manager will receive, for each calendar month, an allocation of twenty percent (20%) of the Fund's net capital appreciation allocable to the Members' Capital Accounts, as provided by the Fund's Operating Agreement (the "Performance Fee"), calculated on a "high water mark" basis. |
| The Trustee | Trust Services Fee | The Fund will pay a fee to the Trustee (the "Trust Services Fee") equal to 0.1667% of the net asset value of the Members' Capital Accounts as of the first day of each calendar month for the preceding calendar month for the services provided to the Fund by the Trustee. |
| Accountants | Auditing Fees | Actual expenses incurred |
| Attorneys | Legal Fees | Actual expenses incurred |

The Manager is authorized to incur and pay in the name and on behalf of the Fund all expenses which it deems necessary or advisable.  The Manager will be responsible for and will pay, or cause to be paid, all "Office Overhead Expenses."  For this purpose, Office Overhead Expenses for a fiscal year will include overhead expenses of an ordinarily recurring nature such as rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, employee insurance, payroll taxes and compensation of analysts and other personnel.

Operating expenses of the Fund will be borne by the Fund including legal, auditing, accounting (including out-sourced accounting) and other professional expenses, administration expenses, research expenses and investment expenses such as commissions, interest on margin accounts and other indebtedness, custodial fees, bank service fees and other expenses related to the purchase, sale or transmittal of Fund assets as shall be determined by the Manager in its sole discretion.

The organizational expenses of the Fund (including legal fees, blue sky fees and other expenses of the initial offer and sale of LLC Interests) of approximately Thirty Thousand Dollars ($30,000.00) will be paid by the Manager and will be reimbursed to it by the Fund as follows: the Manager will be reimbursed from the initial proceeds of the Offering and will amortize its organizational expenses over a period of twelve (12) months from the date the total amount of capital contributions to Fund reaches or exceeds One Million Dollars ($1,000,000.00).

The Fund will bear all fees and expenses that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, and any legal fees incurred in connection with the continuation of this offering.

The Operating Agreement of the Fund provides that the Manager will receive a Management Fee in an amount equal to 0.1667% of the Fund's net asset value as of the first day of each calendar month for the preceding calendar month allocable to the Capital Accounts of its Members.

As noted under "ALLOCATION OF FUND GAINS AND LOSSES," the Manager will receive, for each calendar month, an allocation of twenty percent (20%) of the Fund's net capital appreciation allocable to the Members' Capital Accounts, as provided by the Fund's Operating Agreement (the "Performance Fee"), calculated on a "high water mark" basis..  Investors should note that any such allocation will result in the Manager receiving an amount of Net Capital Appreciation which may be greater than its proportionate share thereof and may thereby result in the Manager receiving a disproportionate share of the Fund's profits.

## ALLOCATION OF
## FUND GAINS AND LOSSES

"Net Capital Appreciation" means the increase in the value of net assets from the beginning of each fiscal month to the end of such fiscal month. "Net Capital Depreciation" means the decrease in the value of net assets from the beginning of each fiscal month to the end of such fiscal month, properly adjusted for contributions and withdrawals during such fiscal month.  The Net Capital Appreciation and Net Capital Depreciation of the Fund will be based on the increases and decreases in the value of the Fund's account.

At the end of each calendar month, any Net Capital Appreciation earned by the Fund will be tentatively allocated to each of its Members (including the Manager) in proportion to each of their opening capital accounts (the "Capital Account") for such month.  At the end of each calendar month, the Capital Accounts of the Members will be adjusted so that 20% of any Net Capital Appreciation tentatively allocated to the Capital Accounts of the Members for such calendar month will instead be allocated to the Capital Account of the Manager (the "Performance Fee").[1]  In the event a Member makes a capital contribution to the Fund during a calendar month or initially becomes a Member after the beginning of a calendar month, the above allocation shall be adjusted for such interim event.

For purposes of determining the Performance Fee for each monthly period, the Net Capital Appreciation allocable to the Members will be deemed reduced by the unrecovered balance, if any, in their respective loss recovery accounts (the "Loss Recovery Account").  The Loss Recovery Account is a memorandum account, established for each Member, the opening balance of which will be zero. At the end of each calendar month, the balance in each Loss Recovery Account will be charged with any Net Capital Depreciation or credited with any Net Capital Appreciation allocable to the Members. In the event that there is an unrecovered balance in a Loss Recovery Account when a Member withdraws all or a portion of its capital in the Fund, the unrecovered balance in such Loss Recovery Account will be proportionately reduced.   Additional capital contributions will not affect a Loss Recovery Account.

The Manager will have no obligation to pay to or otherwise compensate the Fund for the amount of the unrecovered balance (if any) in its Loss Recovery Account, but shall receive no additional Performance Fee, with respect to the Member's Capital Account until the unrecovered balance in such Loss Recovery Account is recovered.  Since the Performance Fee is calculated on a basis that includes unrealized appreciation of the Fund's assets, such allocation may be greater than if it was based solely on realized gains.

## CERTAIN INCOME TAX CONSEQUENCES

**PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR ACCOUNTANTS AND/OR TAX ADVISORS WITH RESPECT TO POSSIBLE FEDERAL, STATE AND LOCAL INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.**

## ERISA CONSIDERATIONS

ERISA, among other things, imposes certain duties on persons who are fiduciaries of employee benefit plans subject to ERISA (an "ERISA Plan") and prohibits certain transaction between and ERISA Plan and the "fiduciaries" and "parties in interest" (as those terms are defined in ERISA) of the ERISA Plan.  If the assets of the Fund are deemed to be "plan assets" under ERISA (1) the prudence standards and other provisions of Part 4 of Title 1 of ERISA applicable to investments by ERISA Plans

---

1       The Fund's allocations to the Manager may result in substantially higher payments than alternative compensatory arrangements with other managers.  As the Securities and Exchange Commission (the "SEC") noted in its Institutional Investor Study Report (1971), "...In most instances the compensation arrangements provided by unregistered hedge funds are far more favorable to the investment manager per dollar of assets managed than the compensation provided for similar services by registered investment companies or other classes of accounts."

and their fiduciaries would extend to investments made by the Fund; (2) fiduciaries of ERISA plans could be liable under ERISA for investments made by the Fund that do not conform to the standards imposed by ERISA; (3) certain transactions that the Fund might seek to enter into may constitute "prohibited transactions" under ERISA and the Code; and (4) the Fund would be subject to certain reporting and disclosure requirements under ERISA.

A regulation adopted by the Department of Labor defining the term "plan assets" for the purpose of ERISA (the "Plan Assets Regulation") generally provides that the underlying assets of an entity in which ERISA Plans make equity investments will be considered "plan assets" unless (1) the equity investment is a "publicly-offered security" or a security issued by an investment company registered under the 1940 Act, (2) the entity is an "operating company" or (3) equity participation by "employee benefit investors" in the entity is not "significant."  The Fund, to the extent it permits ERISA Plans to become Members, will seek to rely on the third of these exceptions.

Under the Plan Assets Regulation, equity participation is not "significant" if investments by employee benefit investors represent less than 25% of a class of securities issued by an entity. Employee benefit investors for this purpose include not only ERISA Plans but also plans not subject to ERISA such as Individual Retirement Accounts, Keogh Plans and governmental plans.

Under ERISA, a fiduciary of an ERISA Plan is required, among other things, to discharge his or its duties toward the plan with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  A fiduciary of an ERISA Plan, in assessing whether causing the plan to invest in the Fund is consistent with ERISA's prudence requirements, should consider, among other things, that investment in the Fund may involve certain risks.

ERISA may prohibit the purchase of the securities by an ERISA plan if the Management or any of its affiliates is a "fiduciary," "party in interest" or disqualified person" (as defined in ERISA) with respect to an ERISA Plan.

## MISCELLANEOUS SECURITIES MATTERS

### Lack of Exemption from the Investment Company Act

The Fund will not be registered as an investment company under the Investment Company Act of 1940, as amended.  As a result, certain protection of such act will not be afforded to the Fund or its Members.

## PRIVACY ACT DISCLOSURE

The Fund's Manager collects nonpublic personal information about current and prospective investors from the following sources: (i) information the Fund's Manager receives from current and prospective investors on Fund Subscription Agreements and related forms (for example, name, address, social security number, birth date, assets, income, investment experience); and (ii) information about investor's investment in the Fund.

