1

2

3

4

5

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10  SECURITIES AND EXCHANGE
    COMMISSION,
11                                      2:09-cv-0665 LKK DAD
             Plaintiff,
12
          v.
13                                      FINDINGS AND RECOMMENDATIONS
    ANTHONY VASSALLO, KENNETH
14  KENITZER, and EQUITY
    INVESTMENT MANAGEMENT AND
15  TRAINING, INC.,

16           Defendants.

17  _____/
    ARCANUM EQUITY FUND, LLC and
18  VESTIUM MANAGEMENT GROUP,
    LLC, parties in interest.
19
    _____/
20  MICHAEL CALLAHAN and
    MATTHEW TUCKER, parties in
21  interest.

22  _____/

23          This case has been referred to the undersigned for an evidentiary hearing to

24  resolve disputed issues of fact related to the receiver's motion to order disgorgement of $2.0

25  million transferred to Michael Callahan and Matthew Tucker (Doc. No. 171).

26  /////

                                    1

In accordance with the referral order filed by the district judge on December 11, 2009, the undersigned held an evidentiary hearing on March 29-30, 2010.  Below the undersigned will review the issues referred for hearing, summarize the evidence elicited at the evidentiary hearing and make recommendations as to the resolution of the motion pending before the assigned district judge.

## BACKGROUND

On July 31, 2009, the assigned district judge appointed a permanent Receiver to marshal and recover the assets of Equity Investment Management and Trading (EIMT).  The assets recovered are to be distributed to the defrauded investors of EIMT.  The Receiver discovered  that EIMT had several sub-funds, one of which was Veritas Investments, LLC (Veritas).  The Receiver also discovered that in December 2008, Veritas had wired $125,000 to Michael Callahan (Callahan) and $1.875 million to Matthew Tucker (Tucker) in connection with the purchase of an investment referred to as a Collateralized Mortgage Obligation (CMO).  After standards were established for summary proceedings for the recovery of EIMT assets and following failed efforts to recover the CMO, the Receiver moved the court for an order of disgorgement with respect to the $2.0 million from interested parties.  Callahan opposed the motion.  Tucker did not.

On December 11, 2009, the assigned district judge granted the Receiver's motion with respect to Tucker as unopposed and ordered Tucker to disgorge the $2 million received from EIMT/Veritas.  The district judge also referred the motion for disgorgement with respect to Callahan to the undersigned for an evidentiary hearing.[1]  (Doc. No. 202 at 7.)  In the referral

---

[1]  The assigned district judge also referred the evidentiary hearing on the Receiver's motion for disgorgement of funds from Arcanum Equity Fund , LLC, Vestium Equity Fund, LLC, and Vestium Management Group, LLC to the undersigned.  (Doc. No. 203.)  That evidentiary hearing was then scheduled for April 12, 2010.  However, on April 9, 2010, the parties to that evidentiary hearing filed a proposed stipulation and order taking the matter off calendar in light of the bankruptcy filings by  Arcanum Equity Fund , LLC, Vestium Equity Fund, LLC, and Vestium Management Group, LLC.  (Doc. No. 249.)

1    order, the court observed that the Receiver and Callahan disputed whether the CMO invested in

2    by Veritas was ever purchased by Callahan and Tucker as well as the extent of Callahan's

3    involvement in the transaction.  (Doc. No. 202 at 2.)  The court directed that through the

4    evidentiary hearing it be determined whether the CMO exists and, if so, whether it is legitimate.

5    (Id. at 6.)[2]  In addition, the court directed that at the evidentiary hearing it be determined whether:

6    (1) Callahan was aware of the falsity of statements he made to EIMT with respect to the multi-

7    stage process of purchasing the CMO[3]; (2) whether Callahan intended to defraud EIMT/Veritas if

8    it were shown that the CMO was never purchased and/or was illegitimate; and (3) whether

9    Callahan's role in the transaction was limited to that of a facilitator who merely introduced

10   Veritas and Tucker, thereby limiting Callahan's liability to the return of the $125,000 that he

11   received as a commission or facilitator fee.[4]

12          Below, the evidence elicited at the evidentiary hearing and the arguments of the

13   parties with respect to that evidence and its import with respect to the pending disgorgement

14   motion will be summarized.  The court will then set forth its findings and recommendations.

15                                      **THE EVIDENCE**

16          Stephen Anderson, the court-appointed receiver charged with seeking to recover

17   any EIMT assets, testified about his investigation of Anthony Vassallo and his "hedge fund"

18   (EIMT) that purportedly operated through the use of a sophisticated computer program for stock

19   /////

20   _____

21          [2]  The referral order noted that if the CMO was never purchased or was not legitimate, the
     transaction would be a fraudulent one in which EIMT/Veritas justifiably relied on knowingly
22   false statements made presumably by Tucker and Callahan, with respect to its purchase which in
     turn resulted in EIMT being defrauded of its $2 million.

23          [3]  If so, Callahan would be a joint tortfeasor and should be held jointly and severally
     liable for the entire $2 million lost by EIMT/Veritas.
24
            [4]  As will be addressed below, by the time the matter came before the undersigned for
25   evidentiary hearing, additional evidence surrounding the CMO transaction had been discovered,
     the positions of the parties had been refined and the nature of the dispute between them
26   somewhat altered.

trading.[5]  According to Receiver Anderson, as Vassallo's fraud began to unravel all legitimate

trading by EIMT stopped and Vassallo began to invest EIMT funds into exotic, highly vulnerable

private investments with astronomical, unbelievable promises of returns such as this one.

Following his initial investigation, the Receiver determined that the EIMT assets

that should first be targeted for recovery on behalf of investors were certain parcels of real

property and the CMO at issue here.  The latter, according to the receiver, was a complicated

transaction in which EIMT/Veritas had invested in mortgage-backed securities.   In the

transaction, EIMT/Veritas was to purchase $1 billion in CMO's from Tucker for a total of $2

million ($1,875,000 sent to Tucker's Bank of America account for the CMO's and $125,000 sent

to Callahan as a facilitator fee) and then sell the CMO, through Tucker's securities account either

the same day it was purchased or at the latest the following day, for $7 million to an "exit buyer"

whose name was not to be disclosed to EIMT/Veritas in advance.[6]  (Evid. Hrg., Ex. 1.)  In an

email to a Jerry Garvin who was apparently acting on behalf of EIMT/Veritas, Callahan

memorialized their discussions regarding the various stages of this agreement and contemplated

CMO transaction which included Callahan receiving an additional $500,000 once the $7 million

was received from the unidentified "exit buyer."  (Id.)  1.)[7]  Other documents, however, indicate

that Callahan himself was to receive an additional $1,500,000 upon payment by the undisclosed

---

[5]  Receiver Anderson testified that he cooperated  with the U.S. Attorney's Office, the
FBI, the SEC, and EIMT investors and their attorney in gathering information about Vassallo's
operation.  He indicated that EIMT was a pool of money with twenty five to thirty subfunds, one
of which was Veritas.  According to the Receiver, approximately $104 million was invested with
EIMT, with a current loss of over $50 million and perhaps as much as $60 million.

