FUTTERMAN DUPREE DODD CROLEY MAIER LLP
JAMIE L. DUPREE (158105)
JAIME G. TOUCHSTONE (233187)
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
jdupree@fddcm.com
jtouchstone@fddcm.com

Attorneys for Receiver
Stephen E. Anderson

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    *Plaintiff*<br><br>v.<br><br>ANTHONY VASSALLO, et al,<br><br>    *Defendants*. | Case No. CV 09-000665 LKK-DAD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RECEIVER'S MOTION TO ORDER DISGORGEMENT OF $2,500,000 TRANSFERRED TO J.R. TRUST, GLOBAL MERGERS & ACQUISITIONS, INC., WILLIAM A. HAYWARD, RAAR INVESTMENTS, LTD., JACK MILLER AND RICHARD J. SCHOTTS, JR.**<br><br>Date:     August 29, 2011<br>Time:     10:00 a.m.<br>Location: Courtroom 4, 15th Floor<br>Judge:    Hon. Lawrence K. Karlton |

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    A.    EIMT's Fraudulent Scheme ...................................................................................2

    B.    The Securities and Exchange Commission Files Suit against EIMT, Vassallo and Kenneth Kenitzer and the Court Appoints Receiver ........................3

    C.    Receiver's Efforts to Trace and Recover $2.5 Million of EIMT Investor Funds Transferred to J.R. Trust .............................................................................4

        1.    Vassallo enters into a sham "prime bank securities" transaction on behalf of EIMT ...........................................................................................4

        2.    EIMT investor money is transferred to Respondents ..................................6

        3.    Respondents spend EIMT investor money ..................................................7

            a.    Schotts transfers significant funds to SGM-Foreign Exchange Limited .....................................................................................7

            b.    RAAR receives EIMT funds ............................................................7

            c.    Miller receives EIMT funds .............................................................8

            d.    J.R. Trust transfers the remaining EIMT funds ..............................9

        4.    Receiver attempts to recover the $2.5 million ..............................................9

ARGUMENT .........................................................................................................................10

    A.    The $2.5 Million Transferred to J.R. Trust Was Acquired in Constructive Trust for the Defrauded Investors .......................................................................10

    B.    Several Other Legal Theories Also Support A Return Of $2.5 Million To The Defrauded Investors .....................................................................................12

    C.    The Joint Tortfeasors Should Be Held Jointly And Severally Liable For The $2.5 Million ...................................................................................................13

    D.    The Remaining Respondents Should Be Ordered To Disgorge The EIMT Funds They Received ..........................................................................................14

CONCLUSION ......................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Burlesci v. Peterson*,
   68 Cal.App.4th 1062 (1998) ............................................................................................... 11

*Calistoga Civic Club v. Calistoga*,
   143 Cal.App.3d 111 (1983) ................................................................................................ 11

*Crosby v. Clark*,
   132 Cal. 1 (1901) ................................................................................................................ 10

*Elliott v. Elliott*,
   231 Cal.App.2d 205 (1964) ................................................................................................ 11

*Expressions at Rancho Niquel Association v. Ahmanson Developments, Inc.*,
   86 Cal.App.4th 1135 (2001) ............................................................................................... 13

*Heckmann v. Ahmanson*,
   168 Cal.App.3d 119 (1985) ................................................................................................ 11

*Pioneer Mining Co. v. Tyberg*,
   215 F. 501 (9th Cir. 1914) ............................................................................................ 10, 11

**Statutes**

Cal. Civ. Code § 2224 .................................................................................................................. 10

Fed. R. of Evid., Rule 201 .............................................................................................................. 4

**Other Authorities**

4 Witkin, California Procedure, *Pleading* § 515 (2008) .............................................................. 12

4 Witkin, California Procedure, *Pleading* § 561 (2008) .............................................................. 13

5 Witkin, California Procedure, *Pleading* § 702 (2008) .............................................................. 12

5 Witkin, California Procedure, *Pleading* § 710 (2008) .............................................................. 12

John Reed Stark & N. Blair Vietmeyer, *The SEC and Prime Bank Securities Frauds: Past, Present and Future*, 31 Sec. Reg. L. Journal 4, 7 and n. 8 (Spring 2003) ............... 4, 6, 11

# INTRODUCTION

Pursuant to orders dated April 30, 2009 and July 31, 2009, the Court appointed Stephen E. Anderson ("Receiver") as Receiver over Defendant Equity Investment Management and Trading, Inc. ("EIMT"). The Court empowered Receiver to "[t]ake all steps the receiver deems necessary to secure and protect the assets and property of EIMT...." Order Appointing Temporary Receiver for Equity Investment Management and Trading, Inc. and Order to Show Cause for Appointment of Permanent Receiver dated April 30, 2009 ("OAR"), ¶ III B.

