UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

        NO. CIV. S-09-0665 LKK/DAD

    Plaintiff,

  v.

        O R D E R

ANTHONY VASSALLO, KENNETH
KENITZER, and EQUITY
INVESTMENT MANAGEMENT AND
TRAINING, INC.,

    Defendants.
                             /

    The Securities and Exchange Commission ("SEC") brought this suit against Anthony Vassallo, Kenneth Kenitzer, and the company they operated, Equity Investment Management and Trading, Inc. ("EIMT"). The Complaint alleges that defendants ran a "Ponzi" scheme that defrauded investors out of $40 million.[1]  Without

---

[1] Defendants are alleged to have violated: Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (all defendants); Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (all defendants, and aiding and abetting by Kenitzer); Sections 206(1) and (2) of the Investment Advisers Act of 1940, 17 U.S.C. §§ 80b-6(1) and 80b-6(2)

1

admitting or denying the allegations of the complaint, Vassallo and Kenitzer consented to the entry of permanent injunctions, and the court has entered consent judgments against both.[2]

Thereafter, EIMT was placed under the control of a Receiver, Stephen Anderson, who was appointed to marshal the assets of EIMT for the ultimate benefit of the defrauded investors.[3]  On July 31, 2009, the appointment of the Receiver was made permanent.[4]  The Receiver has now moved for the disgorgement of $100,000 from non-parties Elevate Communications ("Elevate") and Wright Thurston ("Thurston") (collectively, "respondents").  The Receiver alleges that $100,000 in defrauded investor funds were transferred, without consideration, from EIMT to Elevate at the direction of Thurston.

For the reasons that follow, the court will grant the Trustee's motion as to Elevate, but deny the motion as to Thurston, without prejudice to its renewal.

**I.    THE FACTS AND ALLEGATIONS**

In December 2008, respondent Wright Thurston ("Thurston") was

---

(Vassallo), and Sections 206(4) of that Act, and Rule 206(4)-8 thereunder, 15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8 (Kenitzer).  Dkt. No. 1 (Complaint).

[2] Dkt. Nos. 125 & 127 (Kenitzer Consent & Judgment); 220 & 228 (Vassallo Consent & Judgment).

[3] Dkt. No. 52; see SEC v. Wencke, 577 F.2d 619, 623 (9th Cir.) (district court acted within its discretion in appointing a receiver to protect the public investors) cert. denied, 439 U.S. 964 (1978); 15 U.S.C. § 78u(d)(5) (authorizing the district court to grant equitable relief necessary for the benefit of investors); 28 U.S.C. § 754 (governing the appointment of receivers in federal courts).

[4] Dkt No. 104.

2

founder, Chief Executive Officer, President and Chairman of the Board of respondent Elevate Communications ("Elevate"). Thurston Decl. (Dkt. No. 444) ¶ 1; Anderson Decl. (Dkt. No. 432) ¶ 8. On December 31, 2008, at Thurston's direction, Vassallo wired $100,000 from an EIMT account at Wells Fargo Bank to an Elevate account at the same bank.[5] Anderson Decl. ¶ 7; Thurston Decl. ¶ 12. That $100,000 is the subject of this disgorgement motion.

According to the Receiver, EIMT never received any benefit for the $100,000 Vassallo wired out of its bank account to Elevate. Anderson Decl. ¶ 7. Further, the Receiver's investigation did not uncover anything of value that Elevate had provided to EIMT in exchange for the $100,000, nor that Elevate had made any investment in EIMT. Id.

In defense, Thurston asserts that the $100,000 payment was a return of investment made by Elevate and another company he controlled, Homestead Protection, LLC (aka Homestar Protection, LLC). Thurston asserts that he attempted to have Elevate invest $18,000 in EIMT. According to Thurston, Vassallo instructed Elevate to wire its investment to an account at Bank of America. Thurston Decl. ¶ 9. Thurston asserts that he subsequently wired $18,000 into the account identified by Vassallo. Id. However, that account did not belong to EIMT. Thurston Decl. ¶ 9. Rather, Thurston asserts that the account belonged to "Trinity Capital

---

[5] Anderson's Declaration states that the transfer occurred at Thurston's direction. Thurston's Declaration does not dispute this.