The Manager only discloses nonpublic personal information about their clients or former clients as permitted by law or regulation. The Fund's Manager restricts access to current and prospective investors' nonpublic personal information to their affiliates, and their personnel, counsel and auditors who need to know that information in order to (i) ensure compliance with applicable laws and regulations; or (ii) provide products or services to the investors. Accordingly, the Fund's Manager maintains physical, electronic and procedural controls in keeping with United States federal standards to safeguard the nonpublic personal information about current and prospective investors that is in their possession.

## UNITED STATES ANTI-MONEY LAUNDERING PROGRAM

As part of the United States Patriot Act (the "Patriot Act"), the Manager is required to comply with stringent anti-money laundering provisions. In this regard, each Investor, as a condition to acceptance of his/her investment in the Fund, will be required to represent:

(i) That it will provide any information deemed necessary by the Fund's Manager in their sole discretion to comply with its anti-money laundering programs and related responsibilities from time to time;

(ii) that is, and each of its beneficial owners is, (a) not an individual, entity or organization on any U.S. Office of Foreign Assets Control "watch list" and does not have any affiliation of any kind with such individual, entity or organization; (b) not a foreign shell bank; and (c) not a person or entity resident in or whose subscription funds are transferred from or through a jurisdiction identified as non-cooperative by the U.S. Financial Action Task Force;

(iii) that the monies to be invested in the Fund were not derived from any activities that may contravene U.S. or non-U.S. anti-money laundering laws or regulations; and

(iv) that it is not, and none of its beneficial owners are, a senior foreign political figure, an immediate family member of a senior foreign political figure or a close associate of a senior foreign political figure.

The Manager may adopt additional procedures as the rules under the law are further clarified or amended.

The Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's interest in the Fund. In the event of delay or failure by the subscriber to produce any information required for verification purposes, the Manager may refuse to accept a subscription or may cause the withdrawal of any such investor from the Fund.

*This space intentionally left blank.*

## TERMS OF THE OFFERING

**Vestium Equity Fund, LLC**, a Delaware limited liability company (the "Fund") is offering up to One Hundred Million Dollars ($100,000,000.00) of LLC Interests (the "LLC Interests" or the "Securities"), to Accredited Investors, as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended, (hereinafter, the "Securities Act") pursuant to Regulation D, Rule 506 of the Securities Act.   This Confidential Private Placement Offering Memorandum (the "Memorandum") relates to the offer and sale (the "Offering") of up to One Hundred Million Dollars ($100,000,000.00) gross proceeds from the sale of LLC Interests (the "LLC Interests" or "Securities") bearing a total gross face value of One Hundred Million Dollars ($100,000,000.00).   The minimum subscription amount is Five Hundred Thousand Dollars ($500,000.00).   The LLC Interests offered hereby are collectively referred to as the "Securities."

The amount of the securities of the Fund offered hereby has been arbitrarily determined by the Manager and is not based on the Fund's book value, assets, earnings or any other recognizable standard of value.   As such, no prospective investor should infer that the Fund has chosen to offer the amount of securities described herein because of the Fund's assets or book value.  If profitable results are not achieved from the Fund's operations, of which there can be no assurance, the Fund may not have sufficient resources to make distributions to the Members.

There is no aggregate minimum requirement for the Offering to become effective.  The Fund reserves the right, subject to applicable securities laws, to begin applying "dollar one" of the proceeds from the Offering towards the uses as specifically set forth in this Memorandum.  There is no escrow applicable to the Offering.

These Securities are suitable for investment only by prospective investors who meet the qualifications of an "Accredited Investor," as defined in Regulation D promulgated under the Securities Act, as described below under "Investor Suitability Standards."

## SUITABILITY STANDARDS

Investment in the securities of the Fund involves substantial risk.  There will be no public market for the securities.  Also, sale or other disposition requires prior written consent of the Manager until and such securities become registered under the federal and state securities laws.  To the extent they do not become registered under the federal and state securities laws, the securities cannot be transferred unless they comply with one of the federal exemptions that permit the transfer of restricted securities and with the appropriate state securities laws.  Accordingly, investment in the securities referred to in this memorandum is suitable only for person of adequate financial means who have no need for liquidity with respect to their investment and who are capable of suffering a loss of their entire investment in any securities purchased.

A suitable investor is one who meets the conditions set forth above and whom the Manager immediately prior to sale and upon making reasonable inquiry, shall have reasonable grounds to believe, and does believe:

1)       Is an **accredited investor** within the meaning of Regulation D promulgated under the Securities Act;

2)      Is acquiring the Securities for investment and not with a view to resale or distribution;

3)      Can bear any economic risk incident to holding the Securities;

4)      Recognizes the restrictions on transferability of the securities, has adequate means of providing for his current financial needs and possible personal contingencies, has no need for liquidity of this investment and has no reason to anticipate any change in his personal circumstances, financial or otherwise, which might cause him to attempt to resell or transfer his securities.

5)      Is familiar with the nature and risks attending investments in privately offered securities, and has determined that the purchase of the securities is consistent with his forecasted income and investment objectives;

6)      Is aware that no trading market for his securities is likely to exist at any time and that his securities will at no time be freely transferable unless the Securities are registered pursuant the federal securities laws; and,

7)      Satisfies the applicable state law suitability requirements of the state of the investor's residence.

Each investor will also be required to represent that he has been furnished, has carefully read and has relied solely on the information contained in this Memorandum, including all exhibits, amendments and supplements hereto.

Further, Securities will be offered for sale only to persons who the Manager has reasonable grounds to believe are qualified investors.  The Manager will request that prospective investors or their Purchaser Representative(s) complete a questionnaire and may require that such persons furnish other information.

Securities will be sold to "accredited investors" as that term is defined in 17 CFR § 230.501(a).  Among the categories of persons who are defined as accredited investors in 17 CFR § 230.501(a) are the following: natural persons who have a personal net worth or joint net worth with a spouse (including homes, furnishings and automobiles) in excess of $1,000,000; or natural persons who have had an annual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who reasonably expect an income of the same level in the current year.  Corporations, partnerships, trusts and other entities may be deemed accredited investors if all of their equity holders are accredited investors.

As used in this Memorandum, the term "net worth" means the excess of total assets over total liabilities.  In computing net worth for the purpose the foregoing paragraph, the principal residence of the investor must be valued at cost, including the cost of improvements, or at recently appraised value by an institutional lender making a secured loan, net of encumbrances.  In determining income, an investor should add to the investor's adjusted gross income any amounts attributable to tax-exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or KEOGH retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at gross income.

The suitability standards referred to above represent minimum suitability requirements for prospective purchasers, and the satisfaction of such standards by a prospective purchaser does not necessarily mean that the Securities are a suitable investment for such person.  The Manager, in circumstances it deems appropriate, may modify such requirements.

The above-described representations from prospective investors will be reviewed to determine the suitability of the Securities of prospective investors, and the Manager will have the right to refuse a subscription for the Securities if, in its discretion, it believes the prospective investor does no meet the applicable suitability standards or the Securities are otherwise an unsuitable investment for the prospective investor.  Subscriptions will not necessarily be accepted in the order received by the Manager.

## SUBSCRIPTION PROCEDURES

In order to subscribe for the Securities offered hereby, each prospective investor will be required to deliver to the Manager, a check payable to **"Vestium Equity Fund, LLC"** in the minimum amount of Five Hundred Thousand Dollars ($500,000.00).  In addition, the prospective investor must complete, execute, and deliver the following to the Manager:

(1)    A dated and fully executed Subscription Agreement and Confidential Purchaser Questionnaire (the "Subscription Agreement and Questionnaire").  The Subscription Agreement and Questionnaire sets forth the terms and conditions of an investment on the Fund.  In addition, the Subscription Agreement and Questionnaire contains representations and warranties of the prospective investor that will be relied upon by the Manager to comply with its obligations under the applicable securities laws.   Therefore, care should be taken in reading and completing the Subscription Agreement and Questionnaire to insure accuracy and completeness.