[6]  According to the Receiver, this aspect of the transaction concerned him and raised the
specter of fraud.  The exit buyer was later identified as Stone Crest Contractors LLC, purportedly
represented by an attorney by the name of Jon Divens.  According to Callahan, he later learned
that Divens at some point also began to represent Tucker and received funds in trust on behalf of
both Stone Crest and Tucker.  The court observes that if Callahan's testimony is to be believed,
attorney Divens involved himself in multiple conflicts.

[7]  Callahan testified that after Tucker told him of his access to CMO's and Callahan
himself had focused on Stone Crest as a potential buyer, Jerry Garvin approached Callahan about
the interest of Veritas/EIMT in participating in such an investment.

exit buyer.  (Ex. 5.)

In late December of 2008, EIMT/Veritas wired the $125,000 to Callahan and the $1,875,000 to Tucker.  Predictably, however, EIMT/Veritas never received the promised $7 million despite following instructions to provide the "coordinates" for payment of the funds or delivery of the CMO to be made.

By May of 2009, the Receiver's efforts to contact Tucker and Stone Crest Contractors had met no significant degree of success.  The Receiver was, however, able to contact Callahan and they communicated on several occasions about the Receiver's desire to collect on the CMO.  In general, Callahan indicated that he was in contact with Tucker and expressed confidence that if certain obstacles could be overcome that the transaction could be completed as originally planned.  Despite attempting to comply with each of Callahan's requests in connection with these various obstacles, neither the CMO nor the promised funds were ever delivered to the Receiver.[8]

On June 15, 2009, counsel for the Receiver obtained an order from this court directing Bank of America to provide information and documentation tracing the $1,875,000 transferred to Tucker's account by EIMT/Veritas on or about December 31, 2008.  The bank records produced pursuant to that order reflected that on December 31, 2008, after receiving the $1,875,000, Tucker immediately transferred $100,000 into his own checking account.  (Ex. 12.) On January 2, 2009, Tucker transferred $650,000 to Legent Clearing with those funds finding their way to Chicago Investment Group (CIG) where they were used to purchase twenty-six $50 million Greenwich CMO's that were placed in Tucker's CIG account.  (Ex. 12, 16.)  On January

---

[8] Prior to the appointment of the receiver, attorney Bruce Dravis was acting on behalf of EIMT investors to recover as much of their invested money as possible.  Investors had told attorney Dravis of the CMO and although the transaction was not well-documented and the actual existence of the CMO was in some doubt, he pursued it on their behalf.   According to his testimony at the evidentiary hearing, Dravis was never able to speak directly with Matt Tucker. Through Jerry Garvin, Dravis was able to communicate by email with Callahan who repeatedly indicated he was in contact with Tucker and was working on "solutions" that would complete the CMO transaction and get the investors their promised funds.  This, of course, never occurred.

1  12, 2009, Tucker wired attorney Jon Divens $200,000.  (Ex. 12.)  Tucker appears to have spent

2  several hundred thousand more of the EIMT/Veritas funds within a month of their receipt.  (Id.)

3          On July 30, 2009, counsel for the receiver obtained an order from this court

4  directing CIG to provide the Receiver with information and documentation concerning all of

5  Tucker's accounts for the time period following December 1, 2008.  The account documents

6  provided to the Receiver by CIG pursuant to the court's order revealed that Tucker opened an

7  account with CIG on December 4, 2008.  (Ex. 16.)  On December 16, 2008, a little over two

8  weeks prior to receiving funds from EIMT/Veritas, Tucker purchased four $50 million

9  Greenwich Capital CMO's for $114,062 and held them in his CIG account.  (Id.)  On January 2,

10  2009, immediately after receiving the EIMT/Veritas funds, Tucker purchased another twenty-six

11  $50 million Greenwich Capital CMO's for $737,111.56.  (Id.)  This latter purchase resulted in

12  $1.5 billion in Greenwich Capital CMO's on deposit in Tucker's CIG account as of January 2,

13  2009.  (Id.)

14          Documents produced by CIG also revealed that on January 26, 2009, Stone Crest

15  Contractors, LLC, through a Anna Sanders, opened a CIG account.  (Ex. 17.)  The CIG documents

16  also revealed for the first time that Tucker was a Director of Stone Crest with full authority to

17  manage and control its CIG account.[9]  (Id.)  A journal entry also indicated that on January 26,

18  2009, Tucker transferred the $1.5 billion of CMO's into the Stone Crest CIG account.  (Ex. 18.)

19  On January 29, 2009, Stone Crest sold $500 million of the CMO's, apparently for a mere $47,818.

20  (Id.)  CIG account documents indicated that as of February 28, 2009, Stone Crest still held $1

21  billion in CMO's in its account.  (Ex. 19.)  However, it appears that as of March 31, 2009, all of

22  the CMO's were gone from both the Stone Crest and Tucker CIG accounts, having been sold by

23  /////

24  /////

25  _____

26      [9]  The Receiver concluded that Tucker was placed on the Board of Stone Crest so as to manipulate the CMO transaction.

1  Tucker at a tremendous loss and never transferred to EIMT/Veritas.  (Id.)[10]

2        Based upon these documents, the Receiver concluded that the CMO's had been

3  eventually purchased and that they appeared to be legitimate.  The Receiver conceded that he was

4  not particularly familiar with CMO's nor with how they are transferred.  Although the Receiver

5  learned from CIG that the CMO's in question had been sold out of the Stone Crest account, he did

6  not learn who the buyer was.  The Receiver did discover that the 1912 Selwyn Drive address in

7  Decatur, GA listed for Stone Crest on the CIG account documents was an approximately 950

8  square foot home located in a residential neighborhood and was an address associated with

9  seventy-five different individuals or entities.  The Receiver speculated that the address may have

10  merely been an answering service.  The Receiver admittedly spent little time attempting to learn

11  more about or pursuing Stone Crest, however, because it appeared obvious to him that it was a

12  fraud of some sort and that it would be fruitless to waste the limited resources available to him

13  pursuing a fraudulent entity.