In the course of his investigation into EIMT, Receiver learned of a $2,500,000 transfer by EIMT to respondent J.R. Trust, allegedly in connection with a prime bank securities transaction. After reviewing the limited universe of EIMT records and various bank account statements, it became clear to Receiver that this "transaction" was yet another instance of defendant Anthony Vassallo ("Vassallo") getting conned into "investing" a large sum of EIMT investor money in a fraudulent transaction promising exorbitant returns.[1] While Receiver has not been able to uncover every detail of the fraud, he has determined that respondents William A. Hayward ("Hayward") on behalf of Global Mergers & Acquisitions, Inc. ("Global Mergers") and Richard J. Schotts, Jr. ("Schotts") on behalf of J.R. Trust (collectively, "Joint Tortfeasors"), convinced Vassallo to transfer $2.5 million to J.R. Trust for "depository/custodial fees" required for trading in and sharing profits derived from a "Private Placement Trade Program." Of course, like so many of Vassallo's other "deals," this one was convoluted and made no financial sense. Additionally, Receiver's investigation did not reveal trading account statements, records or any other indication that this was a legitimate "investment." Instead of entering a "Trade Program" and/or trading securities with EIMT's money, J.R. Trust and/or Schotts quickly spent or transferred the funds to respondents RAAR Investments, Ltd. ("RAAR"), Jack Miller ("Miller") and others who were not entitled to receive money from EIMT. Consequentially, EIMT did not receive any financial benefit from J.R. Trust in exchange for its $2.5 million.

---

[1] It's possible that Vassallo was a participant in the fraud, but Receiver has no evidence that Vassallo received any benefit from it.

Pursuant to the Court's August 20, 2009 Order permitting summary proceedings, Receiver now brings this motion requesting an order requiring the Joint Tortfeasors – jointly and severally – to disgorge the $2,500,000 transferred to them, anything purchased with that $2,500,000, any profits therefrom, and to render an accounting. Receiver also requests that RAAR and Miller be required to disgorge the portion of the $2.5 million that they received from J.R. Trust.

## STATEMENT OF FACTS

Since his appointment, Receiver has investigated the activities of EIMT and has attempted to identify and recover assets purchased using EIMT investor funds. Declaration of Stephen E. Anderson in Support of Receiver's Motion to Order Disgorgement of $2.5 Million Transferred to J.R. Trust ("Anderson Decl."), filed herewith, ¶ 2. Receiver has reviewed EIMT documents and records, interviewed many investors and other witnesses, and met with government enforcement agencies, including Plaintiff Securities and Exchange Commission, the Federal Bureau of Investigation, the United States Attorney's Office and the Internal Revenue Service on numerous occasions. *Id.* Receiver has also reviewed documents provided by those government enforcement agencies concerning the activities of EIMT. *Id.*

### A.  EIMT's Fraudulent Scheme

The head of EIMT was Vassallo. Anderson Decl. ¶ 3. EIMT solicited investors for a "hedge fund" program. *Id.* Vassallo told potential investors that he had created a computer software program that could predict movements in leading stock market indexes, such as the Russell 2000 (an index based on the 2000 leading public-traded companies). *Id.*; Declaration of Ethan Conrad filed on March 11, 2009 as Docket No. 8 ("Conrad Decl.")[2] ¶ 12. Based on the software's predictions, Vassallo reported that EIMT could buy and sell stock options and make approximately 3.5% a month on the money invested. Anderson Decl. ¶ 3; Conrad Decl. ¶ 2. Vassallo informed investors that EIMT conducted its trading activity through the TradeStation Securities, Inc. ("TradeStation") brokerage. Anderson Decl. ¶ 3; Conrad Decl. ¶ 2.

---

[2] The Declaration of Ethan Conrad is attached as Exhibit 21 to the Declaration of Jaime G. Touchstone and Request for Judicial Notice in Support of Receiver's Motion to Order Disgorgement from J.R. Trust ("Touchstone Decl.").

EIMT investors were grouped into blocks and identified as EIMT "subfunds" or, more recently, "funds." Anderson Decl. ¶ 4. There were between 22 to 26 funds depending on how they were categorized and the size of each fund varied from a few investors to up to 50 investors. *Id.* Each fund had a name, such as "Veritas" or "Matrix Investment Group." *Id.* EIMT received monies from the funds and transferred monies to the subfunds. *Id.*