Group, Inc." Thurston Decl. ¶ 9.[6] Accordingly, Thurston admits that he never wired any funds to any account owned by EIMT. See Thurston Decl. ¶ 9. Thurston admits that after wiring the money into the Trinity account, he became aware that it "was not an EIMT account." Thurston Decl. ¶ 9.[7]

Thus, Thurston is claiming that he too was a victim of Vassallo, in that he was deceived into transferring Elevate's money to Trinity, rather than to EIMT. However, Thurston's Declaration leaves it undisputed that Elevate did not provide anything of value to EIMT, even if it did invest $18,000 in Trinity.[8] Thurston goes on to assert that he "never personally received any of the $100,000.00 that was paid to Elevate." Thurston Decl. ¶ 12.

---

[6] Thurston claims that he did not determine what entity owned the bank account until after he had wired the $180,000. Thurston Decl. ¶ 9. He does not explain why he blindly wired $180,000 into an unknown bank account, other than that Vassallo told him to do so.

[7] However, he does not say how long after the transfer he learned this, leaving open the possibility that he knew it before he received the $100,000 transfer from EIMT. In other words, there is no dispute that Elevate received $100,000 from EIMT having provided nothing of value to EIMT. The only question is whether Thurston knew that Elevate had provided no value to EIMT.

[8] Thurston's Declaration goes on to claim that Homeland wired $180,000 to Trinity, also thinking, incorrectly, that it was investing in EIMT. Thurston also claims that Elevate then transferred some of the $100,000 to Homeland on the theory that it had been mistakenly sent to Elevate. The transfer of funds between Elevate, Homeland and Trinity do not appear to be relevant to this motion (except possibly to the extent it tends to show the absence of any formal controls over the money), since it is undisputed that none of these companies used the alleged $198,000 ($18,000 from Elevate plus $180,000 from Homeland), to benefit EIMT in any way. The circulation of money among these three therefore does appear to be connected to the transfer of $100,000 to Elevate.

4

**II. STANDARDS**

    **A.   Legal Standard for Disgorgement.**

        **1.   Authority to Order Disgorgement**

"[T]he district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of federal securities laws." SEC v. JT Wallenbrock & Associates, 440 F.3d 1109, 1113–14 (9th Cir.2006).[9]  These powers come expressly from the federal securities laws, 15 U.S.C. § 78u(d)(5) (district court may grant "any equitable relief that may be appropriate or necessary for the benefit of investors"), but more generally, from "common law principles of equity." See FTC v. Network Services Depot, Inc., 617 F.3d 1127, 1141-42 (9th Cir. 2010).

In the Ninth Circuit, this equity power extends to non-parties, often called "nominal defendants," who are "in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in the underlying securities enforcement action." SEC v. Ross, 504 F.3d 1130, 1141 (9th Cir. 2007).[10]  A disgorgement order will issue

---

[9] Citing SEC v. First Pacific Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998), cert. denied, 525 U.S. 1121 (1999).

[10] Citing SEC v. Colello, 139 F.3d 674, 675 (9th Cir.1998) (SEC may sue "nominal defendants"). Ross also cites SEC v. Hickey, 322 F.3d 1123, 1130–32 (9th Cir. 2003) (upholding the district court's exercise of jurisdiction over a corporation nominally owned by the defendant's mother and into which the defendant had channeled proceeds of his securities law violations) as amended, 335 F.3d 834; SEC v. Wencke, 783 F.2d 829, 838 (9th Cir.) (holding that the district court had jurisdiction over the assets of a corporation into which the defendant in the underlying enforcement

against a non-party "if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them." Ross, 504 F.3d, 1144 (citation and internal quotations omitted).[11]

The key here is that it is the "possession" of ill-gotten gains that triggers the right to disgorgement, not the commission of any wrong by the possessor of the funds:

> ample authority supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer <u>or by one who has received the proceeds after the wrong</u>.

SEC v. Colello, 139 F.3d 674, 676 (9th Cir. 1998) (emphasis added).

Although the federal securities laws expressly provide for whatever "equitable remedy" is needed to benefit the defrauded investors, the Ninth Circuit looks to the principles of the common law in determining whether disgorgement is appropriate. See Network Services, 617 F.3d at 1141-42. The remedy applicable in these cases is the "constructive trust":

> Constructive trust is a form of remedy that is "flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems

---

action had funneled proceeds of his securities law violations), cert. denied, 479 U.S. 818 (1986); and SEC v. Cherif, 933 F.2d 403, 414 (7th Cir. 1991) (discussing "nominal defendants"), cert. denied, 502 U.S. 1071 (1992).