(2)    A dated and fully executed Operating Agreement and Counterpart Signature Page (attached thereto).  The Operating Agreement set forth the terms and conditions and method of operation of the Fund.  In addition, the Operating Agreement contains representations and warranties of the prospective investor that will be relied upon by the Manager to comply with its obligations under the applicable Operating Agreement and Counterpart Signature Page (attached thereto) to insure accuracy and completeness.

(3)    If the prospective investor is subscribing for Securities on behalf of an entity (i.e., other than an individual), the investor shall supply the Manager with a properly executed instrument authorizing the purchase by the agent on behalf of the entity.

(4)    Wire transfer or check payable to: "**Vestium Equity Fund, LLC**", 13116 Harriers Place, Bradenton, Florida 34212, with a minimum purchase of Five Hundred Thousand Dollars ($500,000.00).

Subscription Agreements are not binding upon the Manager or the Fund until accepted by the Manager, which reserves the right to reject, in whole or in part, in its sole discretion, less than the amount of the Securities for which the investor has subscribed.  If the Manager rejects all or a portion of any subscription, the Manager will promptly mail to the subscriber a check for all, or the appropriate portion of, the amount submitted with such subscriber's subscription.

**THE SECURITIES ARE BEING OFFERED FOR SALE TO QUALIFIED ACCREDITED INVESTORS (AS THAT TERM IS DEFINED IN RULE 501(D)(2)(E) OF THE SECURITIES ACT) AS A PRIVATE PLACEMENT DIRECTLY BY THE FUND WITHOUT REGISTRATION UNDER THE SECURITIES LAW OF ANY JURISDICTION. INVESTMENT IN THE SECURITIES INVOLVES A HIGH DEGREE OF RISK AND SHOULD NOT BE MADE BY ANY PERSON WHO CANNOT AFFORD A LOSS OF HIS/HER PRINCIPAL.  INVESTMENT IN THE SECURITIES IS SUITABLE ONLY FOR SOPHISTICATED PERSONS WHO HAVE ADEQUATE MEANS OF PROVIDING FOR THEIR CURRENT NEEDS AND PERSONAL CONTINGENCIES AND HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENTS.**

**THERE IS NO ESTABLISHED MARKET FOR THE SECURITIES DESCRIBED HEREIN AND, BECAUSE THERE ARE SIGNIFICANT RESTRICTIONS ON TRANSFERABILITY OF THE SECURITIES, NO PUBLIC MARKET WILL EVER DEVELOP.  THE SALE OF THE SECURITIES OFFERED HEREBY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND ACCORDINGLY CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OR AN EXEMPTION THEREFROM IS AVAILABLE.**

## ADDITIONAL INFORMATION

This Memorandum does not purport to restate all of the relevant provisions of the documents referred to or pertinent to the matters discussed herein, all of which must be read, in their entirety, for a complete description of the terms relating to an investment in the Fund.  This Memorandum is intended only to be a summary of the more significant features of investing in the Fund and is qualified by the provisions of the Fund's Subscription Documents, attached hereto as <u>Exhibit A</u>.

Prospective investors have a right to inquire about, and request and receive, any additional information they may deem appropriate or necessary to further evaluate this Offering and to make an investment decision.  Representatives of the Manager may prepare written responses to such inquiries or requests if the information requested is available.  The use of any oral representations or any written documents other than those prepared and expressly authorized by the Manager in connection with this Offering are not to be relied upon by any prospective investor.  Please contact the Manager directly if you have any questions or require additional information.

**ONLY INFORMATION OR REPRESENTATIONS CONTAINED HEREIN MAY BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE MANAGER.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFER BEING MADE HEREBY, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE MANAGER.  INVESTORS ARE CAUTIONED NOT TO RELY UPON ANY INFORMATION NOT EXPRESSLY SET FORTH IN THIS MEMORANDUM. THE INFORMATION PRESENTED IS AS OF THE DATE ON THE COVER HEREOF UNLESS ANOTHER DATE IS SPECIFIED, AND NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL CREATE ANY IMPLICATION**

**THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION PRESENTED SUBSEQUENT TO SUCH DATE(S).**

## APPENDICES

Exhibit A:          "Subscription Agreement and Confidential Purchaser Questionnaire"

Exhibit B:          "Indenture of Trust between Vestium Equity Fund, LLC and Maximum Financial Investment Group, Inc."

Exhibit C:          "Limited Liability Company Operating Agreement of Vestium Equity Fund, LLC"

# EXHIBIT F

# VESTIUM EQUITY FUND, LLC

## Limited Liability Company Membership Interests

---

### Subscription Booklet

---

*If you decide not to participate in this offering, please return
this Subscription Booklet, the Operating Agreement
and all related documentation to
Vestium Management Group, LLC*



211
**Copy No.** _____

# VESTIUM EQUITY FUND, LLC
## SUBSCRIPTION INSTRUCTIONS

**1.      Please complete, date and sign the Confidential Investor Questionnaire**. By signing the Investor Questionnaire, you agree to the Fund's Operating Agreement (Exhibit A to the Confidential Offering Memorandum) and to the "Terms and Conditions of Subscription Agreement" (part of this Subscription Booklet). **Please keep a signed copy of all completed and signed documents for your records.**

**2.      Please send the original of your completed, dated and signed Investor Questionnaire to:**

VESTIUM MANAGEMENT GROUP, LLC
13116 HARRIERS PLACE
BRADENTON, FLORIDA 34212
ATTENTION: ROBERT L. BUCKHANNON

**3.      Please enclose your check for your subscription amount, payable to "Vestium Equity Fund, LLC". If you prefer to wire-transfer the subscription amount, please wait until Mr. Buckhannon of Vestium Management Group, LLC (the "Manager") notifies you that your subscription has been accepted, then wire-transfer your subscription amount to the Fund's custodial account in accordance with Mr. Buckhannon's instructions.   To ensure proper processing, please call the Manager at (941) 527-1417 to confirm your wire transfer.**

4.      If your subscription is accepted, the Manager will countersign your Investor Questionnaire to confirm your admission to the Fund and will send you a copy of the signature page bearing the Manager's signature.  Your check will not be deposited until your subscription has been accepted.  It will be returned promptly if your subscription is not accepted.

**CONFIDENTIALITY:**  Information furnished in your Investor Questionnaire will be kept strictly confidential, except that the Manager may present the information to such regulatory bodies or other parties as may be appropriate to establish the availability of exemptions from certain securities law registration requirements or the compliance of the Fund and this offering with applicable securities laws.

**QUESTIONS:**

VESTIUM MANAGEMENT GROUP, LLC
Attention: Mr. Robert Buckhannon
13116 Harriers Place
Bradenton, Florida 34212

Telephone:  (941) 527-1417

THIS PAGE INTENTIONALLY LEFT BLANK

# VESTIUM EQUITY FUND, LLC
## CONFIDENTIAL INVESTOR QUESTIONNAIRE

> If you have any doubt as to the meaning or implication of any of the terminology or the significance of any of the following questions, please contact Robert Buckhannon at Vestium Management Group, LLC, 13116 Harriers Place, Bradenton, Florida 34212, telephone (941) 527-1417.
>
> If the answer to any question is "None" or "Not Applicable," please so state.

**PLEASE READ EACH INSTRUCTION AND QUESTION CAREFULLY BEFORE ANSWERING; THE MANAGER IS RELYING UPON YOUR ANSWER IN ACCEPTING YOUR SUBSCRIPTION.**

## I.  SUBSCRIBER INFORMATION

Please provide information as to Subscriber, *not* any person completing this Questionnaire on Subscriber's behalf, except that if you are acting as a custodian for a minor whose funds will be invested, please so indicate and complete the information as to both yourself and the minor.  If the Interest will be held by more than one person in joint tenancy or as tenants in common (*as opposed* to as community property), please provide all information for each joint Subscriber, using a copy of this Questionnaire.

GENERAL INFORMATION:

Full Name of Subscriber (or custodian): _____

Subscriber's **SOCIAL SECURITY** or, if an entity, **TAXPAYER ID NO.**: _____
No Subscriber will be admitted without a Social Security or Taxpayer I.D. Number.

Home
Address: _____         Home
                                          Phone: _____

         _____

         _____

Business
Address: _____         Business
                                          Phone: _____

         _____         Business
                                          Fax: _____

         _____

Marital Status (if applicable):

☐ Married          ☐ Single          ☐ Divorced          ☐ Other _____

State of principal residence: _____ . If Subscriber is a custodian and minor's state of residence is different from Subscriber's, list minor's state of residence: _____ .