14        Jamie Dupree represents Receiver Stephen Anderson in this action and also

15  testified at the evidentiary hearing.  In Dupree's July 23, 2009, letter to Matthew Tucker, she

16  memorialized her failed efforts to recover the CMO on behalf of the Receiver and demanded the

17  return of the $1,875,000 transferred to Tucker in connection with the transaction.  (Ex. 23.)

18  On that same date Dupree sent a letter to Callahan in which she also memorialized her failed

19  efforts to recover the CMO on behalf of the Receiver and demanded the return of the $125,000

20  transferred to Callahan as a fee for "facilitator services" in connection with the transaction.  (Ex.

21  24.)[11]  Tucker never responded to attorney Dupree's letter.  However, on July 27, 2009, Callahan

22  sent an email to Dupree's legal assistant stating that he was gathering information to demonstrate

23

24      [10]  The records seem to indicate that the $1 billion in CMO's were transferred on March 23, 2009 and sold out of the Stone Crest CIG account for a mere $49,853 on March 25, 2009.

25

26      [11]  In both letters, attorney Dupree indicated that an additional $50,000 was paid by EIMT/Veritas to Jerry Garvin as a referral fee in connection with the CMO investment.

1   that the CMO's had been purchased and that it was "on the re-sale" that "the buyer failed." (Ex.

2   26.)  Callahan also suggested that it was the Receiver who was at fault for failing to "retrieve" the

3   CMO despite having been given by him the appropriate "coordinates." (Id.)  On August 3, 2009,

4   Callahan again emailed Dupree's legal assistant reporting that he had reached Tucker who would

5   "deliver the instrument in two $500M tranches[12] if you will provide the delivery coordinates."

6   (Pl.'s Ex. 27.)  Callahan also requested that attorney Dupree provide assurances that Veritas was

7   an entity covered by the court's orders in this action.  (Id.)  On September 15, 2009, attorney

8   Dupree responded to Callahan by reminding him that the terms of the CMO transaction called for

9   the purchase of a $2 million CMO that would immediately be sold for $7 million to a third party

10   buyer and through which EIMT would receive over $5 million.  (Pl.'s Ex. 28.)[13]  Dupree also

11   provided Callahan with Bank of America account information where the promised funds could be

12   delivered and warned that if they were not received with five business days, the Receiver would

13   conclude that CMO did not exist and pursue disgorgement proceedings against Callahan for the

14   $125,000 he personally received as well as the $1,875,000 received by his "agent" Tucker.  (Id.)

15         Of course, no CMO was delivered to the Receiver.  Instead, on November 18,

16   2009, Callahan emailed attorney Dupree and continued to report that Tucker was willing to

17   deliver the CMO.  (Pl.'s Ex. 29.)  Callahan claimed that it was Stone Crest that had breached the

18   agreement and should be held responsible.  (Id.)  He also suggested that he was willing to

19   negotiate regarding the $125,000 he had received in connection with the transaction but argued he

20   should not be held responsible for the $2 million loss.  (Id.)  By late January of 2010, Callahan

21   finally informed Dupree that he had now learned that Tucker had liquidated the CMO's.  Dupree

22   explained in her testimony that she continued to communicate with Callahan because he was the

---

23

24     [12] A "tranche" is a portion, especially of money.  As with several words or phrases used by Callahan in describing the CMO transaction, its use appeared to the undersigned intended to give an air of legitimacy to what most would view as an obviously fraudulent transaction.

25

26     [13] The delay in Dupree's response was attributed to the fact that Callahan directed his emails to Dupree's legal assistant.

1   only one responding on Tucker's behalf, Tucker did not respond to any of her attempts to

2   communicate with him and Tucker's whereabouts were unknown at the time.  It was subsequently

3   learned that Tucker was in Missouri where he was facing federal charges and had agreed to plead

4   guilty to conspiracy to commit wire fraud with a loss amount of almost $2.7 million as part of a

5   mortgage fraud scheme.[14] (Ex. 33.)

6           Michael Callahan testified at the evidentiary hearing as follows.  He is a 1981

7   graduate of Cal Western School of Law.  From 1981 through 1994 he practiced law in Hawaii at

8   which time he moved to the Seattle area, changed his bar status to inactive and became an

9   entrepreneur.[15]  Callahan met Matthew Tucker in connection with a private-placement investment.

10  In the Fall of 2008, Tucker showed Callahan a financial statement reflecting a net worth of $628

11  million.  Callahan did a background check through his sources and, as a result, believed Tucker to

12  be legitimate, capable, and wealthy.  Tucker claimed that he was on the board of a hedge fund and

13  had access to CMO's at well below market rates.[16]

14          Following the Receiver's initial contact with Callahan, Tucker told Callahan that

15  he was attempting to sell the EIMT CMO's for $10 million but that the sale was being prevented

16  by a problem in arranging for "free delivery" which security houses had become reluctant to agree

17  to.  Upon encountering this problem, Callahan understood that Tucker paid attorney Jon Divens

18  $200,000 to serve as a nominal buyer of the CMO's so that they could be delivered.  (See Ex.

19  31.)[17]  Of course, that transfer never occurred and Divens apparently never returned the money he

20  was paid for his "services."

---

21          [14]  Tucker is represented by counsel in connection with those federal charges.

22
23          [15]  Callahan testified that he returned to active status with the California Bar in 2009.

24          [16]  Callahan testified that as a result of the mortgage market collapse the value of CMO's
        plummeted compared to their value at the time of the EIMT investment.

25          [17]  Callahan's testimony suggested that he still believes that this alleged problem with
        "free delivery" was an actual impediment to the completion of the CMO transaction at issue
26      which could have been, but was not, overcome.

1    Callahan testified that while searching for somewhere to place Tucker's CMO's, he

2    learned of Stone Crest Contractors, LLC an "on ramp" to a "managed buy-sell platform."