Receiver's investigation has revealed that in the early years of EIMT, Vassallo made actual investments and trades through various trading accounts with various trading facilities. Anderson Decl. ¶ 5. By mid-2007, however, Vassallo had almost completely stopped trading in securities although he reported "returns" and "profits" to EIMT investors. *Id.*; Declaration of Mark Siska filed on March 11, 2009 as Docket No. 7 ("Siska Decl.")[3] ¶¶ 2-4. In mid-2007, Vassallo started "investing" in more exotic investments than available through brokerage houses. Anderson Decl. ¶ 5. In some instances, Vassallo showed investors "screen shots" purporting to represent investment balances at TradeStation. Conrad Decl. ¶ 12; Mark Siska Decl. ¶¶ 2-4. The reported "returns" and "profits" were entirely fictional and Vassallo has not had an active trading account at TradeStation since 2007. Siska Decl. ¶ 3; Anderson Decl. ¶ 5. EIMT was operated as a Ponzi-scheme, that is monies from one investor were used to pay false "returns" to other investors to lull them into keeping their money with EIMT or to induce other investors to place funds with EIMT. Anderson Decl. ¶ 5.

By late 2008, EIMT's fraudulent scheme began unraveling. In late December 2008, Vassallo met with certain EIMT investors, including Ethan Conrad. Conrad Decl. ¶ 12. At that meeting, Vassallo admitted he did not have an active trading account with TradeStation, that he had been fabricating TradeStation reports for some time, and that the TradeStation reports he had shown investors depicted "simulated," as opposed to actual trading on behalf of EIMT. *Id.*

**B.   The Securities and Exchange Commission Files Suit against EIMT, Vassallo and Kenneth Kenitzer and the Court Appoints Receiver**

On March 11, 2009, the Securities and Exchange Commission (the "SEC") filed suit against Vassallo, Kenneth Kenitzer ("Kenitzer") and EIMT and sought a restraining order. In its

---

[3] The Declaration of Mark Siska is attached as Exhibit 20 to the Touchstone Declaration.

papers, the SEC outlined in some considerable detail the fraudulent activities of Vassallo, Kenitzer and EIMT. The Court ultimately entered preliminary injunctions against all defendants, and upon the motion of the SEC, appointed Receiver on April 30, 2009 with the duties set forth in the OAR.[4]

**C.   Receiver's Efforts to Trace and Recover $2.5 Million of EIMT Investor Funds Transferred to J.R. Trust**

Pursuant to the OAR, Receiver has attempted to identify assets purchased with EIMT investor funds in an effort to recover those assets for the defrauded investors. Anderson Decl. ¶ 6. During the course of his investigation, Receiver determined that $2,500,000 of investor money was transferred to J.R. Trust in August 2008, a few months preceding the unraveling of Vassallo's fraudulent scheme, under the guise of a "prime bank securities" transaction. *Id.*

**1.   Vassallo enters into a sham "prime bank securities" transaction on behalf of EIMT**

The Securities and Exchange Commission defines "prime bank securities fraud" as involving "the promotion and sale of bogus financial instruments purported to derive their value from European secondary markets for stand-by letters of credit, a wholly fictional concoction. Though letters of credit are well established financial instruments, it is impossible to trade in bank guarantees detached from the underlying obligation of one party to another. Consequently, and by the very nature of letters of credit, there exists no option or prospect of any such 'secondary' market." John Reed Stark & N. Blair Vietmeyer, *The SEC and Prime Bank Securities Frauds: Past, Present and Future*, 31 Sec. Reg. L. Journal 4, 7 and n. 8 (Spring 2003). As described in detail below, a closer review of the evidence recovered by Receiver during the course of his investigation reveals that like so many of Vassallo's other "exotic" investments, the J.R. Trust "investment" also turned out to be a form of prime bank securities fraud. See generally Anderson Decl. The details are somewhat unclear due to Receiver's lack of information, however Receiver has determined that together, Hayward on behalf of Global Mergers and Schotts on behalf of J.R.

---

[4] These facts are contained in the Court's files and records in this matter, judicial notice of which is requested pursuant to the Federal Rules of Evidence, Rule 201.

Trust, sold Vassallo on a "securities deal" through which EIMT was supposed to "share in the distribution of trade profits derived from a Private Placement Trade Program," participation in which was allegedly secured by "a line of credit drawn against a Medium Term Note" valued at $500 million. *Id.* ¶ 7 and Exhibits 1, 2. This Medium Term Note was supposed to be assigned by the Floris Bank to a Danish man named Dr. Hans Tranholm of the "Legal and Political Science Consultance" based in Latvia who would then initiate the "Trade Program."[5] This deal sounds convoluted and far-fetched because it was fraudulent. The technical financial information and language, the exclusive trading platform and the "prestigious" European banks and facilitators were simply a smoke and mirrors act through which Hayward and Schotts swindled Vassallo, and subsequently the EIMT investors, out of $2.5 million.[6] See generally Anderson Decl.