[11] In Ross, the Ninth Circuit found that summary proceedings were not proper because the sole basis for the disgorgement was the wrong-doing of the non-parties. 504 F.3d at 1144 (the purpose of summary proceedings is "simply to 'obtain equitable relief from a non-party against whom no wrongdoing is alleged'").

6

> to call for it." It is a creature of the common law, rather than any federal statute.

Id., 617 F.3d at 1141–1142 (citation omitted). As applicable to these cases,

> At common law, where property has been obtained by fraud, a court in equity "has jurisdiction to reach the property either in the hands of the original wrong-doer, or in the hands of any subsequent holder" and to convey that property to "the one who is truly and equitably entitled to the same." Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 251 (2000).

Id., 617 F.3d at 1141–1142.[12]

### 2. Burdens of Proof

#### a. Disgorgement

The burden of proving that Elevate received defrauded investor funds rests with the Receiver. See Colello, 139 F.3d at 678 (district court correctly based its disgorgement order "on the SEC's proof of Colello's receipt of the funds of the victims");[13]

---

[12] Respondents rely upon the standards set forth in Donell v. Kowell, 533 F.3d 762 (9th Cir.), cert. denied, 555 U.S. 1047 (2008). However in Donell, the receiver sought disgorgement of the winning investor's funds pursuant to California's Uniform Fraudulent Transfer Act, Cal. Civ. Code §§ 3439.04(a)(1)-(2), which addresses debtor-creditor law. The Receiver in this case, however, is proceeding under the common-law theory of "constructive trust," and the statute governing "Involuntary Trusts," Cal. Civ. Code § 2224, which provides: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Respondents have made no attempt to explain why the debtor-creditor law of Section 3439.04(a) should be applied in this situation, and accordingly the court declines to do so.

[13] This proof was combined with an adverse inference from Colello's invocation of his Fifth Amendment privilege. Id.

7

accord SEC v. Better Life Club of America, Inc., 995 F. Supp. 167, 184 (D.D.C. 1998) ("plaintiff has carried its burden to show that the $50,000 was gratuitously given to relief defendant Lawson; as such, it is subject to disgorgement") aff'd mem., 203 F.3d 54 (D.C. Cir.), cert. denied, 528 U.S. 867 (1999).

The burden of establishing that Elevate was not entitled to the defrauded investor funds also appears to rest with the Receiver: "we emphasize that in the typical case, the creditor plaintiff must show that the nominal defendant has received ill gotten funds and that he does not have a legitimate claim to those funds"). Colello, 139 F.3d at 677 (emphasis in text).[14]

### b. Piercing the Corporate Veil.

The Receiver asserts that the court should pierce Elevate's corporate veil to reach Thurston's assets. It is the Receiver's burden to pierce the corporate veil. Gough v. Titus (In re Christian and Porter Aluminum Co., 584 F.2d 326, 338 (9th Cir. 1978). And it appears that California law governs the issue:

> "We apply the law of the forum state in determining whether a corporation is an alter ego" of an individual.

---

[14] The burden of proof here is not firmly established in the cases, and the cases have generally not discussed the burden of proving lack of entitlement to defrauded investor funds. See Colello, 139 F.3d at 677 n.3 ("Unfortunately, the cases discussing the use of nominal defendants are not explicit on this question" of the burden of proof). In Colello, the cited standard is arguably dicta, since it did not involve "the typical case." The case was atypical because Colello, the nominal defendant, had invoked his Fifth Amendment privilege, thus preventing the SEC from meeting what would otherwise be its burden of showing that he was not entitled to the funds. Id., 139 F.3d at 677-78. Accordingly, the district court shifted that burden to Colello, a move approved by the Ninth Circuit. Id., 139 F.3d at 677.

SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003), quoting Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1391 (9th Cir. 1993). Although these cases state the rule without reservations, it appears that in both cases the forum state was also the state of incorporation. It is not clear that the same rule would apply if the states were different. The parties argue that the laws of California and Utah are the same, and so no choice of law issue arises.[15]

Under California law, the court pierces the corporate veil (1) if "there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased," and (2) "an adherence to the fiction of the separate existence of the corporation would ... sanction a fraud or promote injustice." Hickey, 322 F.3d at 1128-29 (applying California law).[16]

---

[15] However, neither party considers whether the court should apply a federal common law of veil-piercing, since this is, at bottom, a case arising under the federal securities law. In another federal law context, the Supreme Court has noted the possibility of applying federal common law, without deciding it:

> There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing.