**SUBSCRIBER'S EDUCATION:**

 College/University                    City, State           Degree/Major              Year

_____

_____

_____


**EMPLOYMENT OF SUBSCRIBER:**

Name and address of employer                _____

                                            _____

                                            _____

                                            _____

Nature of employment                        _____

                                            _____

If self-employed, nature of business        _____

                                            _____

                                            _____

                                            _____

OTHER EXPERIENCE OF SUBSCRIBER:
Other positions/background related to financial    _____
business, accounting, economics, taxation or       _____
investment matters that demonstrate investment     _____
sophistication                                     _____


**SUBSCRIBER'S INVESTMENT EXPERIENCE:**

**DESCRIBE SUBSCRIBER'S PRIOR EXPERIENCE INVESTING IN PRIVATE PLACEMENTS, OVERALL GENERAL INVESTMENT EXPERIENCE AND EXPERIENCE WITH THE TYPE OF ASSETS TO BE HELD IN THE FUND**

_____

_____

_____

_____

_____

_____

_____

_____

_____

**TYPE OF SUBSCRIBER OR PROPOSED FORM OF OWNERSHIP:** *Please check appropriate box:*

☐ Individual                 ☐ Trust                      ☐ IRA

☐ Partnership                ☐ Employee Benefit Plan      ☐ Keogh Plan

☐ Corporation               ☐ Limited Liability Company   ☐ Joint/Tenants in Common with
                                                            Spouse

☐ Joint/Tenants in Common with   ☐ Other
Person other than Spouse

If Subscriber is a corporation, trust, partnership, association or other entity, please identify which type of entity, the jurisdiction under the laws of which Subscriber is organized and existing, and the jurisdiction where Subscriber's principal place of business is located:

_____

**DUPLICATE REPORTS.**  If duplicate reports should be sent to an accountant, business manager, or other adviser, provide the following information for each person authorized to receive them:

Name: _____

Address: _____

_____

Telephone: _____   Fax: _____

*This Space Intentionally Left Blank*

## II.   QUESTIONS TO DETERMINE FINANCIAL QUALIFICATION

Each Subscriber must be an "Accredited Investor" within the meaning of the U.S. Securities Act of 1933, as amended (the "1933 Act").   Investors that are not accredited may only be admitted to the Fund by express permission of the Manager.   *Please check all boxes that describe Subscriber.*

### A.   "ACCREDITED INVESTOR" STATUS

If Subscriber is a custodian acting for one or more minors, responses below should apply to each minor, *not* to the custodian.

☐   **INDIVIDUAL WITH $1 MILLION NET WORTH..**   A natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1 million.

☐   **INDIVIDUAL WITH $200,000 INDIVIDUAL ANNUAL INCOME.**   A natural person (not an entity) who had an individual income in excess of $200,000 in each of preceding two years and has a reasonable expectation of reaching same income level in current year.

☐   **INDIVIDUAL WITH $300,000 JOINT ANNUAL INCOME**.   A natural person (not an entity) who had joint income with his or her spouse in excess of $300,000 in each of preceding two years and has a reasonable expectation of reaching same income level in current year.

☐   **CORPORATIONS OR PARTNERSHIPS**.   A corporation, partnership, or similar entity that has at least $5 million of assets and was not formed for the specific purpose of acquiring an Interest.

☐   **REVOCABLE TRUST.**   A trust that is revocable by its grantors and *each* of whose grantors is a natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1 million.

☐   **IRA OR SIMILAR BENEFIT PLAN.**   An IRA, Keogh or similar benefit plan that covers only a non-employee natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1 million.

☐   **PARTICIPANT-DIRECTED EMPLOYEE BENEFIT PLAN ACCOUNT.**   A participant-directed employee benefit plan *(e.g.,* many 401(k) plans), investing at the direction of and for the account of a participant whose individual net worth, or joint net worth with his or her spouse, exceeds $1 million.

☐   **OTHER ERISA PLAN.**   An employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA") other than* a participant-directed plan (i) with total assets of at least $5 million *or (ii)* for which investment decisions (including the decision to purchase an Interest) are made by a bank, registered investment adviser, savings and loan association, or insurance company.

☐   **GOVERNMENT BENEFIT PLAN.**   A plan established and maintained by a state, its political subdivisions *(e.g.,* municipalities), or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, with total assets of at least $5 million.

☐   **IRREVOCABLE TRUST.**   A trust *(other than* an ERISA employee benefit plan) that (i) is not revocable by its grantor(s), (ii) has at least $5 million of assets, (iii) was not formed for the specific purpose of acquiring an Interest, and (iv) is directed by a person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of an investment in the Fund.

☐   **NON-PROFIT ENTITY.**   An organization described in Section 501(c)(3) of the Internal Revenue Code, as amended, with total assets in excess of $5 million (including endowment, annuity and life income funds), as shown by the organization's most recent audited financial statements.

☐   **OTHER INSTITUTIONAL INVESTOR (*check one*).** ☐ A bank, as defined in Section 3(a)(2) of the 1933 Act (whether acting for its own account or in a fiduciary capacity); ☐ a savings and loan association or similar institution, as defined in Section 3(a)(5)(A) of the 1933 Act (whether acting for its own account or in a fiduciary capacity); ☐ a broker-dealer registered under the Exchange Act; ☐ an insurance company, as defined in Section 2(13) of the 1933 Act; ☐ an investment company registered under the ICA; ☐ a "business development company," as defined in Section 2(a)(48) of the ICA; ☐ a small business investment company licensed under Section 301(c) or (d) of the Small Business Investment Act of 1958, as amended, or ☐ a "private business development company" as defined in Section 202(a)(22) of the Advisers Act.

☐   **ENTITY OWNED ENTIRELY BY ACCREDITED INVESTORS.** A corporation, partnership, or similar entity *each* of whose equity owners is either a natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1 million or an entity each of whose equity owners meets this test.

_____

Subscribers Initial Here
to certify the above

**PLEASE NOTE:**

As used herein, the term "net worth" means the excess of total assets over total liabilities. In computing net worth for the purpose the foregoing, the principal residence of the Subscriber must be valued at cost, including the cost of improvements, or at recently appraised value by an institutional lender making a secured loan, net of encumbrances. In determining income, an investor should add to the Subscriber's adjusted gross income any amounts attributable to tax-exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or KEOGH retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at gross income.

*This Space Intentionally Left Blank*

## B. CORPORATIONS, PARTNERSHIPS, OTHER ENTITIES

Provide the following information as to each partnership, corporation, limited liability company, trust, or other entity[1] that will have a Beneficial Interest *(see* definition in Note 1) in the Membership Interest being purchased.

**1.**     *Relationship to Broker or Dealer.*

a.     Is Subscriber a general partner of a Member *(see* definition) of the FINRA or a non-Member broker or dealer (a *"Broker-Dealer")*?

☐     Yes          ☐     No

b.     Does Subscriber otherwise actively participate in or control the business of such a broker or dealer?

☐     Yes          ☐     No

c.     Does Subscriber otherwise own equity securities, or has it contributed to the capital, of a Broker-Dealer *other than* a Broker-Dealer that is engaged solely in the purchase or sale of either investment company/variable contracts securities or direct participation program securities?

☐     Yes          ☐     No

If "Yes,"

(1)     What percentage of any class of outstanding equity securities of that Broker-Dealer does Subscriber own?

_____%[2]

(2)     What percentage of the capital of that Broker-Dealer did Subscriber contribute?

_____%

(3)     Are the securities of that Broker-Dealer traded on a national securities exchange or in the Nasdaq system?

☐     Yes          ☐     No

(4)     If the answer to question (3) is "No," what is the name of the Broker-Dealer?

_____

**2.**     *Investment Entities.*  Is Subscriber an investment partnership (general or limited), corporation, investment club, or other, similar organization of which a principal activity is investing or trading in securities (an *"Investment Entity"*)?

☐     Yes          ☐     No

---

[1]   Includes foundations, endowments and organizations described in Sectrion 501(c)(3) of the Internal Revenue Code.
[2]   If Subscriber's interest in a Broker-Dealer is through an intermediary entity, such as a partnership or corporation, then in determining percentage ownership or capital contribution multiply Subscriber's interest in that intermediary by the intermediary's interest in the Broker-Dealer.