3    Callahan met with Ricardo Lewis, President of Stone Crest, for two days in Atlanta, Georgia.

4    Lewis appeared to Callahan to be successful and legitimate, in part because he seemed to have a

5    nice office and drove a nice car.  Callahan claimed to have done his "due diligence" of Lewis and

6    Stone Crest.  In this regard, Callahan found it to be of significance that without being notified in

7    advance that he would want it, Lewis showed Callahan a bank statement reflecting that Stone

8    Crest had millions of dollars on deposit.  Callahan also obtained the Certificate of Organization

9    and Articles of Organization for Stone Crest from the Georgia Secretary of State's Office.  (See

10   Ex. E.)  Since he met with Lewis in a downtown Atlanta office, Callahan inquired about the 1912

11   Selwyn Drive in Decatur, GA address and was told by Lewis that it was just a registered agent

12   address.  Callahan also spoke to a lawyer for Stone Crest, Anna Sanders, J.D./Ph.D., who

13   explained that Stone Crest had been very successful in operating under an investment model

14   whereby a percentage of its profits were committed to humanitarian projects.  Callahan reported

15   being very comfortable doing business with Stone Crest as a result of his due diligence.

16   Callahan offered into evidence a copy of the irrevocable purchase order dated

17   December 18, 2008, signed by Sanders on behalf of Stone Crest and by Vassallo, calling for the

18   transfer and sale of the CMO.  (See Ex. A.)  Later, when the CMO transaction stalled, at

19   Callahan's request Lewis sent him an on-line statement reflecting that in 2009 Stone Crest had a

20   bank checking account balance of over $77 million.[18]  Callahan disputed the notion that it was

21   unusual that the third party buyer (Stone Crest) was not disclosed to EIMT in advance.  Rather, he

22   contended that from the point of view of a facilitator such as himself, it was not unusual to

23   _____

24   [18]  The document referred to by Callahan is not, in fact, a bank statement.  It does not
     identify a financial institution and is merely a one-line entry reflecting a "business checking
     account" with a purported available checking account balance of $77, 234,890.50.  (See Ex. B.)

25   On cross-examination Callahan testified that he did not find it unusual that Stone Crest would
     have this large amount of money on deposit in a checking account.  In any event, the document

26   appears to the undersigned to have no indicia of legitimacy.

withhold the name of the exit buyer until the fees were paid  so as to avoid being "circumvented" in the course of the transaction.  Callahan also disputed the contention that it was suspicious that Tucker appeared on the Board of Stone Crest.  Rather, Callahan claimed that Tucker went on the Stone Crest Board only to attempt to facilitate the completion of the transaction in light of the problem that arose with respect to "free delivery."  According to Callahan, his attempts to follow-up on the transaction (see Ex. F) continued but all he got from Ricardo Lewis of Stone Crest was excuses.  Finally, Callahan learned that Tucker had removed the CMO's from the Stone Crest accounts into unspecified "safe-keeping" because he was concerned that the CMO's would "vanish" and the transaction was taking too long.  Callahan emphasized in his testimony that he never had control over the CMO's nor did he have knowledge of where they were moved.

According to Callahan, for months Tucker was adamant that the CMO's would be delivered or the EIMT/Veritas money would be refunded.  The thought of Tucker being a crook never entered his mind and Callahan denied knowingly participating in any fraud.  Callahan was comfortable passing along to the Receiver and his attorneys whatever limited information Tucker shared with him.  In retrospect, Callahan agrees that at the very least Tucker was not telling him everything and that he was too slow to change his opinion of Tucker.  Eventually, Callahan learned of Tucker's legal troubles in Missouri from Jerry Garvin.[19]  By June of 2009 Callahan also learned that Tucker was liquidating the CMO's and confronted him with that information.  According to Callahan, Tucker said he was liquidating the CMO to pay back the $2 million to Veritas/EIMT.  Thereafter Tucker stopped communicating at all with Callahan.  Callahan still purports to believe that transactions like this are legitimate and that this one failed only because

---

[19]  Callahan expressed the belief that Tucker had moved all of his assets off-shore where he could no longer gain access to them, thereby putting himself under financial pressure which, in Callahan's opinion, caused Tucker to do the "wrong thing."  Callahan also professed an initial belief in representations by Tucker that he was involving himself in these CMO transactions to generate profits for use in a series of "humanitarian projects."  Incredibly, Callahan stated at the hearing that only "pristine" individuals (presumably such as the under-indictment Tucker) who pledge a portion of their profits to "humanitarian projects" could gain access to these types of transactions.

1  Stone Crest failed to perform.[20]  In fact, Callahan testified that in his opinion $500 million of the

2  CMO still exists and could be retrieved by the Receiver.[21]

3           On cross-examination Callahan contended that Tucker didn't sell the CMO's in

4  question directly to Stone Crest because he wanted to build a relationship with EIMT/Veritas in

5  the hope of doing much larger CMO transactions with them in the future.  Callahan also claimed

6  that Stone Crest could not itself engage in a "buy ticket, sell ticket transaction."[22]  Callahan

7  testified that he was involved in brokering financial transactions and financial instruments only so

8  that he could fund humanitarian projects in which he was involved.  He believed he did not need

9  to be licensed given his role in the transactions but acknowledged that he has subsequently had a

10  dispute with Tucker over whether he was acting as Tucker's attorney in connection with such

11  transactions.

12           Despite his initial contention that he had not worked on other CMO transactions

13  and never been the subject of a cease and desist order of any kind, Callahan later conceded that he

14  was named as a defendant in a securities fraud lawsuit filed in Arizona where he had signed a

15  personal guarantee in connection with a CMO transaction also involving Tucker.[23]  Callahan was

16  then confronted with that civil action brought in connection with that February 8, 2009, CMO

17  transaction in Arizona which also involved Tucker and himself and in which Stone Crest again

18  /////

19  /////

20

21      [20]   Callahan contended that Stone Crest still exists, is a viable entity and should be sued
       by the Receiver.  Indeed, Callahan continued to take the position that it was the Receiver who
22     erred in not acting to recover the CMO by obtaining a court order requiring it to be turned over.

23      [21]   Finally, Callahan renewed his objection on due process grounds to the summary nature
       of the disgorgement proceedings.
24
        [22]   See fn. 12, infra.
25
        [23]   Callahan explained that his initial denial was because he felt that the Arizona
26     transaction was "a loan" as opposed to a CMO transaction.