Receiver recovered a "Transaction Agreement" between EIMT and Global Mergers, dated August 11, 2008, signed by Vassallo on one hand, and Hayward (as Chief Executive Officer) on the other. Anderson Decl. ¶ 7 and Exhibit 1. Receiver also recovered a "Fiduciary Agreement," dated July 18, 2008, naming J.R. Trust as a fiduciary over the $2.5 million transferred to it by EIMT (collectively "the Agreements"). *Id.* ¶ 7 and Exhibit 2. Schotts signed the Fiduciary Agreement as the First Trustee for J.R. Trust. *Id.* The terms of the Agreements required EIMT to wire $2.5 million to Wells Fargo Bank Account Number XXXXX2269 ("J.R. Trust Account") for the benefit of J.R. Trust. *Id.* ¶ 8 and Exhibits 1 and 2. J.R. Trust was to hold the funds "in the account in trust" and then forward the funds to Floris Bank to be used for "depository/custodial fees." *Id.* The Agreements detail the same Taxpayer Identification Number, Wells Fargo Bank account number, Wells Fargo Wire Routing Transit Number, "Mailing Address," and "Trust

---

[5] Schotts provided Receiver with documents and information implying that the alleged Dr. Tranholm was the European based facilitator for the entire transaction and that the assignment of the Medium Term Note from Floris Bank never materialized. *Anderson Dec.* ¶ 17 and Exhibits 16-18. Notably, Receiver's investigation has revealed that the Floris Bank operates out of the United Kingdom and is listed on the U.K. Financial Services Authority's list of unauthorized internet banks. Touchstone Decl. ¶ 4 and Exhibit 22; Anderson Decl. ¶ 8. In 2009, Floris Bank was involved in a fake bond investigation by the Italian finance police. *Id.* ¶ 5 and Exhibit 23; Anderson Decl. ¶ 8.

[6] In fact, many of the documents describing the transaction provided to Receiver by Schotts contained language eerily reminiscent of "financial" buzz words ("exit buyer", "Spread" and "Plus") used by Michael Callahan and Matthew Tucker, the orchestrators and joint tortfeasors of the failed and proven fraudulent CMO transaction that was before this Court last year. Anderson Decl. ¶ 18.

1  Address" for J.R. Trust.[7] Id.¶ 9 and Exhibits 1 and 2. Both Agreements also describe the same
2  "Medium Term Note"[8] and list the highly suspect Floris Bank as the ultimate "safekeeping"
3  financial institution for EIMT's $2.5 million. Id.
4      Receiver's investigation did not reveal trading account statements, records or any other
5  indication that the Agreements are evidence of a legitimate investment. Anderson Decl. ¶ 18.
6  More important, EIMT did not receive any benefit for its $2.5 million investment. Id. In fact, the
7  entire transaction, when viewed as a whole appears to constitute prime bank securities fraud.
8  Hayward and Schotts promoted and purported to sell the ability to garner profits from a "Private
9  Placement Trade Program" secured by a financial instrument with a value of $500 million Euro,
10  administered by various European financial institutions. See John Reed Stark & N. Blair
11  Vietmeyer, *The SEC and Prime Bank Securities Frauds: Past, Present and Future*, 31 Sec. Reg.
12  L. Journal 4, 7 and n. 8 (Spring 2003). As described below, as soon as Vassallo transferred the
13  money from EIMT's bank account to J.R. Trust, it was immediately dispersed by J.R. Trust and
14  the Respondents who transferred or spent the entire amount within two months.

15  **2.  EIMT investor money is transferred to Respondents**

16      On August 12, 2008, just one day after executing the Transaction Agreement, Vassallo
17  wired $2.5 million from EIMT's Wells Fargo Bank account number XXXXXX6681 to the J.R.
18  Trust Account. Anderson Decl. ¶ 10 and Exhibit 3. The Trustees of the J.R. Trust Account are
19  Schotts, Andrea R. Schotts, Ryan A. Schotts and Aram J. Schotts. Id. ¶ 10 and Exhibit 4. The
20  balance of the J.R. Trust Account just prior to the $2.5 million deposit was $49.37. Id. ¶ 10 and
21  Exhibit 5. By October 27, 2008, the EIMT funds were gone from the J.R. Trust Account and the
22  account balance was $216.15. Id. ¶ 10 and Exhibit 7. In short, the vast majority of the EIMT
23  funds deposited in the J.R. Trust Account on August 12, 2008, was transferred out of that account

---

[7] The Agreements reflect that J.R. Trust has mailing addresses located in Redondo Beach, California and Las Vegas, Nevada. Based on his investigation, Receiver also believes that J.R. Trust operates out of and/or has a bank account located in Nassau, Bahamas. Anderson Decl. ¶ 9.