U.S. v. Bestfoods, 524 U.S. 51, 64 (1998).

[16] Accord Automotriz Del Golfo De California S. A. De C. V. v. Resnick, 47 Cal.2d 792, 796 (Cal. 1957) (same); Misik v. D'Arco, 197 Cal. App.4th 1065, 1071-1072 (2nd Dist. 2011) (same); Smith v. Grand Canyon Expeditions Co., 84 P.3d 1154, 1163 (Utah 2003) (same, applying Utah law); Seymour v. Hull & Moreland Engineering, 605 F.2d 1105, 1111 (9th Cir. 1979) (same, applying federal common law,

**III. ANALYSIS**

    **A.    Elevate**

The Receiver has established, and Respondents do not dispute, that EIMT was in possession of defrauded investor funds. It is further undisputed that EIMT wired $100,000 of those funds to Elevate. Those funds must be disgorged if the Receiver shows that Elevate is not entitled to them. In this case, however, Elevate's own admissions establish that it did not invest $18,000 in EIMT, nor provide anything else of value to EIMT. Accordingly, Elevate must disgorge the $100,000 it received from EIMT, to the Receiver.

    **B.    Thurston**

The Trustee asserts that the court should ignore Elevate as an entity, and order the disgorgement of Thurston's personal assets. Thurston, the Trustee argues, "has treated Elevate as his alter ego," and it would "promote injustice" to allow Thurston to escape personal liability. There is much to commend the Trustee's assertion, as it is clear that Elevate received the money without consideration, and Thurston himself appears to concede that Elevate will not be able to disgorge it.

However, <u>Hickey</u> appears to preclude piercing the corporate veil in this case. In <u>Hickey</u>, the Ninth Circuit (applying California law), held that the first part of the test for piercing the corporate veil required that the individual have <u>some</u> ownership

---

but adding as a factor, the consideration of "the fraudulent intent of the incorporators").

stake in the company, even if it is only one share (or one unit, in this case). In that case, although the non-party, Hickey, completely dominated the brokerage company whose corporate veil the SEC sought to pierce, that was not enough to pierce the veil, since Hickey had no ownership share. The Ninth Circuit was very clear about this:

> However much control Hickey may have over the Brokerage, he does not own any part of the Brokerage. According to the SEC, an individual need not own any part of a corporation for an alter ego relationship to exist. [¶] We disagree with the SEC's argument. Ownership is a prerequisite to alter ego liability, and not a mere "factor" or "guideline."

Hickey, 322 F.3d at 1128.

The Trustee argues that Thurston indirectly owns shares in Elevate. The Trustee asserts that Stephanie Thurston is Thurston's wife, and he has presented evidence that Stephanie Thurston is the "Manager" of Mommy Fitness, LLC, which in turn, is the majority unit holder of Elevate.[17] Assuming all of this is true, it does not make Thurston an owner of Elevate for purposes of piercing its corporate veil. Once again, Hickey is clear about this. In that case, the Ninth Circuit relied on the reasoning and holding of Riddle v. Leuschner, 51 Cal.2d 574 (1959). In Riddle, Leuschner's wife together with her step-son, owned the corporations at issue, even though Mrs. Leuschner had reduced her ownership to one (1) share. Leuschner himself did not own any shares in the company. However, Leuschner was the "managing employee of the two companies,

---

[17] See Dkt. No. 447-3 at p.3 (CM/ECF).

11

and his control over their affairs must be treated as that which would be exercised by a managing agent." Id. 51 Cal. 2d at 580.

The California Supreme Court pierced the corporate veil to reach Mrs. Leuschner's personal assets even though she owned only one (1) share of the corporation. Id. 51 Cal. 2d at 580-81. However, it refused to reach Leuschner's personal assets specifically because he owned no shares, and notwithstanding his managerial control over the companies. Id. It did not consider Leuschner's wife's shares to create in him the indirect ownership the Trustee asserts here, although it also did not directly address that possibility.