Confidential

If "Yes", has Subscriber provided the Fund with a letter of representation from Subscriber's counsel or accountant relating to the persons with Beneficial Interests in Subscriber, *or* as to Subscriber's status as a "foreign investment company," that satisfies the requirements set forth in the FINRA's "Free-Riding and Withholding" Interpretation under the section thereof entitled "Investment Partnerships and Corporations."

☐      Yes                    ☐      No

**3.      *Employee Benefit Trusts.*** If Subscriber is an employee benefit trust, provide the following information.

a.      Types of business(es) in which the sponsor of the employee benefit plan pursuant to which Subscriber was formed or is maintained (the "*Sponsor") is* engaged:

☐      The Sponsor is a Broker-Dealer or owns a controlling interest in a Broker-Dealer.

☐      The Sponsor is engaged in "financial services activities," as or through ownership of one of the following: ☐ an investment adviser; ☐ a bank; ☐ an insurance company; ☐ an investment company; ☐ other financial services company _____ .

☐      The Sponsor is *not* engaged in the investment or financial services industry.

b.      Was the Subscriber formed primarily to provide benefits to the following types of persons?

☐      Persons Associated with a Broker-Dealer or members of their Immediate Families.

☐      Other persons with "Restricted Characteristics," as described above.

## III.    QUESTIONS AS TO CERTAIN REGULATED ENTITIES

### A. EMPLOYEE BENEFIT PLANS

☐ Yes  ☐ No    Subscriber is an "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not the plan is subject to ERISA), or a plan as described in IRC Section 4975(e)(1).

☐ Yes  ☐ No    Subscriber has a class of equity interests that is 25% or more owned by one or more such plans.

### B. CERTAIN INVESTMENT COMPANIES

☐ Yes  ☐ No    Subscriber is a "private investment company" -- *i.e.*, an entity that would be an "investment company" under the ICA but for an exclusion under either Section 3(c)(1) or Section 3(c)(7) of the ICA. Those sections generally exclude a company that is not making (or presently proposing to make) a public offering of its securities, *and* (Section 3(c)(1)) whose outstanding securities (other than its short-term paper) are beneficially owned by not more than 100 persons *or* (Section 3(c)(7)) whose outstanding securities are owned exclusively by persons who, at the time of the purchase, are "qualified purchasers" as defined in Section 2(a)(51) of the ICA -- generally individuals who own at least $5 million in "investments" and entities that own at least $25 million in "investments."

*If* Subscriber answered "Yes" to the preceding question, Subscriber represents and warrants that set forth in the blank below is the number of persons who "beneficially own outstanding securities of Subscriber (other than its short term paper) within the meaning of Section 3(c)(1) of the ICA. Subscriber will advise the Manager as soon as practicable after becoming aware of any change in that number.

   *Number of Beneficial Owners:* _____ .

☐ Yes  ☐ No    If Subscriber answered "Yes" to the preceding question *(i.e., is* a "private investment company" *OR* is an investment company registered under the ICA, or a "business development company" (as defined in Section 202(a)(22) of the Advisers Act), *each* of Subscriber's beneficial owners is a natural person or "company" (as defined in paragraph (d)(2) of Rule 205-3 under the Advisers Act) who (a) presently has at least $750,000 invested with the Subscriber and/or (b) Subscriber's investment adviser reasonably believes has a net worth of at least $1.5 million (calculated as in Part II.A. ("Qualified Client" Status) above). If any beneficial owner of Subscriber is itself a private investment company, registered investment company, or business development company, then Subscriber believes that each beneficial owner of such entity also satisfies one or both of the foregoing tests.

                                                            _____
                                                            Subscribers Initial Here
                                                            to certify the above

**IV.**   **I**NFORMATION **T**O **D**ETERMINE **W**HETHER **T**HE **S**UBSCRIBER **S**HOULD **B**E **A**DVISED **TO** **D**ESIGNATE **A** **P**URCHASER **R**EPRESENTATIVE

Subscriber, either alone or together with a "purchaser representative" (such as an investment adviser, attorney, accountant or other consultant), should have such knowledge and experience in financial and business matters **that Subscriber can evaluate the merits and risks of this investment and protect the** Subscriber's own interests in this investment. *Please check one box below:*

☐        **N**O **P**URCHASER **R**EPRESENTATIVE. **Subscriber is CERTAIN that - without the assistance of any purchaser representative – Subscriber has such knowledge and experience in financial and business matters that Subscriber can evaluate the merits and risks of this investment, make an informed investment decision and otherwise protect the Subscriber's interests in this transaction and that Subscriber after reviewing the Memorandum understands the nature of the offering and proposed investment.. Subscriber chooses not to engage any purchaser representative.**

_____<br>Subscribers Initial Here to<br>certify the above if checked

≫ ≫ <strong><u>SKIP</u> the remainder of this section if you checked the box above.</strong> ≪≪

☐        **P**URCHASER **R**EPRESENTATIVE **D**ESIGNATED. Subscriber will be relying on the advice of the purchaser representative identified below in evaluating the merits and risks of this investment. Subscriber should (1) furnish the information requested below about Subscriber's purchaser representative; (2) ask the purchaser representative to complete and sign a Purchaser Representative Questionnaire; (3) sign the "Subscriber's Acknowledgement of Purchaser Representative" on the last page of the Purchaser Representative Questionnaire, after reviewing the completed Purchaser Representative Questionnaire; and (4) deliver the Purchaser Representative Questionnaire to the Manager.

Name of purchaser representative: _____

Firm: _____

Address: _____

Telephone number: _____   Occupation: _____

**E**LIGIBILITY **R**EQUIREMENTS **OF **P**URCHASER **R**EPRESENTATIVE: As explained further in the Purchaser Representative Questionnaire, a person may not serve as Subscriber's purchaser representative if the person is being compensated by the Fund (or certain related persons) for advising Subscriber in connection with this investment, or if the purchaser representative has certain present or past relationships with the Fund (or certain related persons). In addition, the purchaser representative must have such knowledge and experience in financial and business matters that he or she, either alone or together with Subscriber, is capable of evaluating the merits and risks of Subscriber's prospective investment in the Fund.

**SUBSCRIPTION AMOUNT:**  Subscriber hereby agrees to invest the following amount in Limited Liability Company Membership Interests of Vestium Equity Fund, LLC:

$ _____

Subscriber represents and warrants that the information provided above is true and correct in all material respects. By signing below, Subscriber agrees to become a Member of Vestium Equity Fund, LLC under the terms and conditions of its Operating Agreement (as amended through the date Subscriber executes this Questionnaire) and the attached "Terms and Conditions of Subscription Agreement," each of which is incorporated fully herein by this reference. Subscriber has received and read such Agreements.  In addition, Subscriber agrees to deliver to the Manager, if requested, a copy of any documentation necessary to establish the authority of the person signing this document on behalf of Subscriber (*e.g.*, corporate articles of incorporation, bylaws, and authorizing resolutions; Operating Agreement; operating agreement; declaration of trust).  Each person signing below represents and warrants that he or she has all requisite power and authority to execute this document (and through it, the Terms and Conditions of Subscription Agreement and the Operating Agreement) on behalf of Subscriber.

➤➤ **SIGNATURE PAGE FOLLOWS** ◀◀

➤➤ **IMMEDIATELY AFTER THIS PAGE** ◀◀

## SUBSCRIBER CERTIFICATION

By executing below, Subscriber hereby irrevocably constitutes and appoints the Manager, Subscriber's true and lawful attorney-in-fact, with full power and authority in Subscriber's name, place and stead to execute, deliver, certify, acknowledge, swear to, file, record and publish all documents and other instruments described in the Operating Agreement.

**THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE IN SECTION 9 OF THE ATTACHED TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT.   THE SUBSCRIPTION ACKNOWLEDGES RECEIPT OF THE OPERATING AGREEMENT AND THE MEMORANDUM, WHICH CONTAINS DETAILED INFORMATION REGARDING THE FUND, INCLUDING RISK FACTORS RELATED TO AN INVESTMENT IN THE FUND AND CONFLICTS OF INTEREST OF THE MANAGER AND ITS AFFILIATES IN CONNECTION WITH THE FUND. THE SUBSCRIBER CERTIFIES THAT HE HAS REVIEWED THE MEMORANDUM, THIS SUBSCRIPTION DOCUMENT INCLUDING THE ATTACHED TERMS AND CONDITIONS AND THE OPERATING AGREEMENT. THE SUBSCRIBER UNDERSTANDS THAT THE SUBSCRIBER IS WAIVING OR APPROVING CERTAIN PRACTICES OF THE FUND IN RESPECT OF TRADE EXECUTION AND OTHER ITEMS DESCRIBED IN THE MEMORANDUM.   SUBSCRIBER REPRESENTS THAT SUBSCRIBER HAS REVIEWED THESE DOCUMENTS CAREFULLY, THAT ANY STATEMENT, ORAL OR OTHERWISE, INCONSISTENT WITH, OR CONTRARY TO, THESE DOCUMENTS IS NOT TO BE RELIED UPON IN ANY WAY IN EVALUATING AN INVESTMENT IN THE FUND.   SUBSCRIBER ACKNOWLEDGES THAT THE FUND AND ITS AFFILIATES ARE RELYING UPON THESE REPRESENTATIONS IN ACCEPTING SUBSCRIBER'S INVESTMENT.**

**DO NOT SIGN WITHOUT READING THE ABOVE CERTIFICATION CAREFULLY.**

| **SIGNATURE FOR INDIVIDUAL SUBSCRIBER:** | **SIGNATURE FOR PARTNERSHIP, CORPORATION, TRUST OR OTHER ENTITY SUBSCRIBER:** |
|---|---|
| _____ (Signature) | _____ (Print Name of Subscriber) |
| _____ (Print Name) | _____ (Signature) |
| _____ (Signature of Joint Subscriber, if any) | _____ (Print Name of Person Signing) |
| _____ (Print Name of Joint Subscriber, if any) | _____ (Title of Person Signing) |

NOTARIAL ACKNOWLEDGEMENT

STATE OF _____                          )
COUNTY OF _____                         )

          On  this  _____  day  of  _____ ,  in  the  year  200_ ,  before  me,  personally  appeared  _____ ,  _____  of  _____ ,  personally known to me (or proved to me on the basis of satisfactory evidence) to be the person that executed this instrument on behalf of _____ and acknowledged to me that _____ executed it.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.

_____         My  Commission  expires: _____
Signature of Notary Public                    *[Notarial Seal]*

## SUBSCRIPTION ACCEPTED:

VESTIUM MANAGEMENT GROUP, LLC,
AS MANAGER OF VESTIUM EQUITY FUND, LLC

By:   _____
         Robert Buckhannon, Manager

Date: _____


## CERTIFICATION OF BROKER (if applicable)

I have reviewed the above with the client, I have reviewed the suitability of this investment and determined it is suitable for the client and the information in this Subscription document is believed by me to be true and correct.


X    _____
        Signature of Broker


## CERTIFICATION OF SUPERVISORY PRINCIPAL (if applicable)

I have reviewed the subscription in accordance with the private placement compliance and supervisory rules of my broker-dealer and I believe the acceptance of the subscription is in compliance with those rules.


X    _____
        Signature of Supervisory Principal

# VESTIUM EQUITY FUND, LLC
## INVESTOR'S ANTI-MONEY LAUNDERING REPRESENTATIONS

In connection with the Manager's compliance with the United States Patriot Act (the "Patriot Act"), each investor is required to make the following representations to the Fund as a condition to acceptance of their investment.

**I, _____ , in connection with my/our subscription for the Limited Liability Company Membership Interests (the "Interests") issued by Vestium Equity Fund, LLC, represent and warrant that the following statements are true and accurate:**

1.  All evidence of identity I have provided in connection with my/our subscription for the Interests is true and correct and all related information furnished is genuine and accurate.

2.  I agree to provide such additional information as may be deemed necessary by the Manager from time to time for ongoing compliance with anti-money laundering programs.  Any delay or failure on my part to comply with such requests and provide the requisite information may result in the refusal of my initial or any future subscription for Interests or, in certain instances, the mandatory withdrawal of my/our interest(s) in the Interests.

3.  I hereby represent and warrant that neither I, or in the case of an entity subscriber neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity on the List of Specifically Designated Nationals and Blocked Persons (the "OFAC Control List") maintained by the US Office of Foreign Assets Control ("OFAC"), and that it is not investing and will not invest in the Fund on behalf of or for the benefit of any individual, organization, or entity on the OFAC Control List.  I further agree to notify the Manager of any change in information affecting these representations and covenants.

4.  I hereby represent and warrant that (i) the amounts invested in the Interests were not and are not directly or indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations, and (ii) the proceeds from my investment in the Interests will not be used to finance any illegal activities.

5.  I agree and acknowledge that if, following my subscription for the Interests, the Fund reasonably believes that I am listed on the OFAC Control List (available at www.ustreas.gov/ofac/t11sdn.pdf) or that I have breached any representations, warranties and/or covenants contained in this document, the Manager may be obligated to block my investment in the Stock in accordance with applicable law, and that I shall have no claim against the Manager or the Fund for any form of damages as a result of blocking the investment.  By executing this document, I hereby waive any such claim(s) for damages that may result from blocking the investment and further agree to indemnify and hold harmless the Manager, the Fund and its principals, employees and advisors from any and all actions, causes of action, claims, suits, and/or litigation arising from the blocking of my/our investment under applicable anti-money laundering laws, rules or regulations.

6.  If I am subscribing for the Interests on behalf of a "fund of funds" or other similar entity that invests on behalf of others, I certify that, in addition to and without limiting any of the foregoing representations, warranties or covenants, I am aware of the requirements of the Patriot Act and the rules and regulations promulgated thereunder and other applicable anti-money laundering measures in any jurisdiction and that I/we have adopted anti-money laundering procedures and policies reasonably designed to verify the identity of the beneficial owners of or investors in our fund/entity, and the respective sources of funds obtained from these beneficial owners/investors.  I further represent that the aforementioned policies and procedures are properly enforced and are consistent with the anti-money laundering rules and regulations applicable to our jurisdiction and entity.  I further represent and certify that, to the best of my knowledge, the beneficial owners of or investors in our fund/entity are not individuals, entities or countries that may

Confidential

subject the Manager, the Fund or any of thier affiliates to criminal or civil violations of *any* anti-money laundering laws, rules or regulations.  If requested by the Manager, I/we will furnish copies of our anti-money laundering policies and procedures, and further agree to immediately notify them if any of the foregoing representations, warranties and/or certifications becomes inaccurate.

7.  I hereby represent and warrant that I am not a Senior Foreign Political Figure, a member of a Senior Foreign Political Figure's Immediate Family, and/or a Close Associate of a Senior Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated by the US Treasury as warranting special measures due to money laundering concerns, nor am I a former Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to money laundering concerns.

8.  I hereby represent and warrant that I am not resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the US Secretary of Treasury under Sections 311 and 312 of the Patriot Act as warranting special measures due to money laundering concerns.

9.  I hereby represent and warrant that the entity I represent, if any, is not a Foreign Shell Bank as the term is defined in the Patriot Act.

10.  I hereby represent and warrant that the funds being invested in the Interests do not originate from, nor will they be routed through an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a jurisdiction deemed to be a non-cooperative country of territory (list available at www1.oecd.org/fatf).

The undersigned does represent and certify under penalty of perjury, by executing this Investor's Anti-Money Laundering Representations, that the foregoing statements are true and correct.

Executed this _____ day of _____ , 200___ at _____ .

**INVESTOR:**

**Signature:** _____

**Name:** _____

**Title:** _____

**Entity:** _____

**Jurisdiction
of Organization:** _____

# VESTIUM EQUITY FUND, LLC
## TERMS AND CONDITIONS OF SUBSCRIPTION AGREEMENT

The following provisions, together with the Operating Agreement (the "*Operating Agreement*") of Vestium Equity Fund, LLC, a Delaware Limited Liability Company (the "*Fund*"), are the terms and conditions on which investors in the Fund subscribe for units of membership interest and apply to become Members in the Fund. Each prospective investor in the Fund accepts these terms and conditions by signing the signature page to such investor's Confidential Investor Questionnaire *("Questionnaire").* These terms and conditions are sometimes referred to, collectively with the Questionnaire and exhibits hereto, as the *"Agreement"* or the "*Subscription Agreement."*

1.    **Agreement to Subscribe for Interests**. The person or entity executing this Subscription Agreement ("*Subscriber*") hereby offers to purchase a membership interest (the "*Interest*") in the Fund, in the amount set forth on the signature page to the Subscriber's Questionnaire. Subscriber agrees that (a) the Fund's Manager, Vestium Management Group, LLC (the "*Manager*") may reject Subscriber's offer to purchase an Interest for any reason; (b) as of the date designated by the Manager when (if at all) the Manager accepts this Subscription Agreement and Subscriber's subscription funds on behalf of the Fund, Subscriber shall become obligated under the terms and conditions of this document and of the Operating Agreement as a Member; and (c) by executing the signature page of the Questionnaire, Subscriber agrees to be bound by those terms and conditions.

2.    **Independent Determination and No Investment Advice Given.** The Subscriber acknowledges and represents that the Manager has provided no advice to the Subscriber about whether to subscribe for an Interest in the Fund. The Subscriber has requested and received from the Manager all information that the Subscriber, after due inquiry, deemed relevant to subscribing for an Interest in the Fund. Subscriber has taken into account that there is a risk of loss of this investment, and that this investment will be relatively illiquid so that invested funds will not be readily available. Taking into account these factors and all other factors relating to the Fund, the Subscriber has independently concluded that this investment is suitable for the Subscriber.

3.    **Representations and Warranties.** Subscriber hereby represents and warrants as follows, with the understanding that the Fund will rely on the accuracy of these representations to establish the eligibility of this offering for certain registration exemptions under federal and state securities laws, and to enable the Fund to comply with certain other laws and regulations:

(a)    **Interests Not Registered**. Subscriber understands that the Fund's offer and its sale to Subscriber of an Interest have not been registered under the Securities Act of 1933, as amended (the "1933 Act"), or registered or qualified under state securities laws, on the ground, among others, that Interests are being offered and sold in a transaction that does not involve any public offering within the meaning of Section 4(2) of the 1933 Act and Rule 506 of Regulation D thereunder. Subscriber understands that no federal or state agency has passed on the merits or fairness of this investment.

(b)    **Interest Acquired for Investment**. Subscriber is acquiring the Interest with Subscriber's own funds and for Subscriber's own account (or for a designated custodial or trust account, if Subscriber is a custodian or trustee) for investment and not with a view to the distribution of any interest therein. No other person will own any part of Subscriber's Interest or have any right to acquire such a part.

(c)    **Review of Offering Materials and Independent Advice**. Subscriber has carefully reviewed the Confidential Private Placement Offering Memorandum, dated June 9, 2008 (the "Memorandum"), the Fund's Operating Agreement and this Agreement (including the attachments thereto) and has discussed with Fund representatives any questions Subscriber may have had as to such materials or the Fund or the business, operations or financial condition of the Fund or the Manager. Subscriber understands the risks of this investment as described in the "Certain Risk Factors" of the Offering Memorandum, and the conflicts of interest to which the Manager will

be subject. Subscriber has consulted with Subscriber's own legal, accounting, tax, investment and other advisers in connection with this investment, to the extent that Subscriber has deemed necessary.

(d)     **Offer Made Privately**.  The Fund's offer of Interests was privately communicated to Subscriber. At no time has Subscriber received information concerning this offering or the Fund or the Manager from any newspaper, magazine, television or radio broadcast, leaflet or other advertisement, public promotional meeting or any other form of general advertising or general solicitation.

(e)     **Subscriber Able to Bear Risks and Protect Own Interests**.  The Subscriber is an Accredited Investor (as indicated on the attached Investor Questionnaire, unless otherwise indicated thereon) and has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of investing in the Fund, and all information that the Subscriber has provided concerning the Subscriber, the Subscriber's financial position and knowledge of financial and business matters is true, correct and complete.  The Subscriber acknowledges and understands that the Manager will rely on the information provided by the Subscriber in this Agreement and in the Investor Questionnaire that accompanies this Agreement for purposes of complying with Federal and applicable state securities laws.  The Subscriber represents that it understands that an investment in the Fund involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment.  **The Subscriber also represents that no assurances or guarantees have been made to the Subscriber by anyone regarding whether the Fund's investment objective will be realized or whether the Fund's investment strategy will prove successful.  The Subscriber recognizes that he or she may lose all or a portion of their investment in the Fund.**  The Subscriber also understands that if he or she is subject to income tax, an investment in the Fund is likely (if the Fund is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities.  It is specifically understood and agreed by the Subscriber that the Manager and its affiliates have not made, nor by this Agreement shall be construed to make, directly or indirectly, explicitly or by implication, any representation, warranty, projection, assumption, promise, covenant, opinion, recommendation or other statement of any kind or nature with respect to the anticipated profits or losses of the Fund.  The Manager has made available to the Subscriber and the Subscriber's accountants, attorneys and other advisors full and complete information concerning the financial structure of the Fund, and any and all data requested by the Subscriber as a basis for estimating the potential profits and losses of the Fund and the Subscriber acknowledges that the Subscriber has either reviewed such information or has waived review of such information.

(f)     **Approval of Conflicts of Interest.**  The Subscriber understands the various risks of an investment in the Fund and that the Manager has conflicts of interest with the Fund, and the Subscriber has carefully reviewed the various risks and conflicts summarized under *"RISK FACTORS AND CONFLICTS OF INTEREST"* in the Memorandum and consents to such conflicts.

(g)     **Representations of Entity Subscribers**. If Subscriber is an entity, then:

(1)     Subscriber has or will have substantial business activities or investments other than its investment in the Fund and was not specifically formed for the purpose of purchasing Interests;

(2)     under Subscriber's governing documents and in practice, Subscriber's investment decisions are based on the investment objectives of Subscriber and its owners generally, not on the particular investment objectives of any one or more of its owners; and

(3)     under Subscriber's governing documents and in practice, the participation of each owner of Subscriber in each investment made by Subscriber is based on the owners' ownership percentages or on some other allocation provision that (a) does not result in varying levels of participation among owners based on the nature, amount or other characteristics of a particular investment; and (b) cannot be varied for particular investments made by Subscriber as a result of any election or other decision by any such owner in connection with a particular investment, any exercise of judgment or discretion made by Subscriber's investment decision-maker(s) in connection with a particular investment, or any other reason.

(h)      **Authority**.   Subscriber is duly authorized to enter into this Subscription Agreement (including the power of attorney granted herein), and the person signing this Subscription Agreement on behalf of Subscriber is authorized to do so, under all applicable governing documents (e.g., Operating Agreement, trust instrument, pension plan, certificate of incorporation, bylaws, Operating Agreement). Each individual who may participate in Subscriber's investment decision is over twenty-one years of age (or the age of majority in such individual's state of residence).  This Subscription Agreement constitutes a legal, valid and binding agreement of Subscriber enforceable against Subscriber in accordance with its terms.

(i)      **Taxpayer Identification Number, No Backup Withholding; Not a Foreign Entity**. Under penalty of perjury, Subscriber certifies that the taxpayer identification number being supplied herewith by Subscriber is Subscriber's correct taxpayer identification number and that Subscriber is not subject to backup withholding under section 3406(a)(1)(c) of the Internal Revenue Code.  If Subscriber is an entity, then (1) Subscriber is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code and Regulations thereunder; and (2) if Subscriber hereafter becomes such a foreign entity, Subscriber shall notify the Manager within 60 days thereafter.

(j)      **Approval of Management Fees, Performance Fees and Profit Allocations.**   The Subscriber has been informed and has consented to the fees and expenses charged to the Fund.  Specifically, the Subscriber is aware and by executing this Subscription Agreement expressly consents to the Management Fees, Performance Fees and Profit Allocation payable to the Manager.