1   appeared as the "exit buyer."[24]   (See Ex. 34.)  In the Arizona transaction, a $1 million investment

2   was to result in payment of $2.8 million to the investors from the exit buyer (Stone Crest) within a

3   matter of days.  (Id.)  Not surprisingly, the Arizona transaction also failed.  Once again, in the

4   Arizona case Callahan took the position that the $2.8 million was not paid because Stone Crest

5   did not perform under the agreement.[25]   (Id., at Ex. 15.)  In that Arizona investment, Callahan

6   personally guaranteed the repayment of the $1 million "in the event something should go wrong

7   with this transaction."[26]   (Id., at Ex. 5.)  Finally, evidence was introduced indicating that in late

8   May of 2009 Callahan was also assuring parties to the Arizona CMO transaction that their money

9   would be delivered in the near future, just as he did in connection with the EIMT transaction.  (Id.,

10   at Ex. 16.)  Of course, no payments were ever made to either the EIMT or Arizona investors.

11              Callahan testified that he had no business relationship with attorney Jon Divens

12   other than in connection with this CMO transaction.  However, confronted with evidence that he

13   and Divens had used letterhead that was identical in every respect including the same Beverly

14   Hills address, Callahan attempted to explain that he had merely attempted to adopt the style of

15   Divens' letterhead and had accidently failed to remove the office address.  (Ex. 36.)  Similarly,

16   when asked why the Stone Crest documents reflected a Las Vegas, Nevada fax number even

17   

18      [24]  Notably this Arizona CMO transaction which closely mirrored the failed EIMT/Veritas
      CMO transaction that is the subject of these disgorgement proceedings was entered into by
19      Callahan and Tucker over a month after the transfer of funds from EIMT to Tucker and Callahan
      and when it was already apparent that "exit buyer" Stone Crest had not performed as anticipated.
20      

21      [25]  Callahan maintained that when he entered both the EIMT and Arizona transactions he
      believed them to be legitimate transactions that would be successfully completed.  Callahan also
22      testified that he believed the Arizona case would be settled shortly after the hearing in this matter
      with the investors being paid and the case against him being dismissed.

23      [26]  As noted above, Callahan's involvement in the fraudulent Arizona CMO transaction
      on February 8, 2009, took place over a month after he was aware of the fact that of the
24      Veritas/EIMT CMO transaction was not moving to conclusion as promised.  Others involved in
      fraudulent  Arizona CMO transactions, including HPHC, were also involved in securities-related
25      frauds and/or received funds from Tucker that originated with EIMT/Veritas as part of the instant
      failed transaction.  (Exs. 37-38.)  This evidence of involvement in similar failed schemes calls
26      the credibility of Callahan's claim of a lack of wrongful intent into question.

1  though it was purportedly a Georgia corporation, Callahan stated that he had not noticed the

2  discrepancy.  Nonetheless, Callahan continued to contend that he had earned his $125,000 fee in

3  the EIMT/Veritas transaction because the first step of that transaction, to which that fee payment

4  applied, closed as anticipated when the CMO's were deposited into the Stone Crest account at

5  CIG.

6                        THE ARGUMENTS OF THE PARTIES

7          The Receiver argues that from the evidence submitted it is obvious that this failed

8  CMO transaction was illegitimate and fraudulent from the outset.  As such, the $2 million

9  transferred to Callahan and Tucker in connection with the transaction was acquired in constructive

10  trust for the defrauded investors.  Counsel for the Receiver argues that under both federal and state

11  law that one who gains property wrongfully becomes an involuntary trustee of the property for the

12  benefit of those who would have otherwise had it.  (Memo. of P. & A. in Sup. of Mot. at 6) (citing

13  Pioneer Mining Co. v. Tyberg, 215 F. 501, 505-06 (9th Cir. 1914) and Cal. Civil Code § 2224).

14  Counsel for Receiver argues that Vasallo held the $2 million in investor funds in constructive trust

15  due to his own fraud and that when he transferred the funds to Callahan and Tucker those funds

16  remained in trust for EIMT investors.  Second, counsel argues that Callahan and Tucker obtained

17  the funds under false pretenses and anything purchased with those funds was in turn held in

18  constructive trust for the EIMT investors.  Finally, the Receiver argues that any claim by Callahan

19  that he is responsible only for the $125,000 commission that he received is unsupportable because

20  as one of multiple tortfeasors, he is jointly and severally liable for the full amount of damages

21  caused.  (Memo. of P. & A. in Sup. of Mot. at 8) (citing Rancho Niguel Association v. Ahmanson

22  Developments, Inc., 86 Cal. App. 4th 1135 (2001)).

23          In opposition to the Receiver's motion seeking disgorgement of $2 million,

24  Callahan argues that he received only $125,000 as a fee in connection with the EIMT/Veritas

25  CMO transaction, which he believed was a legitimate transaction.  Callahan contends that he, in

26  fact, earned that fee because the first step of the transaction closed and the $125,000 fee was to be

1   paid solely in connection with that aspect of the transaction.   Callahan also takes the position that

2   in referring this matter to the undersigned the assigned District Judge limited the evidentiary

3   hearing to a determination of: (1) whether a CMO was ever purchased by Tucker; (2) the extent of

4   his (Callahan's) involvement in the transaction; (3) whether he knew the statements he made to

5   EIMT representatives regarding the transaction were false and intended to defraud; and (4)

6   whether any disgorgement order directed against him should be limited to a return of the $125,000

7   he received due to his role as a mere facilitator of the transaction.  (See Order filed Dec. 11, 2009

8   (Doc. No. 202).)   In this regard, Callahan argues that the evidence is undisputed that the CMO's

9   were purchased by Tucker, that his (Callahan's) involvement in the transaction was limited to that

10  of being a facilitator between the parties and that there is no persuasive evidence that he knew his

11  statements to EIMT representatives were false in any way or that he acted with an intent to

12  defraud.  Callahan contends that he should not be held responsible for the actions of Tucker or

13  Stone Crest.  He concludes by arguing that to do so would be punishing him for continuing to try

14  in good faith to deal with the investors and the Receiver in an attempt to see the transaction

15  through to its intended conclusion after those responsible for its failure had bailed out.