[8] The "Medium Term Note" is described in both Agreements as follows:
    Interest Coupon 3,125% BAYERISCHE LBK GZ06-2009
    Common Code: 0000244300811SIN
    Code: XS0244300819
    Face Value: EURO $500,000,000.00 (Five Hundred Million)
    Data System: Clearstream Screen
Anderson Decl.¶ 9 and Exhibits 1 and 2.

within two months of its deposit and during the time period in question, the account appears to have been used only for the receipt and disbursement of funds received from EIMT. *Id*, ¶ 10 and Exhibits 5-7.

### 3. Respondents spend EIMT investor money

Upon a review of pertinent bank records, it appears that the $2.5 million transferred to J.R. Trust was dispersed among four main recipients: an unidentified SGM-Foreign Exchange Limited account; RAAR; Miller; and Michael Bradshaw ("Bradshaw"). Anderson Decl.¶10.

#### a. Schotts transfers significant funds to SGM-Foreign Exchange Limited

In August 2008, at Schotts' direction, J.R. Trust transferred $1,879,000.00 to an SGM-Foreign Exchange Limited account in the United Kingdom via HSBC Bank. Anderson Decl. ¶ 11 and Exhibit 9. Receiver has been unable to determine the signatories on and/or ultimate purpose of this account. *Id.* Furthermore, Receiver has not recovered any trading statements or promissory notes that would indicate that this money was transferred to SGM-Foreign Exchange for the purpose of initiating legitimate trading activity. *Id.* As previously stated, Receiver's investigation revealed that no Medium Term Note was ever "reserved" and trading as part of a "Private Placement Trade Program" was never initiated. *Id.*¶ 18.

#### b. RAAR receives EIMT funds

During the two month period following EIMT's transfer of the $2.5 million to J.R. Trust, RAAR received at least $228,387.50 of EIMT money. Anderson Decl. ¶ 12 and Exhibit 11. RAAR is a Nevada entity with revoked corporate status, for which Miller, Schotts and Michael Bradshaw ("Bradshaw") are listed as managers and/or managing members. Touchstone Decl.¶ 6 and Exhibit 24. The address listed for each manager and/or managing member is J.R. Trust's address – 1117 Desert Lane, Suite 515, Las Vegas, Nevada 89102. *Id.* RAAR's Wells Fargo Bank account number XXXXXX1611 ("RAAR Commercial Checking Account") was opened on September 3, 2008, and lists Schotts and Miller as signatories with a "Statement Mailing Address" of P.O. Box 3476, Redondo Beach, California 90277 – the same address as the "Mailing Address" for J.R. Trust detailed on both the Transaction and Fiduciary Agreements. Anderson Decl. ¶ 12 and Exhibit 10.

Specifically, during September 2008, following the opening of the RAAR Commercial Checking Account, $105,000 was deposited into the account from the J.R. Trust Account. Anderson Decl. ¶ 12 and Exhibit 11. In October 2008, another $210,000 was deposited into the RAAR Commercial Checking Account via a check written from the J.R. Trust Account. *Id.* On October 6, 2008, RAAR transferred $117,000 of those funds back to J.R. Trust. From October 2008 through the closing of the account in January 2010, only nominal amounts were deposited. At the time the RAAR Commercial Checking Account was closed, it had a negative balance of $37.71. *Id.*

RAAR's Wells Fargo Bank account number XXXXXX9438 ("RAAR Low Activity Checking Account") lists Schotts as its signatory with an address of 503 S. Gertruda Avenue, Redondo Beach, California 90277 – the same address listed at the bottom of the Fiduciary Agreement. Anderson Decl. ¶ 13 and Exhibit 12. On August 25, 2008, the RAAR Low Activity Checking Account had a negative balance of $6.72. *Id.* ¶ 13 and Exhibit 13. On September 26, 2008, $27,000 was deposited into the Account via a check written from the J.R. Trust Account. *Id.* ¶ 13. On October 7, 2008, a check in the amount of $27,000 was paid from the RAAR Low Activity Checking Account to J.R. Trust. The RAAR Low Activity Checking Account had a balance of $27.28 on October 24, 2008 and was closed on November 17, 2008. *Id.* ¶ 13 and Exhibit 13. Receiver has been unable to discern any legitimate reason for the transfer the transfer and subsequent return of EIMT funds to RAAR. *Id.*

### c.  Miller receives EIMT funds

Miller is listed along with Schotts and Bradshaw as a manager and/or managing member of RAAR. Touchstone Decl. ¶ 6 and Exhibit 24. He is also listed as a signatory on the RAAR Commercial Checking Account. Miller's Wells Fargo Money Market Savings Account Number XXX-XXX9327 ("Miller Account") reflects at least seven transfers from the J.R. Trust Account and the RAAR Commercial Checking Account amounting to deposits of at least $167,317.01 of EIMT investor funds during the time period of August 12, 2008 to October 27, 2008. Anderson Decl. ¶ 14 and Exhibits 14 and 15. Upon a review of the Miller Account statements, it appears that the account was used as Miller and his wife Susan's primary account from which they