Based upon the Trustee's citation to Zaragosa v. Craven, 33 Cal.2d 315, 319-21 (1949), the court infers that he is arguing that Thurston's ownership of Elevate units is established by California community property law. The court notes that the Ninth Circuit has held, in an alter ego case, that a wife's community property interest in her spouse's stock holdings, "which arises under Cal. Civ. Code § 5105 (West 1985), is sufficient to satisfy the ownership requirement" which is the "threshold requirement" for finding alter ego liability. Firstmark Capital Corp. v. Hempel Fin. Corp., 859 F.2d 92, 94 (9th Cir. 1988). However, it appears that Cal. Civ. Code § 5105 – upon which Firstmark relied – has been repealed, and the parties have not advised the court on the current state of California community property law, nor whether Mrs. Thurston's ownership of Elevate units meets whatever requirements

////

12

may apply under that law.[18]

Accordingly, the court is not able to hold Thurston personally liable as the alter ego of Elevate, based on the Trustee's showing to this point. However, even if the Trustee were able to establish the "threshold" issue of Thurston's ownership of Elevate, his showing as to the other factors thus far, is not convincing, as set forth below (and keeping in mind that the Trustee bears the burden of proof here).

**1.  Undercapitalization.**

The trustee asserts that Elevate has not been properly capitalized "since at least as early as June 2009, and likely earlier." However, the Trustee's citation for this assertion is the Thurston Declaration, ¶ 6 and Exh. 3 & 4. However, Thurston's Declaration does not support this assertion. Rather, it states that although Elevate is <u>currently</u> unable to resolve certain claims filed against it in court, "From its organization through late 2009, Elevate was a properly capitalized ongoing concern." Thurston Decl. ¶ 5. Nothing in the Declaration or its supporting materials supports the Receiver's assertion that Elevate was inadequately capitalized "as early as June 2009, and likely

////

////

---

[18] For example, although the court makes no ruling on the subject, it may be that "[I]n California, property acquired prior to marriage is separate, while property acquired during the marriage is presumed community property." <u>Patrick v. Alacer Corp.</u> 201 Cal. App.4th 1326, 1339 (4th Dist. 2011).

13

earlier."[19]  The Receiver bears the burden of establishing undercapitalization, but he has cited only to evidence (Thurston's own Declaration) which fails to support such a claim.[20]

**2.   Corporate Formalities.**

The Receiver asserts that Elevate failed to observe the "corporate formalities," such as stock issuance, keeping of minutes, regular election of directors, appointment of officers, occurrence of regular board meetings, or filing of corporate tax returns.  The Receiver provides no legal or factual basis for this court to conclude that the "corporate formalities" he lists are actually required of Elevate, which purports to be a Utah limited liability company.[21]

Although it appears that California law governs the alter ego issue, and the court has applied that law above, it would appear that the specific "corporate formalities" applicable to it are those required by Utah statutes, under which Elevate is organized. See Salt Lake City Corp. v. James, 761 P.2d 42, 46 (Utah Ct. App. 1988), quoting Messick v. PHD Trucking Serv., Inc., 678 P.2d 791, 794 (Utah 1984).  It appears that Utah limited liability companies

---

[19] The court infers from the Trustee's language that he believes that the undercapitalization had to occur around the time of the fraudulent activities (since the funds were received in December 2008, and were emptied out of Elevate from January to June 2009).  Neither side offers any argument for or against this view.

[20] The Receiver also cites Exh. 4 of the Thurston Decl.  That document is a Utah "Record of Filing," the significance of which the Receiver does not explain.

[21] The Trustee does not contest Elevate's status as a Utah limited liability company.

14

are governed by the Utah Revised Uniform Limited Liability Company Act, U.C.A. § 48-3-101 (1953), et seq. The court's limited review of that law does not reveal that the listed formalities are required of Utah limited liability companies, with the possible exception of the filing of taxes. See U.C.A. § 48-3-208 (1)(c) (1953) ("certificate of existence for a limited liability company" shall include a statement of whether taxes have been paid).[22]

In addition, the Receiver has not made any showing that Elevate does not follow the corporate formalities he has listed, even assuming they are required.[23] To the contrary, Thurston's submission discloses, among other things: the issuance of "units," which are defined as units of ownership in the company; the role and election of "managers" (the applicable Utah law does not appear to require "directors"); the appointment of officers, including Thurston, and the delegation of authority to them; the role of Manager meetings; and the keeping of official records, including meeting minutes. The Receiver does not contest any of this, except by simple assertion.