4.      **Transfer Restrictions.**   Subscriber understands that, except to the extent withdrawals are permitted under the Operating Agreement, Subscriber must hold the Interests indefinitely, that no market is ever likely to develop for the Interests, and that transfers of Interests are subject to further restrictions under the Operating Agreement, although withdrawals of capital are permitted on certain conditions described in the Operating Agreement. Subscriber agrees that (1) Subscriber will not attempt to transfer the Interest in violation of these transfer restrictions; (2) the Fund may note these transfer restrictions in its records and refuse to recognize any transfer which violates these transfer restrictions, or any proposed transfer for which the Fund has not received an acceptable opinion of counsel stating that the proposed transfer will not violate these transfer restrictions; and (3) if the Fund ever issues a certificate evidencing the Interest, one or more legends required under federal and/or applicable state securities laws and regulations may be imprinted thereon.  One of such legends shall read substantially as follows:

**"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SAID ACT OR AN OPINION OR OTHER EVIDENCE SATISFACTORY TO THE MANAGER THAT SUCH REGISIRATION IS NOT REQUIRED."**

5.      **Indemnification.** Subscriber agrees to indemnify and hold harmless the Fund and the Manager, and each of their employees, agents, and attorneys, from and against any and all loss, liability, claims, damage, and expense (including any expense reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) related to any false representation or warranty or any breach of agreement by Subscriber contained herein or in any other document furnished by the Subscriber to the Fund in connection with this transaction.

6.      **Power of Attorney.** Subscriber hereby irrevocably constitutes and appoints the Manager, Subscriber's true and lawful attorney-in-fact, with full power and authority in Subscriber's name, place and stead to execute, deliver, certify, acknowledge, swear to, file, record and publish all documents and other instruments described in the Operating Agreement, which is hereby incorporated in this paragraph by this reference.

7.      **Agreement Binding on Subscriber's Successors.**   The representations, warranties and agreements in this Subscription Agreement shall be binding on Subscriber's successors, assigns, heirs and legal representatives and shall inure to the benefit of the respective successors and assigns of the Fund and the Manager.

Terms and Conditions of Subscription Agreement – Page 3<br>Vestium Equity Fund, LLC

8.        **Employee Benefit Plan Subscribers.**

(a)        **Definitions.**  In this section 8, (i) "*Employee Benefit Plan*" means any "employee benefit plan" as defined in the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), whether or not such plan is subject to ERISA, and any "plan" as defined in section 4975(e)(1) of the Internal Revenue Code; (ii) "*25%-Plan-Owned Subscriber*" means any Subscriber that is not itself an Employee Benefit Plan but that has 25% of any class of equity interests owned (directly or indirectly) by one or more Employee Benefit Plans; and (iii) "*Plan Investor*" includes Subscriber itself if Subscriber is an Employee Benefit Plan or, if Subscriber is instead a 25%-Plan-Owned Subscriber, includes each Employee Benefit Plan that directly or indirectly owns any class of Subscriber's equity interests.

(b)        **Representations, Warranties and Agreements**.  If Subscriber is either an Employee Benefit Plan or a 25%-Plan-Owned Subscriber, then the person executing this Agreement on behalf of Subscriber (the "*Signer*") represents, warrants and agrees as follows on behalf of the Plan Investor(s):

(1)        **Independent Determination**. The Signer has independently determined, as to the Plan Investor(s), that this investment satisfies all requirements of section 404(a)(1) of ERISA, and that this investment will not be prohibited under any of the provisions of section 406 of ERISA or section 4975(c)(1) of the Internal Revenue Code.  The Signer has requested and received from the Manager all information that the Signer, after due inquiry, deemed relevant to such determinations.  The Signer has taken into account that there is a risk of loss of this investment, and that this investment will be relatively illiquid so that invested funds will not be readily available for the payment of employee benefits.  Taking into account these factors and all other factors relating to the Fund, the Signer has concluded that this investment is an appropriate part of the overall investment program of the Plan Investor(s).

(2)        **Agreement to Give Notice of Certain Changes**. Promptly after Subscriber obtains knowledge thereof, the Signer will notify the Manager in writing of (i) any termination, substantial contraction, merger or consolidation, or transfer of assets of any Plan Investor; (ii) any amendment to the governing instrument(s) of a Plan Investor that materially affects the investments of such Plan Investor or the authority of any named fiduciary or investment manager to authorize investments by such Plan Investor; and (iii) any change in the identity of any named fiduciary or investment manager (including the Plan Investor itself) who has authority to approve investments for any Plan Investor.

(3)        **No Investment Advice Given**. The Signer acknowledges that (i) neither the Manager nor any of its Affiliates provides any investment advice on a regular basis to Subscriber (or, to the Signer's knowledge, to any other Plan Investor) and none of such parties provides any investment advice to Subscriber (or, to the Signer's knowledge, to any other Plan Investor) that serves as the primary basis of any investment decisions Subscriber makes as to any of its assets (or that such other Plan Investor(s) makes, as the case may be), or (ii) in the event that the Manager or any of its Affiliates has provided investment advice to the Subscriber as described in (i), that the Subscriber has consulted with Subscriber's own legal, accounting and tax advisors, and has obtained investment advice independent from the Manager and its Affiliates, and has not relied on the Manager or any of its Affiliates, in connection with Subscriber's decision to make this investment in the Fund.

(4)        **Limit on Fiduciary Responsibilities**. If the Manager, or equity owner, employee, agent, or Affiliate of the Manager, is ever held to be a fiduciary of Subscriber or any other Plan Investor, then, in accordance with sections 405(b)(1), 405(c)(2) and 405(d) of ERISA, the fiduciary responsibilities of that person shall be limited to the person's duties in administering the business of the Fund, and the person shall not be responsible for any other duties to Subscriber or such other Plan Investor, specifically including evaluating the initial or continued appropriateness of this investment in the Fund under section 404(a)(1) of ERISA.

(c)        **Additional Representations and Warranties**.  If Subscriber itself is an Employee Benefit Plan, then the Signer further represents and warrants that (i) the Signer is an authorized fiduciary of Subscriber, with full authority under the terms of Subscriber's governing instrument(s) and, if applicable, the agreement pursuant to which the Signer has been engaged by Subscriber, to cause Subscriber to purchase the Interest; and (ii) this investment has been duly approved by all other fiduciaries of Subscriber whose approval is

required, if any, and this investment is not prohibited by ERISA or prohibited or restricted by any provision of Subscriber's governing instrument(s) or of any related agreement or instrument.

9.      **Dispute Resolution**. This Agreement contains a provision which requires that all claims arising from Subscriber's investment in the Fund be resolved through arbitration.  Subscriber acknowledges, understands, and agrees that:

**(a)      Arbitration is final and binding on the parties.**

**(b)      The parties are waiving their right to seek remedies in court, including the right to jury trial.**

**(c)      Pre-arbitration discovery is generally more limited than and potentially different in form and scope from court proceedings.**

**(d)      The Arbitration Award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of a ruling by the arbitrators is strictly limited.**

**(e)      The panel of arbitrators may include a minority of persons engaged in the securities industry.**

**To the extent permitted by law, all controversies which may arise from Subscriber's investment in the Fund, or the construction, performance, or breach of this Agreement, whether entered into prior to, on or subsequent to the date hereof, shall be submitted to arbitration conducted in New York, New York under the Rules for Commercial Arbitration of American Arbitration Association.**

**Arbitration must be commenced by service of a written demand for arbitration or a written notice of intention to arbitrate.  Judgment upon any award rendered by the arbitrator(s) shall be final, and may be entered in any court having jurisdiction.  Any arbitration proceeding pursuant to this Agreement shall be determined pursuant to the laws of the State of New York.  This Agreement supersedes any and all preexisting agreements and/or understandings regarding the subject matter hereof.  No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) Subscriber is excluded from the class by the court.  Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.**

**Subscriber hereby submits to the in personam jurisdiction of the courts of New York, New York and the federal courts located therein (and expressly waive any defense to personal jurisdiction of Subscriber by such courts) for the purpose of confirming, vacating or modifying any such award or judgment entered thereon. To the extent any controversy as above described is to be resolved in a court action, Subscriber expressly agrees that such action shall be brought only in State or Federal courts in New York and service of process in such action shall be sufficient if served by certified mail, return receipt requested, at the last address of the party served known to the other party.  In this connection each Subscriber expressly waives any defense(s) to personal jurisdiction of Subscriber by such court; (b) service of process as set forth above; (c) to venue, and in addition, expressly agree that New York County is a convenient forum for any such action.**

10.      **Governing Law**.  This Agreement shall be governed by the laws of the State of New York excluding the conflict-of-laws rules of New York.