16          In reply, the Receiver points out that Callahan is a California-licensed attorney who

17  cannot credibly explain the evidence which indicates that this was a fraudulent  transaction at the

18  outset.[27]  Counsel for the Receiver also argues that the evidence establishes that Callahan and

19  Tucker were working together on this transaction and that Callahan should be held jointly and

20  severally liable for the entire $2 million loss.  Counsel points out that as late as September of

21  2009, Callahan was representing that the CMO would be delivered shortly, thereby establishing

22

---

23          [27]  The legitimate questions posed by the Receiver include: (1) Why would Tucker sell a
    CMO he already owned to Veritas/EIMT for $2million so that Veritas/EIMT could
24  simultaneously sell it to Stone Crest  for $7 million; (2) Why would Tucker open a CIG account
    in Stone Crest's name as purported "Director" of Stone Crest if the transaction was legitimate;
25  and (3) Why would Tucker wire $200,000 to Jon Divens as Stone Crest's attorney when Stone
    Crest had not completed its end of the transaction and Veritas/EIMT had not received its $7
26  million as promised.

that he was integrally involved in the entire transaction and should be considered a joint tortfeasor along with Tucker.  Finally, counsel for the Receiver argues that if there were any doubt about Callahan's level of involvement in, and responsibility for, the loss of investors it is answered by the evidence of his involvement in the Arizona CMO transaction with the same parties (Tucker and Stone Crest) after this transaction had failed to perform as promised.

FINDINGS AND RECOMMENDATIONS

As noted above, in referring this matter to the undersigned, the assigned District Judge directed that through the evidentiary hearing it be determined whether:  (1) the CMO in question exists and, if so, whether it was legitimate;  (2) Callahan intentionally made false statements to Veritas/EIMT with respect to the multi-stage process of purchasing and re-selling the CMO thereby making him a joint tortfeasor who should be held jointly and severally liable for the entire $2 million lost by Veritas/EIMT; and (3) Callahan's role in the transaction was limited to that of a facilitator who merely introduced Veritas/EIMT and Tucker, thereby limiting his liability to the return of the $125,000 that he received as a commission or facilitator fee.  (Order filed Dec. 11, 2009 (Doc. 202) at 2, 6-7.)

As also noted above, however, since the date of the referral order documents were acquired by the Receiver pursuant to court order that resolve some disputed issues and alter the nature of the remaining inquiry.  Thus, documents produced by CIG and Bank of America establish the CMO's did exist, were held or purchased by Tucker at some point[28] and were themselves legitimate.  The Receiver no longer disputes these facts.  It would also appear that the

---

[28]  However, those documents also establish that while Tucker already held some $200 million in CMO's in his CIG accounts as of December 16, 2010, he used part of the money provided by Veritas/EIMT to purchase the bulk of the CMO's that he was supposed to be "selling" as part of the transaction.  (Exs. 15-16.)  Specifically, Tucker received the $1.875 million from Veritas/EIMT in exchange for the CMO's on December 31, 2008, but used $650,000 of that money to buy $1.3 billion in CMO's on January 2, 2009, bringing the total value of CMO's in his account to $1.5 billion. (Exs. 12, 14-16.)  In short, Tucker did not possess what he purported to sell to Veritas/EIMT but instead used the Veritas money to acquire the bulk of the asset that he was purportedly selling.

1  $1 billion in CMO's were eventually sold by Tucker on March 25, 2009, out of the Stone Crest

2  CIG account for $49,853.30, an enormous loss, following the collapse of the collateralized

3  mortgage market.  (Ex. 20.)

4              To the extent that Callahan has suggested in argument that his role in this

5  transaction was limited to that of a facilitator who merely introduced Veritas and Tucker, the

6  undersigned finds the argument unpersuasive.  The evidence introduced at the hearing established

7  that Callahan played a much more integral role in this fraudulent transaction.  Callahan testified

8  that Tucker told him that he had access to CMO's at below market rates.  Callahan was assessing

9  entities where those CMO's could be "placed" before the EIMT/Veritas investment began.

10  Callahan stated that it was he who selected Stone Crest after conducting what he claimed was due

11  diligence.  It was Callahan who conducted discussions with Jerry Garvin, acting in some capacity

12  on behalf of Veritas/EIMT, in relation to this CMO transaction.  Finally, the only written

13  memorialization of the preposterous-on-its-face Veritas/Tucker/Stone Crest transaction (by which

14  Veritas would pay $2 million for the CMO's and then sell them that same day to Stone Crest for

15  $7 million) was authored by Callahan.  (Ex. 1.)  Callahan was the only participant in the

16  transaction who had a relationship and was in communication with all the parties to it.  He was

17  not a mere facilitator even though he did not directly control the asset being exchanged, the $1

18  billion in CMO's.

19              That Callahan played a more integral role in the fraudulent transaction than that of

20  a mere facilitator does not necessarily answer the question of whether he should be held jointly

21  and severally liable for the entire $2 million loss suffered by EIMT investors.  The question of

22  whether Callahan intentionally made false statements to Veritas/EIMT with respect to the

23  transaction at the outset is a somewhat difficult one to answer.  It would seem to the undersigned

24  that any reasonably intelligent person would have serious doubts about the legitimacy of the CMO

25  transaction in question, whereby Veritas/EIMT would profit to the tune of approximately $5

26  million over the course of twenty-four hours.  The Receiver legitimately questions who could

1   possibly believe such a thing and, if it was legitimate, why would either Tucker or Stone Crest

2   engage in such a transaction foregoing such a windfall on their own behalf?[29]   Callahan,

3   nonetheless, adamantly professes to believe in the legitimacy of these transactions and other like

4   them - and not entirely unconvincingly so as far as the court is concerned.   It may be that Callahan

5   has convinced himself that the tooth fairy is real, despite what others think.   Why else would

6   Callahan fly to Atlanta to meet with Ricardo Lewis of Stone Crest or in January of 2009 continue

7   to assure the parties that the CMO's would be delivered as soon as Veritas supplied the proper

8   "coordinates" and the "free delivery" problem was solved.   Was it because regardless of whether

9   the entire EIMT/Veritas transaction was completed, Callahan received his $125,000 as soon as

10  Veritas "purchased" the CMO's from Tucker and that the transaction from Callahan's perspective

11  was a risk free, win-win proposition?   In the end, however, the undersigned is struck by one thing

12  established by the evidence.   Even if he was a "true-believer," how could Callahan profess

13  ignorance as he entered the CMO transaction in Arizona with Tucker and Stone Crest after he had

14  seen Stone Crest's failure to perform with EIMT/Veritas and how could he continue to reassure

15  EIMT/Veritas and its successors after February of 2009 that their CMO transaction would be

16  completed?

17              With respect to the joint and several liability of joint-tortfeasors, one California

18  court has explained as follows:

19              Under the law, a tortfeasor generally is liable for all damages
             proximately caused by his tortious conduct.  (See Civ. Code, §
20           1714.)  Where multiple tortfeasors are responsible for an indivisible
             injury suffered by the plaintiff, each tortfeasor is jointly and
21           severally liable to the plaintiff for those damages and thus may be
             held individually liable to the injured plaintiff for the entirety of
22           such damages.  (American Motorcycle Assn. v. Superior Court
             (1978) 20 Cal.3d 578, 582, 586-587, 590 [146 Cal. Rptr. 182, 578

23

24        [29]   Of course, the answer in part is they would not.  Tucker didn't own all the CMO's that
       he purportedly sold to Veritas/EIMT.  He apparently needed the Veritas money to purchase them
25     in the first place while pocketing any money left over.  Stone Crest, on the other hand, simply
       never paid anyone either in this transaction or in the subsequent CMO transaction in Arizona
26     where they were offered as the "exit buyer."

1  P.2d 899] (American Motorcycle); DaFonte v. Up-Right, Inc.
2  (1992) 2 Cal.4th 593, 600 [7 Cal. Rptr.2d 238, 828 P.2d 140];
   Wimberly v. Derby Cycle Corp. (1997) 56 Cal. App.4th 618, 633
3  [65 Cal. Rptr.2d 532].)  Thus, the joint and several liability doctrine
   ensures that the injured party receives adequate compensation for its
   injuries, even if one or more of the responsible parties do not have
4  the financial resources to pay for their share of the liability.
   (American Motorcycle, at pp. 588, 590.)  Under such circumstances,
5  "fairness dictates that the 'wronged party should not be deprived of
   his right to redress,' but that '[t]he wrongdoers should be left to
6  work out between themselves any apportionment.'" (Id. at p. 590,
   quoting Summers v. Tice (1948) 33 Cal.2d 80, 88 [199 P.2d 1, 5
7  A.L.R.2d 91].)

8  Expressions at Rancho Niguel Ass'n v. Ahmanson Developments, Inc., 86 Cal. App.4th 1135,

9  1139 (2001).  See also Greystone Homes, Inc. v. Midtec, Inc., 168 Cal. App. 4th 1194, 1208

10  (2008): Dominick's Finer Foods v. National Construction Services, Inc., No. CV 10-00836-SVW

11  (PWJx), 2010 WL 891321, at *5 (C.D. Cal. Mar. 9, 2010).  Joint tortfeasors may act in concert or

12  independently of one another and may include joint , concurrent and successive tortfeasors so long

13  as their negligence concur to produce the sum total of injuries to the plaintiff.  Gackstetter v.

14  Frawley, 135 Cal. App.4th 1257, 1271-72  (2006).

15  Closely related to the applicability of joint and several liability in this context, is

16  legal doctrine of civil conspiracy which

17  "imposes liability on persons who, although not actually committing
   a tort themselves, share with the immediate tortfeasors a common
18  plan or design in its perpetration. [Citation]  By participation in a
   civil conspiracy, a co-conspirator effectively adopts as his or her
19  own the torts of the other conspirators within the ambit of the
   conspiracy. [Citation]  In this way, a coconspirator incurs tort
20  liability co-equal with the immediate tortfeasors." (Applied
   Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7 Cal.4th 503,
21  510-511, 28 Cal. Rptr.2d 475, 869 P.2d 454 (Applied Equipment
   Corp.).)
22
   The act done and resulting damage to the plaintiff, not the
23  conspiracy to act, is the essence of civil conspiracy. ( Applied
   Equipment Corp., supra, 7 Cal.4th at p. 511, 28 Cal. Rptr.2d 475,
24  869 P.2d 454.)  The elements of an action for civil conspiracy are
   (1) formation and operation of the conspiracy, and (2) damage to
25  plaintiff resulting from an act or acts done in furtherance of the
   common design.  The existence of a civil conspiracy makes each
26  participant in the wrongful act responsible as a joint tortfeasor for

> all damages resulting from the wrong, whether or not a participant was a direct actor and regardless of the degree of his activity.  (*Ibid.*)

<u>Klistoff v. Superior Court</u>, 157 Cal. App.4th 469, 479 (2007).  <u>See also</u> <u>Green Wood Industrial Company v. Forceman International Development Group, Inc.</u>, 156 Cal. App. 4th 766, 771 (2007) (Thus, "'the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor <u>for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of activity.</u>'") (emphasis in original) (quoting <u>Applied Equipment Corp. v. Litton Saudi Arabia, Ltd.</u>, 7 Cal. 4th 503, 511 (1994)).

      Here, the evidence before the court establishes that Tucker, through Callahan, engaged in clear fraud and deception with respect to the "too good to be true" CMO transaction at issue.  For instance, rather than selling the $1 billion in CMO's to EIMT/Veritas as represented (Ex. 1), Tucker used those funds to acquire that vast majority of the CMO's in question.  It was also concealed from EIMT that Tucker was on the Board of the undisclosed exit buyer (Stone Crest) and would himself have the ability to control and transfer the CMO's through each phase of the transaction.  Finally, it was not disclosed until well after the fact that Tucker had chosen to "move" for safe-keeping the CMO's and eventually sell them at a tremendous loss.  It is also clear from the evidence presented that Callahan worked closely with Tucker in connection with this transaction.  Again, by his own admission it was Callahan who located and approved of the failed "exit buyer" Stone Crest.  It is difficult to accept Callahan's protestations that he believed everything he was told by Tucker and was also convinced of Stone Crest bona fides.  If true, then Callahan was completely blind to several obvious issues of concern surrounding both Tucker and Stone Crest.  However, even if Callahan were to be believed with respect to his initial involvement in the transaction, his subsequent actions belie any claim that he was an innocent dupe.

/////

1      In this regard, the undersigned again notes that by early January of 2009, Callahan

2  was well-aware of serious problems with the EIMT/Veritas CMO transaction he had arranged.

3  Nonetheless, on February 8, 2009, Callahan entered an almost identical transaction in Arizona.

4  (Ex. 34.)  At the very latest, by May of 2009, Callahan was well-aware that the Arizona

5  transaction had failed to perform as promised as well.  (Id.)  Indeed, by June of 2009 he and his

6  wife, as well as Tucker, had been sued in Arizona as a result of the failure of that CMO

7  transaction, which Callahan had guaranteed.  (Id.)  Nonetheless, From March through November

8  of 2009, Callahan continued to represent to investors, the Receiver and the Receiver's attorneys

9  that the CMO's purchased by EIMT/Veritas, or the $2 million invested therein, would be returned.

10  (Exs. 21, 22, 26, 27, 29 & 30.)  These lulling misrepresentations had no basis in reality and, given

11  his knowledge by that time of both failed CMO transactions, are incapable of innocent

12  explanation.  Callahan's continued false promises establish, by a preponderance of the evidence[30],

13  his knowing involvement in this scheme thereby subjecting him to joint and several liability for

14  the entire $2 million loss suffered. [31]

15      However, the undersigned rejects the Receiver's argument that such liability be

16  imposed on a constructive trust theory.  A constructive trust is an involuntary trust created by

17  operation of law.  California Civil Code § 2217; Calistoga Civic Club v. City of Calistoga, 143

18  Cal App. 3d 111, 116 (1983).  In this regard, California Civil Code § 2224 provides as follows:

19        One who gains a thing by fraud, accident, mistake, undue influence,
20        the violation of a trust, or other wrongful act, is, unless he has some

---

[30]  In California, the default standard of proof in civil cases is the preponderance of the evidence standard.  California Evidence Code § 115; Conservatorship of Wendland, 26 Cal. 4th 519, 546 (2001); People ex rel. Monterey Mushrooms Inc. v. Thompson, 136 Cal. App. 4th 24, 37 (2006) (applying that standard to joint and several liability determination), cert. denied 549 U.S. 1178 (2007).

[31]  The adoption of this recommendation would not preclude a finding that Stone Crest Contractors is likewise jointly and severally liable for the entire loss, should it be determined that it is a viable entity with assets.  Moreover, this recommendation would not preclude an order of disgorgement directed at Attorney Jon Divens for the $200,000 in EIMT/Veritas funds he received in connection with this scheme.

1             other and better right thereto, an involuntary trustee of the thing
            gained, for the benefit of the person who would otherwise have had

2             it.

3 In order to create a constructive trust as defined in § 2224, three conditions must be satisfied: the

4 existence of a res (property or some interest in the property); the plaintiff's right to that res; and

5 the defendant's acquisition of the res by some wrongful act.  Calistoga Civic Club, 143 Cal App.

6 3d at 116 (citing Kraus v. Willow Park Public Golf Course, 73 Cal. App.3d 354, 373 (1977);

7 Cramer v. Biddison , 257 Cal. App.2d 720, 724 (1968)).[32]  It is with respect to this first required

8 condition that the Receiver has failed to meet his burden.

9             A constructive trust requires "money or property identified as
            belonging in good conscience to the plaintiff [which can] clearly be

10             traced to particular funds or property in the defendant's possession.
            Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1150

11             (2003) (quoting Great-West Life & Annuity Ins. Co. v. Knudson,
            534 U.S. 204, 213 (2002)).  A constructive trust is available where

12             the specific res or funds can be identified and attached, "but not
            where the plaintiff seeks to impose general personal liability as a

13             remedy for the defendant's monetary obligations." Honolulu Joint
            Apprenticeship and Training Committee of United Ass'n Local

14             Union No. 675 v. Foster, 332 F.3d 1234, 1238 (9th Cir. 2003).

15 Flores v. Emerich & Fike, No. 1:05-CV-0291 AWI DLB, 2008 WL 2489900, at *40 (E.D. Cal.

16 June 18, 2008) (parallel citations omitted).  Where, as here, the property sought to be recovered

17 has been dissipated, the plaintiff cannot enforce a constructive trust and the claim is one like that

18 of a general creditor.  (Id.) (citing Great-West Life & Annuity Ins. Co., 534 U.S. at 213-14).   The

19 evidence presented at the hearing on this matter establishes that most, if not all, of the CMO's in

20 question were liquidated by Tucker in March 2009 at a huge loss.  The $2 million paid by

21 EIMT/Veritas has been dissipated.  Certainly no evidence was presented to this court that even the

22 portion of those funds distributed directly to Callahan or Tucker still exist.  Accordingly, the

23 _____

24     [32]  The wrongful act giving rise to a constructive trust need not amount to fraud or
intentional misrepresentation.  Rather, all that must be shown is that the acquisition of the

25 property was wrongful and that the keeping of the property by the defendant would constitute
unjust enrichment.  Calistoga Civic Club, 143 Cal App. 3d at 116 (citing Estrada v. Garcia, 132

26 Cal. App.2d 545, 552  (1955); see also Edwards-Town, Inc. v. Dimin, 9 Cal. App.3d 87, 94
(1970)).

1   remedy of constructive trust is not available to the Receiver.

2                                 CONCLUSION

3          For the reasons set forth above, IT IS HEREBY RECOMMENDED that the court

4   find Michael Callahan jointly and severally liable for the $2 million lost by EIMT/Veritas

5   investors in the failed CMO investment and order him to disgorge up to that amount to the

6   Receiver until such time as the EIMT investors are made whole in connection with this

7   investment.[33]

8          These findings and recommendations are submitted to the United States District

9   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

10  one days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within fourteen days after service of the objections.  Failure to file

14  objections within the specified time may waive the right to appeal the District Court's order.

15  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

16  1991).

17  DATED: July 20, 2010.

18

19                                          _____

20  DAD:                                    DALE A. DROZD
    Ddad1\orders.civil\SEC0665.oah330       UNITED STATES MAGISTRATE JUDGE

21

22          [33]  As noted at the outset, the referral of this action to the undersigned initially included
    the conducting of an evidentiary hearing on the Receiver's motion for disgorgement of funds
    from Arcanum Equity Fund, Vestium Equity Fund and Vestium Management Group, LLC.
23  (Doc. No. 203.)  On April 9, 2010, the court approved the parties' stipulation to drop that
    evidentiary hearing from calendar in light of the bankruptcy filings by  Arcanum Equity Fund ,
24  LLC, Vestium Equity Fund, LLC, and Vestium Management Group, LLC.  (Doc. No. 249.)  On
    June 7, 2010, the assigned district judge granted the motion of counsel on behalf of Arcanum
25  Equity Fund , LLC, Vestium Equity Fund, LLC, to be relieved as counsel of record.  (Doc. No.
    300.)  These findings and recommendations do not address the motion for disgorgement directed
26  at those entities.  In effect, that aspect of the referral has been withdrawn.