1  withdrew funds to pay for living and travel expenses. *Id.* Receiver has been unable to discern any
2  legitimate reason for the transfer of EIMT funds to Miller. *Id.*

### d. J.R. Trust transfers the remaining EIMT funds

At least $172,000 of EIMT investor funds were transferred to Bradshaw who is also listed as a manager and/or managing member of RAAR.[9] Anderson Decl. ¶ 15 and Exhibits 5, 6 and 7. Receiver has thus far been unable to recover any documentation concerning Bradshaw's use of the $172,000 in EIMT funds transferred to him from J.R. Trust. *Id.*

J.R. Trust disbursed any remaining EIMT funds in nominal amounts to various persons and/or bank accounts via wire transfer, checks and cash withdrawals. Anderson Decl. ¶ 10 and Exhibits 5, 6 and 7.

### 4. Receiver attempts to recover the $2.5 million

During the course of his investigation, Receiver contacted Hayward on several occasions to inquire as to the $2.5 million that was transferred by EIMT to J.R. Trust. Anderson Decl. ¶ 16. Hayward would not provide Receiver with any information, claiming that he never received any of the money and so was not responsible for its loss and/or return. *Id.* Receiver also contacted Schotts and requested that he return the $2.5 million. *Id.* ¶ 17 and Exhibits 17 and 18. In response, Schotts claimed that the $2.5 million was transferred as part of a legitimate lease of a "Floris Bank instrument." *Id.* ¶ 17 and Exhibit 16. On May 20, 2011, Receiver mailed a letter to Schotts requesting information and/or documentation confirming that the transaction was legitimate. *Id.* ¶17 and Exhibit 17. On May 27, 2011, Schotts responded to Receiver's demand in writing, stating: "J.R. Trust never had any agreement with EIMT or Global Mergers and Acquisitions, Inc. . . . . J.R. Trust did have an agreement with a different firm and did act accordingly based on that agreement." *Id.* ¶ 17 and Exhibit 18. Schotts produced documents to Receiver, however they do not contain any information (notably, no account statements or promissory notes) that would indicate that the $2.5 million was related to any legitimate investment activity.

---

[9] Despite his best efforts, Receiver has been unable to locate Mr. Bradshaw and thus has not named him as a Respondent in this disgorgement motion because he would be unable to serve Mr. Bradshaw with notice. Anderson Decl. ¶ 15.

1  Receiver brings this motion seeking an order of disgorgement of the $2.5 million against
2  Global Mergers, Hayward, J.R. Trust and Schotts ("Joint Tortfeasors"), jointly and severally,
3  anything purchased with that $2.5 million, any profits and for a full accounting. Anderson Decl.
4  ¶ X. Receiver also seeks the disgorgement of at least $228,387.50 transferred to RAAR and at
5  least $167,317.01 transferred to Miller, with any amount recovered acting as an offset to the $2.5
6  million owed by the Joint Tortfeasors. *Id.*

## ARGUMENT

**A.  The $2.5 Million Transferred to J.R. Trust Was Acquired in Constructive Trust for the Defrauded Investors**

The law of constructive trusts is well-established:

> A constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form. If one person having money or any kind of property belonging to another in his hands wrongfully uses it for the purchase of lands, taking the title in his own name; or if a trustee or other fiduciary person wrongfully converts the trust fund into a different species of property, taking to himself the title; or if an agent or bailee wrongfully disposes of his principal's securities, and with the proceeds purchases other securities in his own name -- in these and all similar cases equity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrongdoer, but as long as it can be followed and identified in whosesoever hands it may come, except into those of a bona fide purchaser for value and without notice, and the court will enforce the constructive trust for the benefit of the beneficial owner . . .

*Pioneer Mining Co. v. Tyberg*, 215 F. 501, 505-06 (9th Cir. 1914). The same rule is recognized in California Civil Code section 2224: "One who gains a thing by fraud, accident, mistake or undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Cal. Civ. Code § 2224.

A constructive trust will be imposed where a person obtains property by fraudulent representation or concealment. *Crosby v. Clark*, 132 Cal. 1, 5 (1901). Proof of actual fraud is not a prerequisite to the imposition of a constructive trust. Instead, "[t]he wrongful act giving rise to a constructive trust need not amount to fraud or intentional misrepresentation. All that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would be unjust enrichment." *Calistoga Civic Club v. Calistoga*, 143 Cal.App.3d

111, 116 (1983). Constructive trust is also imposed as a remedy for conversion. *Burlesci v. Peterson*, 68 Cal.App.4th 1062, 1069 (1998).

Here, there are two different schemes imposing a constructive trust on the $2.5 million. First, EIMT held the $2.5 million in constructive trust for the defrauded investors because Vassallo secured those funds from persons who believed he was investing their funds via the TradeStation brokerage and deriving profits for their benefit. He was not. He admitted that he falsified documents concerning his trading activity. Conrad Decl. ¶ 2. Those activities made him the involuntary trustee for those funds. When Vassallo transferred the funds to J.R. Trust, they remained in trust for the EIMT investors.

Second, the Joint Tortfeasors also obtained $2.5 million from EIMT under false pretenses, specifically, by claiming the funds would be used for "depository/custodial fees" and would permit Vassallo to share profits from the trading of securities (on behalf of EIMT) as part of a purportedly lucrative "Private Placement Trade Program" for the benefit of EIMT. Anderson Decl. ¶ 7 and Exhibits 1 and 2. Constructive trust is an appropriate remedy when the property holder would unjustly benefit "or the other would unjustly suffer loss." *Elliott v. Elliott*, 231 Cal.App.2d 205, 210 (1964). No trading on this "Private Placement Trade Program" ever took place. *Id.* ¶ 18. In fact, Receiver cannot confirm the existence of any "Private Placement Trade Program" – likely because it is another form of "prime bank securities" fraud. See generally Anderson Decl.; *see* John Reed Stark & N. Blair Vietmeyer, *The SEC and Prime Bank Securities Frauds: Past, Present and Future*, 31 Sec. Reg. L. Journal 4, 7 and n. 8 (Spring 2003). Instead, the Joint Tortfeasors took the money and quickly utilized it for their own benefit, including transferring large sums to undisclosed recipients, RAAR and Miller. *Id.* This transaction was a fraud at the outset and there is no reason the Respondents should be permitted to keep $2.5 million to the detriment of the EIMT investors.

Accordingly, the Joint Tortfeasors are the constructive trustees for the $2.5 million. Further, any funds transferred to RAAR and Miller, anything purchased with the funds and profits derived therefrom are also held in constructive trust for the EIMT investors. *Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 135 (1985); *Pioneer Mining Co.*, 215 F. at 505-06.

### B. Several Other Legal Theories Also Support A Return Of $2.5 Million To The Defrauded Investors

The Joint Tortfeasors should be required to the return of the $2.5 million to the defrauded EIMT investors for any number of additional reasons.

First, it appears that the Joint Tortfeasors perpetrated a fraud on or – at the very least – breached a fiduciary duty to EIMT. *See* 5 Witkin, California Procedure, *Pleading* § 710 (2008); *See Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal.App.4th 1022, 1044-1045 (1998)(listing elements for a cause of action for breach of fiduciary duty and fraud). They represented to Vassallo that in exchange for $2.5 million of investor money, EIMT would "share in the distribution of trade profits derived from a Private Placement Trade Program." Anderson Decl. ¶ 18 and Exhibits 1 and 2. J.R. Trust represented that it would act as fiduciary over the $2.5 million transferred by EIMT. *Id.* and Exhibit 2. The Joint Tortfeasors provided to EIMT documents, information on financial institutions and the contact information for various alleged "dealers" and/or "facilitators" located in Europe. *Id* ¶ 17 and Exhibit 18. All of these representations and documents were – of course – false, issued with the intent to deceive Vassallo, who relied upon the representations and transferred $2.5 million to J.R. Trust. See generally Anderson Decl.

Second, Global Mergers through Hayward and J.R. Trust through Schotts, breached their "investment contract(s)" with EIMT, through which EIMT was supposed to receive a monetary benefit in exchange for the payment of $2.5 million of EIMT investor funds. *See* 4 Witkin, California Procedure, *Pleading* § 515 (2008); *McDonald v. John P. Scripps Newspaper*, 210 Cal.App.3d 100, 104 (1989) (listing elements for a cause of action for breach of contract). EIMT wired the $2.5 million to Respondents, but never received anything in return, thereby causing damage to the EIMT investors. *Id.*

Finally, the Joint Tortfeasors solicited and converted $2.5 million of EIMT investor funds under the guise of an "investment" for which EIMT was to receive a benefit. *See* 5 Witkin, California Procedure, *Pleading* § 702 (2008); *Weiss v. Marcus*, 51 Cal.App.3d 590, 599 (1975)(detailing the elements required to succeed on a cause of action for conversion). In actuality, the "investment" was a sham and EIMT lost its $2.5 million. Anderson Decl. ¶ 18.

1  These facts are equally applicable to a cause of action for money had and received. *See* 4 Witkin, California Procedure, *Pleading* § 561 (2008); *Smith v. Randall*, 51 Cal.App.2d 195, 197 (1942)(detailing instances in which a complaint will state a cause of action for money had and received). Common examples of money had and received are actions to recover money paid under mistake, fraud or coercion or where the plaintiff has paid money pursuant to a contract that is void for illegality, fraud or mistake. *Id.* Given the facts detailed above concerning the fraudulent "investment transaction," both examples are equally applicable here.

The Joint Tortfeasors should be found liable to EIMT under all of the alternative legal theories detailed above as well.

### C. The Joint Tortfeasors Should Be Held Jointly And Severally Liable For The $2.5 Million

Hayward and/or Schotts may argue that he should not be responsible for the full $2.5 million transferred by EIMT, and instead, should be responsible for only the amount he received. That argument is unsupportable. It is well-established that a tortfeasor generally is liable for all damages proximately caused by his tortuous conduct. Where multiple tortfeasors are responsible for an individual injury suffered by the plaintiff, each tortfeasor is jointly and severally liable to the plaintiff for those damages and thus may be held individually liable to the injured plaintiff for the entirety of such damages. *Expressions at Rancho Niquel Association v. Ahmanson Developments, Inc.*, 86 Cal.App.4th 1135 (2001). Here, the Joint Tortfeasors acted together in defrauding EIMT of the $2.5 million for alleged entry into the "Private Placement Trading Program." Anderson Decl. ¶ 7 and Exhibits 1 and 2. Together, they persuaded Vassallo, by the use of fancy financial terms and complicated contracts, that he was investing $2.5 million as part of a legitimate financial transaction that would benefit the EIMT investors. See generally Anderson Decl. Instead of using the EIMT money for investment purposes, J.R. Trust subsequently transferred the $2.5 million for the Respondents' benefit. *Id.* When Receiver contacted Hayward and Schotts, both attempted to convince Receiver that this was a legitimate transaction and therefore they should not be responsible for repaying the $2.5 million. *Id.* ¶¶ 16, 17. Schotts even went as far as to forward to Receiver "information and documentation" purporting to support this phony transaction. Hayward

1  and Schotts acted as joint tortfeasors and should be jointly and severally responsible for the full
2  $2.5 million transferred from EIMT to J.R. Trust. *Id.* ¶ 19.

3  **D.  The Remaining Respondents Should Be Ordered To Disgorge The EIMT Funds They Received**
4

5  Receiver does not have enough information in his possession to fully comprehend or
6  explain to the Court the roles that RAAR and/or Miller played in this fraudulent transaction.
7  Anderson Decl.¶ X and Exhibit X. Accordingly, Receiver does not currently request that the Court
8  to hold these two Respondents jointly and severally liable as tortfeasors; however, it is
9  unquestionable that RAAR and Miller received significant sums of EIMT investor money to which
10 they were not entitled. Accordingly, under the constructive trust theory, these Respondents should
11 be required to return to Receiver the funds they received from EIMT, in RAAR's case,
12 $228,387.50, and in Miller's case, $167,317.01, anything purchased with those funds, and/or any
13 profits therefrom. Any amounts recovered from RAAR and Miller should act as an offset to the
14 $2.5 million owed by the Joint Tortfeasors. *Id.*

15                              **CONCLUSION**

16 Global Mergers & Acquisitions, Inc., William A. Hayward, J.R. Trust and Richard J.
17 Schotts, Jr. induced EIMT to transfer $2.5 million to J.R. Trust in exchange for a share of profits
18 realized from a "Private Placement Trading Program" which was to be a lucrative investment for
19 EIMT. No trading was ever initiated, nor did EIMT ever receive any return on its $2.5 million
20 "investment." Instead, the Joint Tortfeasors transferred and/or spent the money for their own
21 benefit. They should be required, jointly and severally, to disgorge the $2.5 million immediately,
22 anything purchased with that $2.5 million, including but not limited to any and all profits
23 therefrom.

24 While their role the fraudulent transaction is unclear, RAAR Investments, Ltd. and Jack
25 Miller received significant amounts of EIMT's $2.5 million for no legitimate reason. Under the
26 theory of constructive trust, RAAR Investments, Ltd. should be required to disgorge to Receiver
27 $228,387.50 and Jack Miller should be required to disgorge to Receiver $167,317.01. Any
28

1  amount recovered from these two respondents should be considered as an offset to the $2.5 million
2  owed by the Joint Tortfeasors.
3      The Respondents should also be required to provide Receiver with a full accounting.

5  Dated: July 28, 2011                    FUTTERMAN DUPREE DODD
                                            CROLEY MAIER LLP

7                                           By:   /s/ Jamie L. Dupree
                                                  Jamie L. Dupree
8                                           Attorneys for Receiver Stephen E. Anderson