////

---

[22] Certainly, there are formalities Utah limited liability companies must meet, but they are not the ones listed by the Receiver. For example, the company apparently must have an "operating agreement," see U.C.A. § 48-3-110 (1953), and "certificate of organization," see U.C.A. § 48-3-201 (1953), both of which Elevate has, according to Thurston's submission.

[23] The Receiver asserts that "there is insufficient evidence before the Court that Elevate complies with corporate formalities." Reply (Dkt. No. 447) at p.9. This has the burden reversed; it is the Receiver who bears the burden of showing that Elevate does not comply with corporate formalities.

15

### 3. Check Writing Authority.

The Receiver asserts that Thurston is a signatory on the Elevate bank account, and can withdraw or transfer money from the account. However, the Receiver does not explain the significance of the Chief Executive Officer being a signatory on the company bank account. The Trustee does not, for example, assert that Thurston used this authority to commingle Elevate's funds with his own.

### 4. Guaranty of Loan to Elevate.

The Trustee has provided evidence that on June 22, 2009, Thurston guaranteed a $305,000 loan to Elevate. See Touchstone Decl. Exh. 13 (Dkt. No. 447-3). Under California law, such a guarantee, when considered with other "unity of interest" factors, is pertinent:

> The requisite unity of interest and ownership in Ethridge's exertion of control over Aqualec is evidenced by several facts. Ethridge had absolute authority to act on Aqualec's behalf and was one of five members of Aqualec's board of directors. Ethridge owned twenty percent of the corporation's stock and his wife owned ten percent. In addition, Ethridge does not receive any compensation for his services as president of the corporation. The undercapitalization of the corporation is easily illustrated. Aqualec has no assets and most of its capitalization came from Ethridge. <u>Further evidence that Ethridge should be held individually liable for Aqualec's debt is that Ethridge personally guaranteed a loan extended to the corporation</u> which was used partially to pay for the litigation expenses of the original lawsuit, that Ethridge is now being sued for collection of the loans he personally guaranteed, and that until recently, Ethridge was paying the interest on the Aqualec loan personally. Moreover, there is no written agreement with respect to the monies expended by Ethridge with respect to the loan executed between Ethridge and Aqualec. Additionally, the checks made out to plaintiff for payment of legal services were drawn on

16

1  Ethridge's personal account.
2  <u>Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana
3  Hydrolec</u>, 854 F.2d 1538, 1543-44 (9th Cir. 1988) (per curiam)
4  (emphasis added).  Notably, several apparently key factors from
5  <u>Nilsson</u> are absent here, or at least the Trustee has made no
6  showing of them: absolute control by the individual; commingling
7  of funds; undercapitalization; capitalization coming principally
8  from the individual; and a lack of a written agreement regarding
9  the guaranteed loan.  The Trustee does not explain how the loan,
10  standing by itself, establishes the unity of interest needed to
11  pierce the corporate veil.

### 5. Personal E-mail Account.

13  The Trustee has provided evidence that Thurston received an
14  e-mail from Vassallo on his Gmail account.  <u>See</u> Anderson Decl. Exh.
15  6 (Dkt. No. 432-1).  However, the Trustee provides no support for
16  this conclusion that the Gmail account was Thurston's "personal"
17  e-mail account, as opposed to his regular business e-mail account.
18  Nor is there any evidence that this was the e-mail Thurston
19  normally used, as opposed to a one-off use captured by the Trustee.
20  Nor does the Trustee explain the relevance of a corporate employee
21  using a personal e-mail, once, for business.

## IV. CONCLUSION

23  The Trustee has made an adequate showing that Elevate received
24  $100,000 in defrauded investor funds to which it has no legitimate
25  claim.  The Trustee has not shown that Thurston received defrauded
26  investor funds, nor that this court should pierce Elevate's

17

1  corporate shield to reach Thurston's assets.
2      Accordingly:
3      1.   The Trustee's motion for disgorgement is **GRANTED** as to
4  Elevate.
5      2.   The Trustee's motion for disgorgement is **DENIED** as to
6  Thurston, **WITHOUT PREJUDICE** to its renewal upon a proper showing
7  that Thurston received defrauded investor funds, or that Elevate's
8  corporate shield should be pierced to reach Thurston's personal
9  assets.
10     IT IS SO ORDERED.
11     DATED:  May 21, 2012.

_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT